**ORAL ARGUMENT REQUESTED**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

Case Nos. 11-9533

US MAGNESIUM LLC,

*Petitioner,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondent.*

On Petition for Review of Final Action of the
U.S. Environmental Protection Agency

## PETITIONER'S FINAL MERITS BRIEF
## (DEFERRED APPENDIX APPEAL)

Michael A. Zody
Michael J. Tomko
Jacob A. Santini
Parsons Behle & Latimer
201 South Main Street, Suite 1800
Salt Lake City, UT 84111
Telephone: (801) 532-1234
Facsimile: (801) 536-6111

*Attorneys for Petitioner*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Petitioner US Magnesium LLC hereby certifies that US Magnesium LLC is a limited liability corporation organized under the laws of Delaware. US Magnesium LLC's sole member is the Renco Group, Inc., which is owned by trusts created for the benefit of Ira L. Rennert and members of his family. None of these entities are publicly held.

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES ................................................................ 1

JURISDICTIONAL STATEMENT .................................................................. 1

ISSUES PRESENTED FOR REVIEW ............................................................. 2

NATURE OF THE CASE.................................................................................. 2

STATEMENT OF FACTS................................................................................. 3

     1.    Regulatory Background ............................................................. 3

     2.    The Utah SIP ............................................................................. 5

     3.    EPA Malfunction Policy Statements ....................................... 5

     4.    Utah Proposed Revisions to the UBR....................................... 8

     5.    EPA's Proposed SIP Call......................................................... 10

     6.    EPA's Final Rule Finding the UBR Substantially Inadequate ....... 11

SUMMARY OF ARGUMENT ....................................................................... 12

STANDARD OF REVIEW ............................................................................. 13

STANDING .................................................................................................... 14

     1.    USM Suffered an Injury In Fact When the EPA Ordered Revisions to the UBR.................................................................... 15

     2.    USM's Injury is Directly Traceable to EPA's SIP Call.................. 18

     3.    USM's Injury Will be Redressed by a Favorable Judicial Decision ..................................................................................... 18

ARGUMENT .................................................................................................. 18

I.    EPA'S SIP CALL IS ARBITRARY AND CAPRICIOUS BECAUSE EPA FAILED TO SUPPORT ITS CONCLUSION THAT THE UBR RENDERED THE UTAH SIP SUBSTANTIALLY INADEQUATE WITH SUFFICIENT FACTS IN THE ADMINISTRATIVE RECORD ...................... 19

     A.    EPA Must Demonstrate the UBR is Substantially Inadequate Before it May Demand SIP Revisions ................................................. 20

     B.    EPA Failed to Support its Finding that the UBR Renders the Utah SIP Substantially Inadequate ................................................... 29

II.    EPA'S SIP CALL IS ARBITRARY AND CAPRICIOUS BECAUSE EPA RELIED EXCLUSIVELY ON POLICY STATEMENTS THAT HAVE NOT BEEN ADOPTED THROUGH RULEMAKING PROCEDURES............ 31

III.  EPA'S SIP CALL IS ARBITRARY AND CAPRICIOUS BECAUSE IT IS INCONSISTENT WITH ITS OWN POLICY STATEMENTS AND REGULATIONS ................................................................................... 34

    A.  EPA's SIP Call is Arbitrary and Capricious Because EPA Fails to Acknowledge that It Expressly Limited the 1999 Policy Memorandum to Applying to Future Requests for SIP Approval ............. 35

    B.  EPA's SIP Call is Arbitrary and Capricious Because EPA Summarily Concluded that the UBR is Inconsistent with the 1999 Policy Memorandum ................................................................. 36

    C.  EPA SIP Call is Arbitrary and Capricious Because it Demands that Utah Apply a Standard that EPA is Unwilling to Impose Upon its Own Regulations ................................................................... 40

4840-9219-7390.2

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL STATUTES**

5 U.S.C. § 553 ................................................................................................................32

5 U.S.C. § 706 ................................................................................................................13

42 U.S.C. § 7401(b)(1) ......................................................................................................3

42 U.S.C. §§ 7407(a) & 7410 ............................................................................................4

42 U.S.C. § 7409 ...............................................................................................................3

42 U.S.C. § 7410(a)(1) ....................................................................................................26

42 U.S.C. §§ 7410(a)(2)(H) & 7410(k)(5) ...............................................................13, 19

42 U.S.C. § 7410(c) ..........................................................................................................4

42 U.S.C. § 7410(k)(3) ........................................................................................4, 20, 24

42 U.S.C. § 7410(k)(5) ....................................................................................4, 18, 21, 22

42 U.S.C. § 7412 .............................................................................................................25

42 U.S.C. § 7607(b)(1) ......................................................................................................1

42 U.S.C. § 7607(d)(1) & (d)(9) .....................................................................................13

42 U.S.C. § 7607(d)(3)-(6) .............................................................................................32


**LEGISLATIVE HISTORY DOCUMENTS**

S. Rep. No. 91-1196 (1970) .......................................................................................26, 27


**FEDERAL REGULATIONS**

40 C.F.R. § 50.2 ................................................................................................................3

40 C.F.R. § 50.4 ..............................................................................................................31

40 C.F.R. § 52.2320(c)(6) ..................................................................5

40 C.F.R. § 60.8(c) .........................................................................41

40 C.F.R. § 63.6.............................................................................41


**FEDERAL REGISTER DOCUMENTS**

44 Fed. Reg. 28688 ...............................................................5, 38, 40

45 Fed. Reg. 10761 ...............................................................5, 39, 40

75 Fed. Reg. 70888 ......................................................................10

75 Fed. Reg. 77698 ......................................................................22

76 Fed. Reg. 21639 .........................11, 16, 18, 20, 21, 22, 29, 30, 32, 33, 36, 37, 38, 41


**STATE RULES**

Rule 207-107-1 ........................................................................5, 10

Rule 307-107-2 .........................................................................37

Rule 307-107-4 .........................................................................41


**FEDERAL CASES**

*Am. Farm Bureau Fed'n v. Envtl. Prot. Agency,*
    559 F.3d 512 (D.C. Cir. 2009)...................................................27

*Am. Petroleum Inst. v. Johnson,*
    541 F.Supp.2d 165 (D.D.C. 2008) ..............................................15

*Appalachian Power Co. v. Envtl. Prot. Agency,*
    208 F.3d 1015 (D.C. Cir. 2000)...............................................32, 33

*Appalachian Power Co. v. Envtl. Prot. Agency,*
    251 F.3d 1026 (D.C. Cir. 2001).................................................27

*Arizona Pub. Serv. Co. v. U.S. Envtl. Prot. Agency,*
562 F.3d 1116 (10th Cir. 2009) ................................................ passim

*Ballesteros v. Ashcroft,*
452 F.3d 1153 (10th Cir. 2006) ..................................................33

*BCCA Appeal Grp. v. U.S. Envtl. Prot. Agency,*
355 F.3d 817 (5th Cir. 2003) ......................................................25

*Catawba County v. Envtl. Prot. Agency,*
571 F.3d 20 (D.C. Cir. 2009) ......................................................13

*Citizens' Comm. to Save Our Canyons v. Krueger,*
513 F.3d 1169 (10th Cir. 2008) ..................................................14

*City of Colorado Springs v. Climax Molybdenum Co.,*
587 F.3d 1071 (10th Cir. 2009) ..................................................18

*Committee to Save the Rio Hondo v. Lucero,*
102 F.3d 445 (10th Cir. 1996) ....................................................15

*Commonwealth of Virginia v. Envtl. Prot. Agency,*
108 F.3d 1397 ......................................................................23, 28

*Connecticut Fund for Env't v. Envtl. Prot. Agency,*
696 F.2d 169 (2d Cir. 1982) ........................................................25

*County of Los Angeles v. Shalala,*
192 F.3d 1005 (D.C. Cir. 1999) ..................................................34

*Envtl. Defense Fund v. Thomas,*
870 F.2d 892 (2d Cir. 1989) ........................................................24

*Espinosa v. Roswell Tower, Inc.,*
32 F.3d 491 (10th Cir. 1994) ....................................................4, 26

*Florida Audubon Soc'y v. Bentsen,*
94 F.3d 658 (D.C. Cir. 1996) ......................................................16

*Greater Cincinnati Chamber of Commerce v. U.S. Envtl. Prot. Agency,*
879 F.2d 1379 (6th Cir. 1989) ....................................................28

*Hydro Res., Inc. v. U.S. Envtl. Prot. Agency,*
608 F.3d 1131 (10th Cir. 2010) (en banc) ..............................15, 18

*Illinois Bell Tel. Co. v. Fed. Commnc'n Comm'n,*
    740 F.2d 465 (7th Cir. 1984)................................................................35

*Interstate Contract Carrier Corp. v. United States,*
    389 F. Supp. 1159 (D. Utah 1974) .................................................34

*Kansas v. United States,*
    249 F.3d 1213 (10th Cir. 2001) .......................................................14

*Lignite Energy Council v. U.S. Envtl. Prot. Agency,*
    198 F.3d 930 (D.C. Cir. 1999)........................................................24

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555, 112 S.Ct. 2130 (1992)...........................................14

*Michelson v. Enrich Intn'l, Inc.,*
    6 Fed. Appx. 712 (10th Cir. 2001) ................................................16

*Michigan Dep't of Envtl. Quality v. Browner,*
    230 F.3d 181 (6th Cir. 2000) .........................................................20

*Michigan v. U.S. Envtl. Prot. Agency,*
    213 F.3d 663 (D.C. Cir. 2000).................................................13, 28

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29, 103 S.Ct. 2856 (1983) .............................................27

*Nat'l Ass'n of Clean Air Agencies v. Envtl. Prot. Agency,*
    489 F.3d 1221 (D.C. Cir. 2007).....................................................23

*Nat'l Gypsum v. U.S. Envtl. Prot. Agency,*
    968 F.2d 40 (D.C. Cir. 1992).........................................................27

*Natural Res. Def. Council v. Envtl. Prot. Agency,*
    643 F.3d 311 (D.C. Cir. 2011).......................................................33

*Natural Res. Def. Council v. U.S. Envtl. Prot. Agency,*
    824 F.2d 1146 (D.C. Cir. 1987).....................................................24

*New Jersey v. Envtl. Prot. Agency,*
    517 F.3d 574 (D.C. Cir. 2008).......................................................25

*Protocols, LLC v. Leavitt,*
    549 F.3d 1294 (10th Cir. 2008) .....................................................16

*Qwest Corp. v. Fed. Commc'n Comm'n,*
   258 F.3d 1191 (10th Cir. 2001) ...................................................22

*Raley v. Hyundai Motor Co., Ltd.,*
   642 F.3d 1271 (10th Cir. 2011) ..................................................14

*S. Coast Air Quality Mgmt. Dist. v. Envtl. Prot. Agency,*
   472 F.3d 882 (D.C. Cir. 2006) .....................................................3

*S. Utah Wilderness Alliance v. Bureau of Land Mgmt.,*
   425 F.3d 735 (10th Cir. 2005) ...................................................32

*S. Utah Wilderness Alliance v. Office of Surface Mining Reclamation &*
   *Enforcement,*
   620 F.3d 1227 (10th Cir. 2010) ..................................................15

*Sierra Club v. Envtl. Prot. Agency,*
   551 F.3d 1019 (D.C. Cir. 2008) ..................................................41

*Sierra Club v. Georgia Power Co.,*
   443 F.3d 1346 (11th Cir. 2006) ..............................................32, 35

*Sierra Club v. Jackson,*
   648 F.3d 848 (D.C. Cir. 2011) ...............................................4, 41, 42

*Tex Tin Corp. v. U.S. Envtl. Prot. Agency,*
   992 F.2d 353 (D.C. Cir. 1993) ...................................................27

*The Wilderness Soc'y v. Kane County,*
   632 F.3d 1162 (10th Cir. 2011) ..................................................14

*U.S. Telecom Ass'n v. Fed. Commc'n Comm'n,*
   400 F.3d 29 (D.C. Cir. 2005) .....................................................33

*United Keetoowah Band of Cherokee Indians of Oklahoma v. U.S. Dept. of Hous.*
   *& Urban Dev.,*
   567 F.3d 1235 (10th Cir. 2009) ..................................................14

*US Magnesium LLC v. U.S. Environmental Protection Agency,*
   No. 11-9533 (10th Cir. June 17, 2001) ...........................................1

*Utah Shared Access Alliance v. Carpenter,*
   463 F.3d 1125 (10th Cir. 2006) ..................................................14

*W.R. Grace & Co. v. U.S. Envtl. Prot. Agency,*
   261 F.3d 330 (3d Cir. 2001) ......................................................27

*West Virginia v. Envtl. Prot. Agency,*
    362 F.3d 861 (D.C. Cir. 2004) ........................................................................13

*WildEarth Guardians v. Jackson,*
    Case No. 1:09-cv-02109 (D. Colo., Sept. 3, 2009) ........................................9, 10

*Woods Petroleum Corp. v. Dept. of Interior,*
    47 F.3d 1032 (10th Cir. 1995) ......................................................................13

*Wright v. Fed. Bureau of Prisons,*
    451 F.3d 1231 (10th Cir. 2006) ....................................................................22

**OTHER AUTHORITIES**

*Am. Heritage Dictionary of the English Language* (1981) ....................................................23

*Webster's Third New International Dictionary of the English Language* (2002)................23

## GLOSSORY OF ACRONYMS

| | |
|---|---|
| CAA | Clean Air Act |
| EPA | Environmental Protection Agency |
| FIP | Federal Implementation Plan |
| NAAQS | National Ambient Air Quality Standards |
| $PM_{10}$ | Particulate Matter less than 10 micrometers in diameter |
| SIP | State Implementation Plan |
| $SO_2$ | Sulfur Dioxide |
| UBR | Utah Unavoidable Breakdown Rule |
| USM | US Magnesium LLC |

## STATEMENT OF RELATED CASES

Petitioners are not aware of any related cases or challenges to EPA's final rule Finding of Substantial Inadequacy of Implementation Plan; Call for Utah State Implementation Plan Revision.

## JURISDICTIONAL STATEMENT

This appeal arises from a petition to review the final action by the U.S. Environmental Protection Agency ("EPA") entitled "Finding of Substantial Inadequacy of Implementation Plan; Call for Utah State Implementation Plan Revision." 76 Fed. Reg. 21639 (April 18, 2011) ("EPA UBR SIP Call") USM Add 005, JA 01.

EPA promulgated the Final Rule pursuant to Clean Air Act ("CAA") §§ 110(a)(2)(H) & (k)(5). 42 U.S.C. §§ 7410(a)(2)(H) & (k)(5) (2006) (attached hereto as Exhibit B). This Court has jurisdiction to review EPA's UBR SIP Call pursuant to CAA section 307(b)(1). 42 U.S.C. § 7607(b)(1). Given that EPA's SIP Call demands revisions only to the Utah SIP, it is a regionally applicable rule that the Tenth Circuit Court of Appeals has exclusive jurisdiction over. *Id.*

Under the CAA, a petitioner is afforded 60 days from the date that a final rule is published in the Federal Register to file a petition for review. *Id.* EPA published the UBR SIP Call, a final rule, on April 18, 2011. Accordingly, the 60-day window closed on June 17, 2011. US Magnesium LLC filed its Petition for Review on June 17, 2011. Petition for Review, *US Magnesium LLC v. U.S. Environmental Protection Agency*, No. 11-9533 (10th Cir. June 17, 2001).

## ISSUES PRESENTED FOR REVIEW

I.    Is EPA's demand for revisions to the Utah SIP arbitrary and capricious because EPA failed to support its finding of substantial inadequacy with facts in the administrative record, thereby failing to meet its burden to demonstrate that Utah's Unavoidable Breakdown Rule ("UBR") renders the Utah SIP substantially inadequate?

II.    Is EPA's SIP call arbitrary and capricious due to EPA's reliance on policy statements that EPA has never elevated to legislative rules through traditional notice and comment rulemaking?

III.    Is EPA's SIP call arbitrary and capricious due to EPA's failure to fully account for its own statements and regulations that expressly limit EPA's malfunction policy and allow EPA's own regulations to operate identically to Utah's UBR?

## NATURE OF THE CASE

Utah's Unavoidable Breakdown Rule ("UBR") has been part of the state's EPA-approved State Implementation Plan ("SIP")—and therefore enforceable as federal law—since 1980. The UBR embodies a policy recognizing that even the best maintained air-pollution-control equipment may suffer an unexpected and unavoidable breakdown. Accordingly, the UBR grants operators of CAA-regulated facilities a narrowly drawn defense to unavoidable breakdown events by providing limited protection from enforcement action when such a malfunction occurs. But to be within the scope of the UBR's protection, the facility must be properly maintained and operated, and the source must also take *all* reasonable steps to minimize excess emissions during the course of a breakdown.

Thirty-one years after EPA approved the UBR, EPA has decided that the UBR so undermines its ability to enforce emission limitations against regulated entities that Utah must rewrite the UBR. The CAA does empower EPA to order such changes through what is called a SIP call, i.e. EPA is permitted to *call* for SIP revisions. But the CAA also imposes a significant burden on the EPA when it elects to issue such a SIP call; the EPA must find that the SIP is "substantially inadequate."

This appeal is centered on whether EPA's decision finding the UBR rendered the Utah SIP substantially inadequate was properly supported by the record and the law. Ultimately, EPA did not meet the substantially-inadequate standard and effectively lowered that standard to nearly no burden at all.

## STATEMENT OF FACTS

### 1.    Regulatory Background

When it enacted the Clean Air Act ("CAA"), Congress created a federal-state partnership for the purpose of "control[ling] and improv[ing] the nation's air quality." *Arizona Pub. Serv. Co. v. U.S. Envtl. Prot. Agency*, 562 F.3d 1116, 1118 (10th Cir. 2009); *see* 42 U.S.C. § 7401(b)(1). Under this cooperative relationship, EPA was to prescribe National Ambient Air Quality Standard ("NAAQS"). 42 U.S.C. § 7409; *Arizona Pub. Serv. Co.*, 562 F.3d at 1118. The NAAQS set limits for concentrations of six airborne pollutants: Carbon Monoxide, Lead, Nitrogen Dioxide, small particulate matter, Ozone, and Sulfur Dioxide. National Primary and Secondary Ambient Air Quality Standards, 40 C.F.R. § 50.2 (2010); *S. Coast Air Quality Mgmt. Dist. v. Envtl. Prot. Agency*, 472 F.3d 882, 887 (D.C. Cir. 2006).

In turn, the states have the primary obligation of implementing the NAAQS. 42 U.S.C. §§ 7407(a) & 7410. Each state implements the NAAQS through a State Implementation Plan ("SIP"), which outlines how the state intends to attain and maintain the NAAQS. *Id.* at § 7410(a)(1); *Arizona Pub. Serv. Co.*, 562 F.3d at 1119; *Sierra Club v. Jackson*, 648 F.3d 848, 851 (D.C. Cir. 2011). But the CAA does not terminate EPA's role in this partnership with the promulgation of the NAAQS. EPA maintains limited control over each SIP through CAA provisions that require the states to submit their SIPs to EPA for approval. *Espinosa v. Roswell Tower, Inc.*, 32 F.3d 491, 492 (10th Cir. 1994); *see* 42 U.S.C. § 7410(c) & (k)(3). EPA's review is critical because a SIP that is formally approved by EPA is enforceable as federal law. *Arizona Pub. Serv. Co.*, 562 F.3d at 1119; *Espinosa*, 32 F.3d at 492.

Once EPA approves a SIP through notice and comment rulemaking, the CAA restricts EPA's authority to force a state to alter the SIP's terms. The primary option available to EPA is to issue what is commonly referred to as a SIP call, whereby the EPA may call for plan revisions. 42 U.S.C. § 7410(k)(5). But to do so, EPA must "find[] that the applicable implementation plan for any area is substantially inadequate to attain or maintain the relevant [NAAQS] . . . or to otherwise comply with any requirement of [the CAA]." *Id.*[1]

---

[1] CAA section 110(a)(2)(H) requires the same result. Under this subsection, each SIP must provide for revisions "[w]henever the Administrator finds on the basis of information available to the Administrator that the plan is substantially inadequate to attain the [NAAQS] which it implements or to otherwise comply with any additional requirements established under [the CAA]." 42 U.S.C. 7410(a)(2)(H)(ii).

### 2.   The Utah SIP

To meet the Clean Air Act Amendments of 1977, Utah revised, and added to, its SIP in 1978.  40 C.F.R. § 52.2320(c)(6) (2010).  Among the additions to the Utah SIP was the UBR.  *Id.*  EPA reviewed Utah's amendments to the SIP—it specifically addressed the UBR—and approved the revised SIP in 1980.  Approval and Promulgation of Implementation Plans; Nonattainment Area Plan for Utah, 44 Fed. Reg. 28688, 28691 (proposed May 16, 1979) ("EPA UBR Proposed Approval"); Approval and Promulgation of State Implementation Plans; Nonattainment Area Plan for Utah, 45 Fed. Reg. 10761, 10763 (Feb. 19, 1980) ("EPA UBR Approval").

The UBR is currently codified as Utah Admin. Code Rule 307-107-1, *et seq.*, USM Add 003, JA 44-46.  This codification is essentially the same as the version that was originally submitted to EPA in 1978, and ultimately approved by the agency in 1980. *Compare* Utah Admin. Code r. 307-1-4.7 dated Jan. 1, 1992, docket number EPA-R08-OAR-2010-0909-0058, Joint Appendix ("JA") 154-55[2] *with* Utah Admin. Code r. 307-107-1, *et seq.* (2010), docket number -0022, JA 44-46.

### 3.   EPA Malfunction Policy Statements

EPA authored a number of policy memorandums that describe EPA's view on how excess emissions arising during periods of startup, shutdown, and malfunction ("SSM") ought to be treated under the CAA.  None of these policy memos has been

---

[2] For purposes of efficiency, USM's brief will hereafter refer to the docket underlying this appeal as "docket number –00XX," which is a reference to number that EPA assigned to each document as it was entered into the electronic docket. Additionally, USM certifies that citation to the record conforms to Tenth Circuit Rule 28.1(b).

subject to the Administrative Procedures Act's ("APA") notice-and-comment rulemaking procedures.

EPA issued the first of these on Sept. 28, 1982—some 2-1/2 years after EPA approved the UBR. *See* Memorandum by Kathleen M. Bennett, Assistant Administrator for Air, Noise and Radiation, "Policy on Excess Emissions During Startup, Shutdown, Maintenance, and Malfunctions," dated September 28, 1982, docket number -0060, JA 161-65 ("1982 Policy Memorandum"). This memorandum created a distinction between SSM policies that grant operators "automatic exemptions" from emission limitations due to malfunctioning equipment and "enforcement discretion" provisions targeting the same unavoidable breakdown. *Id.* at 1. EPA stated it will not approve any new SIP that contains an automatic exemption. *Id.*, attachment at 1. EPA's reasoning for this conclusion is brief; "[a]utomatic exemptions might aggravate air quality so as to not provide for attainment" of the NAAQS. *Id.*

Just five months later, EPA set out to clarify the 1982 Policy Memorandum. *See* Memorandum of Kathleen M. Bennett, Assistant Administrator for Air, Noise and Radiation, "Policy on Excess Emissions During Startup, Shutdown, Maintenance, and Malfunctions," dated February 15, 1983, docket no. -0059, at 1, JA 156-60 ("1983 Policy Memorandum"). The 1983 Policy Memorandum clarifies that malfunction exceptions in SIPs may apply to malfunctions during startup and shutdown. *Id.*

In 1999, EPA reaffirmed and expanded on the 1982 Policy Memorandum, but relied on the same conclusory basis for objecting to automatic exception provisions. *See* Memorandum by Steven A. Herman, Assistant Administrator for Enforcement and

Compliance Assurance, "State Implementation Plans (SIPs): Policy Regarding Excess Emissions During Malfunctions, Startup, and Shutdown," docket no. -0056, at 1, USM ADD 031, JA 141-150 ("1999 Policy Memorandum"). The 1999 Policy Memorandum made two important additions to EPA's then-existing policy. First, EPA announced it would recognize "affirmative defense provisions"—rules that allow facilities producing excess emissions a defense in an enforcement proceeding based on an unavoidable breakdown—as a second type of breakdown rule that EPA would approve. *Id.*, at 2 & attachment at 2. Second, EPA announced that it identified a new condition that EPA would not approve as a breakdown rule. That condition: any provision that appears to bar EPA or citizens from bringing an enforcement action independent from the state. *Id.* at 3.

Finally, in 2001, EPA issued a fourth policy memorandum on the subject. *See* Memorandum by Eric Schaeffer, Director of the Office of Regulatory Enforcement, and John S. Seitz, Director of the Office of Air Quality Planning and Standards, "Re-Issuance of Clarification—State Implementation Plans (SIPs): Policy Regarding Excess Emissions During Malfunctions, Startup, and Shutdown," dated Dec. 5, 2001, docket no. -0051, JA 131-32 (hereinafter the "2001 Clarification"). The 2001 Clarification states that the 1999 Policy Memorandum had no impact on previously-approved SIPs as the policy "was not intended to alter the status of any existing [SSM] provision in a SIP that has been approved by EPA." *Id.* at 1.

### 4. Utah Proposed Revisions to the UBR

During the same time period, Utah began the process to re-designate Utah and Salt Lake Counties as attainment areas for the $PM_{10}$ NAAQS. As part of that process, EPA

demanded that Utah revise the UBR in accord with the 1999 Policy Memorandum. Letter Ref 8P-AR from U.S. EPA Region 8 to Rick Sprott, dated Oct. 6, 2000, docket no. -0054, at 4, JA 136, 139. EPA did not cite any facts or evidence to support its demand. *Id.* Importantly, the EPA letter fails to create any factual nexus between the UBR and the attainment status of Utah and Salt Lake Counties and EPA cited no evidence of "substantial inadequacy" of the Utah SIP due to the UBR. Utah responded by agreeing that the UBR could be clarified, while not conceding any inconsistency with EPA's shifting SSM policy. Letter Re: Issues surrounding Utah's forthcoming $PM_{10}$ SIP revision, dated Jan. 17, 2001, docket no. -0053, at 2-3, JA 134-35; Letter from Richard Sprott, director of UDAQ to Richard R. Long, EPA Region VIII Director of Air and Radiation Program, dated April 18, 2002, docket no. -0048, at 2, JA 130.

Utah engaged in the time-consuming process of attempting to revise the UBR through notice-and-comment rulemaking. *See* Utah Dep't of Envtl. Quality; Rule & Plan Changes Open for Public Comment, printed on Sept. 21, 2004, docket no. -0039, at 2, JA 69; Notice of Public Hearing; Excess Emissions, printed on Sept. 14, 2004, docket no. -0040, at 1-4, JA 77-80. Utah's attempts to comply with EPA's demand involved a comprehensive re-write of the entire UBR. Public Comment Notice, docket no. -0040 at 6-12, JA 82-88. As part of this process, Utah officials invited EPA to a meeting in which EPA could explain the legal framework for its position that Utah's new rule must mirror the criteria of the 1999 Policy Memorandum. Excess Emissions Rule Meeting, docket no. -0035, JA 57-58. In preparation for the meeting, Richard Sprott, the then-director of

the DAQ, distributed an e-mail raising several questions targeting EPA's conclusion, including:

> 1.    . . . If EPA is requiring states to incorporate the policy as SIP rules, why hasn't EPA done a rulemaking to require such action?
>
> 2.    What is the exact legal argument/connection as to why ALL excess emissions must be violations or why no 'automatic exemptions' . . . ?
>
> 3.    If an area is monitoring attainment, how do excess emissions contribute to a violation?
>
> 4.    Why can EPA provide 'automatic exemptions' in NSPS but SIPs cannot? . . .

E-mail from Richard Sprott to Richard Long, et al., Meeting tomorrow, 10 AM, docket no. -0034, JA 54. Eventually, Utah drafted a replacement rule. Excess Emissions Draft, e-mail from Fred Nelson to Richard Long, et al., docket no. -0030, JA 47-52. EPA refused to accept any rule that differed in any way from the 1999 Policy Memorandum, leading Utah to abandon the revision process.

The issue remained unsettled until the WildEarth Guardians sued EPA, demanding that EPA issue a SIP call mandating the revision of the UBR. Complaint, *WildEarth Guardians v. Jackson*, Case No. 1:09-cv-02109 (D. Colo., Sept. 3, 2009), docket number -0008, JA 29-42. The case was short-lived as the parties settled the case and entered a consent decree in November 2009. Consent Decree, *WildEarth Guardians v. Jackson* Litigation, docket no. -0007, JA 23-28. In settling the matter, EPA agreed that it would issue a final decision on whether the UBR rendered Utah's SIP substantially inadequate by February 28, 2011. *Id.* at ¶ 5.

## 5.     EPA's Proposed SIP Call

EPA published a proposed rule in November 2010 that stated EPA was prepared to find Utah's SIP substantially inadequate.  Finding of Substantial Inadequacy of Implementation Plan; Call for Utah State Implementation Plan Revision, 75 Fed. Reg. 70888 (proposed Nov. 19, 2010), docket no. -0001, USM Add 019, JA 15 ("Proposed SIP Call").  Specifically, EPA stated that it believed Rule 307-107-1 renders the Utah SIP substantially inadequate because the Rule 307-107-1's phrase "emissions resulting from an unavoidable breakdown will not be deemed a violation of these regulations . . . undermines the ability to protect the NAAQS." *Id.* USM Add 022, JA 18.  EPA also argued that Rule 307-107-2 renders the Utah SIP substantially inadequate as well. *Id.* USM Add 023, JA 19.  In focusing on a phrase that requires the Utah Division of Air Quality's ("UDAQ") Executive Secretary to determine if a reported breakdown meets the requirements of the UBR, EPA argued that the UBR could be interpreted as vesting Utah with the exclusive authority to determine if a particular malfunction meets the requirements of the UBR. *Id.* at 70892.  EPA cited no authority for this speculative assertion.

USM submitted comments to EPA's Proposed SIP call on Dec. 30, 2010.  Letter Re: Proposed Rule Finding of Substantial Inadequacy of Implementation Plan, dated Dec. 30, 2010, docket number -0091, USM Add 041, JA 175-189 ( "USM's Comments").

## 6.     EPA's Final Rule Finding the UBR Substantially Inadequate

On April 18, 2011, EPA published a final rule finding the UBR renders Utah's SIP substantially inadequate.  EPA UBR SIP Call, USM Add 005, JA 01.  In doing so, EPA

ordered Utah to either remove the UBR from the SIP or re-write the UBR to comply with the 1999 Policy Memorandum. *Id.* USM Add 006, JA 02. If Utah refused, EPA would sanction the state by restricting federal highway funding, applying a 2-to-1 emission offset requirement for new sources, and EPA would replace the UBR with a Federal Implementation Plan ("FIP"). *Id.* USM Add 006-07, JA 02-03.

For the first time, EPA provided sparse factual data EPA claimed as supporting its conclusion that the UBR prevents Utah from meeting the NAAQS. *Id.* USM Add 009, JA 05. Most notably, EPA cited to a breakdown at the Holly Refinery in Woods Cross, Utah. *Id.* EPA, however, omitted the specific details of this breakdown from its final rule. On June 28, 2006, the Holly Refinery suffered a breakdown that led to the flaring of an estimated 10,800 pounds of $SO_2$. Letter by Michael S. Austin, Environmental Engineer for the Holly Refining and Marketing Company, dated June 28, 2006, docket number -0118, attachment 2 at 10, USM Add 056, JA 312-13 (hereinafter the "Holly Breakdown Report"). According to the Holly Breakdown Report, the Holly Refinery suffered a 9-hour breakdown when a blower drive belt broke, causing a shutdown of the facility's sulfur recovery unit. *Id.*, USM Add 056-57, JA 312-13. The belt had been replaced just two days earlier. *Id.*, USM Add 057, JA 313. In responding to the breakdown, the Holly Refinery called off-duty mechanics and the manufacturer to assist with the replacement. *Id.* EPA's final rule also failed to acknowledge that the docket contained information that proved this June 28 breakdown did not cause a violation of the NAAQS for $SO_2$; in fact, Utah did not have a single violation of the $SO_2$ NAAQS in

2006. *See* Utah Statewide NAAQS Summary, docket number -0120, USM Add 059, JA 402. In short, the Holly Refinery breakdown did not cause a NAAQS exceedance.

## SUMMARY OF ARGUMENT

To call for revisions to an existing EPA-approved SIP, EPA must affirmatively find that such a SIP is so "substantially inadequate" that the state cannot attain or maintain the NAAQS or otherwise comply with the CAA. EPA's final decision demanding revisions to the Utah SIP is arbitrary and capricious as EPA failed to legally or factually satisfy its burden.

First, EPA's UBR SIP Call is arbitrary because EPA refused to consider, let alone actually examine, whether it had sufficient facts in the administrative record to conclude the UBR rendered the Utah SIP substantially inadequate. EPA believes the UBR is substantially inadequate because it undermines compliance with the NAAQS. But EPA has refused to look to any facts developed over the last three decades that make the rule suddenly substantially inadequate. Such a refusal prevented EPA from connecting the UBR to any threat to the NAAQS, leaving EPA short of satisfying the substantially-inadequate standard.

Second, EPA's UBR SIP Call is arbitrary as EPA's basis for demanding revisions to the Utah SIP was premised on a theory that the UBR was substantially inadequate because it did not comply with the 1999 Policy Memorandum. But the memorandum is merely a policy statement that EPA never elevated to a legislative rule through notice-and-comment rulemaking. Accordingly, EPA cannot rely on such a policy statement—regardless of whether the policy is reasonable or not.

Finally, EPA's SIP Call is arbitrary because EPA failed to fully account for its own policies and regulations, which limit the 1999 Policy Memorandum and allow EPA's own regulations to operate identically to the UBR.

## STANDARD OF REVIEW

Generally, a judicial challenge to EPA's action under the CAA is analyzed under the standard of review provided in CAA section 307(d)(9). 42 U.S.C. § 7607(d)(1) & (d)(9). But section 307(d)(9) only applies to an enumerated list of rulemaking actions taken pursuant to the CAA, and a SIP call is not among these actions. *Id.*, § 7607(d)(1); *see Arizona Pub. Serv. Co. v. U.S. Envtl. Prot. Agency*, 562 F.3d 1116, 1123 n.4 (10th Cir. 2009) (finding that CAA section 307(d) "applies only to certain EPA rulemakings"). Accordingly, the APA's standard of review applies to the Court's review of a SIP Call. 5 U.S.C. § 706; *see also West Virginia v. Envtl. Prot. Agency*, 362 F.3d 861, 867 (D.C. Cir. 2004) (finding a SIP call "is subject to the [APA]"); *Michigan v. U.S. Envtl. Prot. Agency*, 213 F.3d 663, 681 (D.C. Cir. 2000) (applying the APA to the review of an EPA SIP call).[3]

An agency rulemaking is unlawful when it is "arbitrary, capricious, an abuse of discretion, or not in accordance with law." 5 U.S.C. 706(2)(A); *Woods Petroleum Corp. v. Dept. of Interior*, 47 F.3d 1032, 1037 (10th Cir. 1995). In reviewing agency action under the arbitrary and capricious standard, the Court must ascertain if the agency "'examined the relevant data and articulated a rational connection between the facts

---

[3] The standard of review under the Clean Air Act is the same as that set forth by the APA. *Catawba County v. Envtl. Prot. Agency*, 571 F.3d 20, 41 (D.C. Cir. 2009).

found and the decision made'" and "'considered all relevant factors and whether there has been a clear error of judgment.'" *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008) (quoting *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994)). Although this Court has described this standard as "narrow," that "does not mean that the [Court's] review is insubstantial." *United Keetoowah Band of Cherokee Indians of Oklahoma v. U.S. Dept. of Hous. & Urban Dev.*, 567 F.3d 1235, 1239 (10th Cir. 2009). Rather, the Court must "'engage in a substantial inquiry' and . . . conduct a 'thorough, probing, in-depth review.'" *Id.* (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814 (1971)).

## STANDING

The party wishing to invoke federal jurisdiction bears the burden of establishing standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130 (1992).[4] A party has standing when: "(1) it 'suffered an injury in fact;'" "(2) that injury is 'fairly

---

[4] Supreme Court jurisprudence divides standing into two threads: Article III standing and prudential standing. *The Wilderness Soc'y v. Kane County*, 632 F.3d 1162, 1168 (10th Cir. 2011). In addition to satisfying Article III standing, as argued *infra*, USM also satisfies the requirement for prudential standing. In the Tenth Circuit, prudential standing is often articulated as requiring (1) that the petitioner asserts its own legal rights, (2) the litigation is not aimed at generalized grievances, and (3) the appeal is within the zone of interest of the relevant regulations or statutes. *Raley v. Hyundai Motor Co., Ltd.*, 642 F.3d 1271, 1275 (10th Cir. 2011); *Utah Shared Access Alliance v. Carpenter*, 463 F.3d 1125, 1137 (10th Cir. 2006). The regulation that this appeal aims to vindicate is the UBR. As an entity directly regulated by the Utah SIP, and subject to the protection afforded by the UBR, USM is within the zone of interest of the relevant regulation and has asserted its own legal right to operate within the framework of the UBR as it has existed for more than three decades. *See Kansas v. United States*, 249 F.3d 1213, 1222 (10th Cir. 2001) ("For a plaintiff to have prudential standing under the APA, the interest sought to be protected by the complainant must be *arguably* within the zone of interests to be protected or regulated by the statute in question." (internal quotation marks omitted)).

traceable to the challenged action of the defendant;'" and "(3) that injury is likely to be 'redressed by a favorable decision.'" *Hydro Res., Inc. v. U.S. Envtl. Prot. Agency*, 608 F.3d 1131, 1144 (10th Cir. 2010) (en banc) (quoting *Lujan*, 504 at 560-61); *Committee to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 447 (10th Cir. 1996).

USM is not the direct object of EPA's SIP Call; the SIP Call directs Utah to revise the UBR. But standing "'is not precluded'" when the petitioner "'is not himself the object of the government action.'" *S. Utah Wilderness Alliance v. Office of Surface Mining Reclamation & Enforcement*, 620 F.3d 1227, 1233 (10th Cir. 2010) (quoting *Lujan*, 504 U.S. at 562). Indeed, standing is "usually self-evident when the plaintiff is a regulated party." *Am. Petroleum Inst. v. Johnson*, 541 F.Supp.2d 165, 176 (D.D.C. 2008). Here USM has standing as an entity regulated by the UBR. Nonetheless, USM meets the three-element test for standing.

### 1. USM Suffered an Injury In Fact When the EPA Ordered Revisions to the UBR

An injury in fact is demonstrated by showing "'an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'" *SUWA*, 620 F.3d at 1233 (*quoting Hydro Res., Inc.*, 608 F.3d at 1144). In regard to the "concrete and particularized" interest, the court's inquiry is focused on whether the party "is sufficiently involved in the current legal dispute to have a defined personal stake in the outcome." *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996); *see also Protocols, LLC v. Leavitt*, 549 F.3d 1294, 1298 (10th Cir. 2008) (stating that standing requires a party to have "such a personal stake in

the outcome of the controversy as to assure that concrete adverseness" (internal quotation marks omitted)); *Michelson v. Enrich Intn'l, Inc.*, 6 Fed. Appx. 712, 718 (10th Cir. 2001) (holding that a plaintiff lacked standing because it could not demonstrate the alleged injury was particularized as to him because he lacked a personal stake in the dispute).

In issuing its SIP Call, EPA directed Utah to "remove R307-107 or revise it to make it consistent with CAA requirements." EPA UBR SIP Call, USM Add 006, JA 02. At every turn in its final rule, EPA used the criteria contained in the 1999 Policy Memorandum as the benchmark for what an SSM provision must provide. *Id.*, USM Add 014, JA 10 ("We find that the criteria contained in the UBR are not as extensive or rigorous as the criteria in the 1999 Policy."); *id.*, USM Add 015, JA 11 ("We find that the UBR lacks the specificity contained in the 1999 Policy."); *id.*, USM Add 010, JA 06 (stating that the final rule is based upon EPA's interpretation found in the 1999 Policy Memorandum); *Id.*, USM Add 011, n.13, JA 07 (comparing the UBR to the 1999 Policy Memorandum automatic-exemption definition); *id.*, USM Add 011, JA 07 (discussing the 1999 Policy Memorandum conclusion that all periods of excess emissions must be violations). Accordingly, the outcome of EPA's final rule is concrete: Utah will either delete the UBR from the Utah SIP or will re-write it to correspond to the 1999 Policy Memorandum. Moreover, if Utah elects to do nothing—an unlikely scenario given the severe penalties EPA vowed to impose—EPA will promulgate a FIP replacing the UBR with an EPA promulgated rule. *Id.*, USM Add 006-07, JA 02-03. In short, the UBR will certainly be removed entirely or replaced with a new rule matching the 1999 Policy Memorandum.

Given that USM operates a facility regulated by the Utah SIP, USM has a personal stake in the outcome of EPA's SIP call. USM's process of extracting and refining magnesium from the Great Salt Lake produces off gasses that are regulated by a Title V permit under the CAA. (Declaration of David Gibby, USM Add 027 at ¶¶ 5 & 7). USM treats these off gasses with a series of pollution control equipment. USM has suffered unavoidable breakdowns in the past that have led to emissions in excess of its permit. (*Id.*, USM Add 028 at ¶¶ 8-9). In those instances of unexpected breakdowns, USM has curtailed its operations as much a possible while the affected pollution control equipment is quickly repaired. (*Id.*, ¶ 11). USM has reported the breakdowns to the UDAQ and has relied upon the UBR to provide it protection from an enforcement action. (*Id.*, ¶¶ 11, 14-18).

Given EPA's demand that Utah rescind or substantially rewrite the UBR, USM will not be afforded the same protection against an enforcement action as under the existing rule. Indeed, each instance that USM's pollution control equipment suffers an unexpected breakdown, USM could be deemed to have violated its permit, regardless of how vigilant USM has been in its efforts to prevent such a breakdown. Thus while EPA's SIP call directs the state of Utah to revise the UBR, USM is injured by the SIP call in a concrete and imminent way and has a personal stake in seeing that the UBR is maintained as it is currently enacted.

### 2. USM's Injury is Directly Traceable to EPA's SIP Call

An injury is "fairly traceable" to a challenged action "where there is a 'causal connection between the injury and the conduct complained of'—that is, where the injury

is the result of 'the challenged action of the defendant and *not the result of the independent action of some third party not before the court.*'" *City of Colorado Springs v. Climax Molybdenum Co.*, 587 F.3d 1071, 1080 (10th Cir. 2009) (quoting *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130). Any action that Utah takes to revise the UBR is necessarily dependent on EPA's SIP Call. EPA UBR SIP Call, USM Add 006-07, JA 02-03. Utah's revisions to the UBR are not the acts of an independent third party since EPA has dictated Utah's actions. Accordingly, USM's injury is directly caused by EPA's action.

### 3. USM's Injury Will be Redressed by a Favorable Judicial Decision

Standing also requires the petitioner to demonstrate that its injury will likely be redressed by a favorable decision. *Hydro Res., Inc.*, 608 F.3d at 1144. USM seeks vacatur of EPA's SIP Call. If the court does so, USM's injury will necessarily be redressed because Utah will not be required to revise the UBR.

### ARGUMENT

To issue a SIP call that satisfies the CAA, EPA must demonstrate that the SIP is so "substantially inadequate" that the state cannot meet the NAAQS or otherwise comply with its obligations under the CAA. 42 U.S.C. § 7410(k)(5). In issuing the UBR SIP Call, EPA effectively reduced its burden to a meaningless requirement. Such conduct is contrary to the CAA and renders EPA's decision to call for revisions to the Utah SIP arbitrary and capricious. EPA's arbitrary conduct is evident in numerous ways. First, EPA divorced itself from the standard contained in section 110(k)(5) by finding that it had no obligation to evaluate the actual effect that emissions produced during breakdown

events covered by the UBR had on the NAAQS. When EPA belatedly chose to provide cursory factual support, EPA failed to even look at its own record to see that the facts provided disproved its conclusion. Second, EPA undercut its burden by treating a policy statement as operating as a legislative rule without subjecting the policy to the crucible of formal rulemaking. Third, EPA downgraded its burden by disregarding its own policy statements and regulations governing SSM provisions. The CAA requires more and EPA's decision to call for revisions to the Utah SIP is arbitrary and capricious.

## I. EPA'S SIP CALL IS ARBITRARY AND CAPRICIOUS BECAUSE EPA FAILED TO SUPPORT ITS CONCLUSION THAT THE UBR RENDERED THE UTAH SIP SUBSTANTIALLY INADEQUATE WITH SUFFICIENT FACTS IN THE ADMINISTRATIVE RECORD

The CAA empowers EPA to call for SIP revisions when underlying air quality information calls for it. 42 U.S.C. §§ 7410(a)(2)(H) & 7410(k)(5). Reflecting the federal-state partnership that it created with the CAA, Congress limited EPA's authority to mandate SIP revisions to those instances where:

> the Administrator finds that the applicable implementation plan for any area *is substantially inadequate* to attain or maintain the relevant national ambient air quality standard, . . . or to otherwise comply with any requirement of this chapter.

*Id.*, § 7410(k)(5) (emphasis added). This statutory language burdens EPA—not the state, the regulated community, or citizen-plaintiffs—with the obligation of demonstrating that a SIP is "substantially inadequate" before EPA may demand SIP revisions. *Id.*

But in calling for revisions to Utah's SIP, EPA misconstrues its burden, effectively vesting itself with unchecked discretion to determine when a SIP is substantially

inadequate and leaving the administrative record devoid of facts that support EPA's putative finding of substantial inadequacy.

## A. EPA Must Demonstrate the UBR is Substantially Inadequate Before it May Demand SIP Revisions

Section 110(k)(5) of the CAA provides that when EPA finds an applicable SIP "substantially inadequate" to attain or maintain the NAAQS or to comply with the CAA, EPA shall issue a SIP call. 42 U.S.C. § 7410(k)(5). But the CAA's SIP call provision mandates that "[s]uch findings . . . shall be public." *Id.*[5]

In commenting on EPA's proposed SIP call, USM called on EPA to support its proposed finding with facts that demonstrate the UBR is preventing Utah from attaining or maintaining the NAAQS. USM Comments, USM Add 0041-44, JA 175-78. EPA responded by concluding it does not need to show any "causal link between any specific unavoidable breakdown excess emissions and violations of the NAAQS to conclude that the SIP is substantially inadequate." EPA UBR SIP Call, USM Add 009, JA 05. Rather,

---

[5] EPA appears to have merged its finding of substantial inadequacy with the question of whether the 1999 Policy Memorandum is a reasonable interpretation of the CAA. *See* EPA UBR SIP Call, USM Add 010, JA 06 (citing to cases in which federal courts have determined that EPA's interpretation in the 1999 Policy Memorandum was reasonable). EPA's conclusion is troubling for multiple reasons. For instance, EPA fails to adequately account for the fact that the favorable court rulings came in a challenge to EPA's decision to not include a SSM provision in an EPA promulgated FIP, *Arizona Pub. Serv. Co. v. U.S. Envtl. Prot. Agency*, 562 F.3d 1116, 1120 (10th Cir. 2009), and a disapproval of a SIP with a new excess emission rule. *Michigan Dep't of Envtl. Quality v. Browner*, 230 F.3d 181, 183-84 (6th Cir. 2000). The standard in both of these instances is not the same as what is required by section 110(k)(5). *Compare* 42 U.S.C. § 7410(k)(3) (authorizing EPA to approve a SIP submission if it meets "the applicable requirements" of the CAA), *with id.* § 7410(k)(5) (authorizing EPA to demand for SIP revisions only after finding a SIP is "substantially inadequate"). Moreover, EPA's argument fails to account for the fact that the 1999 Policy Memorandum was never subject to rulemaking and cannot form the sole basis for concluding that the UBR is substantially inadequate. *See infra*, Part II.

EPA determined that it may skip any need for factual data because it is free to order the revision of a SIP whenever it presumes a SIP may undermine the "fundamental integrity of the CAA's SIP process." *Id.* In short, EPA believes it may arbitrarily select SIPs for revisions, with or without evidence. EPA's standard appears to authorize EPA to issue a SIP call anytime there is a marginal question going to the "integrity" of the SIP. In truth, such a standard plays out as what the EPA deems a substantially inadequate SIP provision must necessarily be substantially inadequate.[6] That is not what Congress intended in vesting EPA with the authority to issue a SIP call. Indeed, the limited caselaw, the legislative history behind section 110(k)(5), and the words Congress chose in enacting section 110(k)(5) demonstrate that EPA's burden is higher than what it set out in this rulemaking.

Congress' intent to laden EPA with a significant burden when EPA requires revisions to a federally-enforceable SIP is evident in the text of section 110(k)(5). After EPA approves a SIP, section 110(k)(5) demands that EPA affirmatively find that a SIP is "substantially inadequate" to attain or maintain the NAAQS or to otherwise comply with the CAA. 42 U.S.C. § 7410(k)(5). Under the plain language of section 110(k)(5), the term "substantially inadequate" modifies both the "attain or maintain the relevant [NAAQS]" and the "to otherwise comply with any requirement of this chapter" phrases.

---

[6] At one point, EPA states that commenters have the burden of disproving EPA's finding of substantial inadequacy. EPA UBR SIP Call, USM Add 012, JA 08 (chastising commenters for failing to provide data showing that there was no NAAQS exceedance that corresponds to a reported unavoidable breakdown).

*Id.*[7] Stated differently, the EPA's burden in issuing a SIP call is to demonstrate that the SIP is substantially inadequate to attain or maintain the NAAQS or is substantially inadequate to comply with the CAA.

Despite the significance of the term "substantially inadequate," EPA made no effort to define the phrase in this rulemaking.[8] This failure to define the terms of the regulation that EPA is applying renders the final rule arbitrary. *See Qwest Corp. v. Fed. Commc'n Comm'n*, 258 F.3d 1191, 1201-02 (10th Cir. 2001) (stating that when an agency fails "to define the terms at all . . . deference is inappropriate" and the court is "unable to conclude that the [agency's] actions are rational"). Nonetheless, by using the term "substantially inadequate"—as opposed to just using the word inadequate—Congress deliberately raised the burden that EPA must carry to issue a SIP call. *See Wright v. Fed. Bureau of Prisons*, 451 F.3d 1231, 1234 (10th Cir. 2006) (stating that the court must read the words of a statute "in their context and with a view to their place in the overall statutory scheme" (internal quotation marks omitted)). Indeed, such language appears to recognize that SIPs can be imperfect documents. But for EPA to disrupt the status quo, it must demonstrate that the SIP is so substantially inadequate that the state

---

[7] In the final rule, EPA applied the term "substantially inadequate" as modifying the otherwise-comply-with-the-CAA requirement. *See* EPA UBR SIP Call, USM Add 007, JA 03 ("Because a court could interpret R307-107-2 as undermining the ability of EPA and citizens to independently exercise enforcement discretion granted by the CAA, it is substantially inadequate to comply with CAA requirements related to enforcement.").

[8] EPA's silence in this regard is confounded by the fact that in previous rulemakings, EPA has acknowledged that it is obligated to define the term. *See* Action to Ensure Authority to Issue Permits Under the Prevention of Significant Deterioration Program to Sources of Greenhouse Gas Emissions: Finding of Substantial Inadequacy and SIP Call, 75 Fed. Reg. 77698, 77705 (Dec. 13, 2010).

cannot attain the NAAQS or comply with the CAA so long as the provision remains part of the SIP.

Moreover, substantially means something that is "[c]onsiderable in importance, value, degree, amount, or extent." *The Am. Heritage Dictionary of the English Language*, 1284 (1981); *see also Webster's Third New International Dictionary of the English Language*, 2280 (2002) (defining "substantial" as "considerable in amount, value, or worth," and "being that is specified to a large degree or in the main"). Substantial is a term that enhances the degree, or level, of proof necessary. Accordingly, by imposing the substantially-inadequate standard, Congress raised the degree of evidence that is necessary to support an EPA SIP call. EPA must point to information that, to a considerable or substantial degree, calls into question Utah's ability to attain or maintain the NAAQS or comply with the CAA before EPA may legally issue a SIP call. EPA cannot merely *assume* that a provision may prevent the state from attaining the NAAQS. *Commonwealth of Virginia v. Envtl. Prot. Agency*, 108 F.3d 1397, 1415 (D.C. Cir. 1997, *modified on other grounds in Commonwealth of Virginia v. Envtl. Prot. Agency*, 116 F.3d 499 (D.C. Cir. 1997).

This result is further illuminated through a comprehensive understanding of the CAA. The CAA routinely vests EPA with broad discretion to take regulatory action in favor of clean air. The federal courts have found that in certain circumstances Congress "delegated expansive authority to the EPA to enact appropriate regulations." *Nat'l Ass'n of Clean Air Agencies v. Envtl. Prot. Agency*, 489 F.3d 1221, 1230 (D.C. Cir. 2007). But the key to such expansive authority is the statutory language that empowers EPA to act.

Indeed, EPA generally is afforded such discretion under the CAA when it is authorized to act in "his judgment," with "discretion," as "may be appropriate," or as the Administrator "may distinguish." *See id.* (finding EPA has broad discretion under a statute empowering the Administrator to act "in his judgment" and as "he deems appropriate"); *Lignite Energy Council v. U.S. Envtl. Prot. Agency*, 198 F.3d 930, 932-33 (D.C. Cir. 1999) (recognizing by using the term "the Administrator *may* distinguish" in CAA section 111, Congress vested EPA with "considerable discretion"); *Envtl. Defense Fund v. Thomas*, 870 F.2d 892, 898 (2d Cir. 1989) (analyzing the term "as may be appropriate" in CAA section 109(d) to afford EPA discretion); *Natural Res. Def. Council v. U.S. Envtl. Prot. Agency*, 824 F.2d 1146, 1153-54 (D.C. Cir. 1987) (stating that "Congress chose" to vest the Administrator with "discretion to deal with uncertainty" in section 112 by instructing EPA to set emission standards for hazardous air pollutants that "in his judgment will provide an ample margin of safety").

Congress, however, did not vest EPA with the same expansive discretion in section 110(k)(5). It limited EPA's authority to only those instances in which the SIP is substantially inadequate to attain the NAAQS or to comply with the CAA. The significance of the substantially-inadequate standard is illustrated through a comparison of the language Congress used to empower EPA to approve or disapprove a SIP in the first instance against the language used to authorize EPA to issue a SIP call. Under section 110(k)(3), EPA is required to "approve such [a SIP] as a whole if it meets all of the applicable requirements of this chapter." 42 U.S.C. § 7410(k)(3). Section 110(k)(3) vests EPA with "substantial discretion in its assessment of what constitutes an approvable

SIP." *BCCA Appeal Grp. v. U.S. Envtl. Prot. Agency*, 355 F.3d 817, 846 (5th Cir. 2003); *Connecticut Fund for Env't v. Envtl. Prot. Agency*, 696 F.2d 169, 173 (2d Cir. 1982). In contrast, section 110(k)(5) authorizes EPA to issue a SIP call only after finding the SIP is "substantially inadequate." By adding the modifier "substantially," Congress purposefully limited EPA's authority to issue a SIP call; section 110(k)(5) heightens the burden that EPA carries to demand revisions to a previously-approved SIP.

The D.C. Circuit's analysis of the statutes underlying the listing and delisting of sources emitting Hazardous Air Pollutants ("HAPs") further illustrates this point. To list certain electric generating units as sources of HAPs, EPA is merely required to find that doing so is "appropriate and necessary." 42 U.S.C. § 7412(n). But to delist such a source, EPA must make "specific findings," as enumerated by section 112(c)(9). *New Jersey v. Envtl. Prot. Agency*, 517 F.3d 574, 578 (D.C. Cir. 2008); 42 U.S.C. § 7412(c)(9). Congress "undoubtedly can limit an agency's discretion to reverse itself, and in section 112(c)(9) Congress did just that, unambiguously limiting EPA's discretion to remove sources . . . from the section 112(c)(1) list once they have been added to it." *New Jersey*, 517 F.3d at 583.

Likewise, Congress limited EPA's authority to reverse course regarding SIPs that EPA had previously approved. The limitation in section 110(k)(5) is plain: the EPA must find the SIP is substantially inadequate. And to do so, it must point to facts that support its finding that Utah's SIP is so substantially inadequate that Utah cannot attain or maintain the NAAQS or comply with the CAA so long as the disputed provision remains a part of the SIP.

This reading is in accord with the federal-state partnership created through the CAA. The CAA calls upon the state—not EPA—to generate a plan for controlling the air pollutants and attaining the NAAQS. 42 U.S.C. § 7410(a)(1); *Arizona Pub. Serv. Co.*, 562 F.3d at 1119. If EPA approves the state's plan, the SIP is federally enforceable. *Arizona Pub. Serv. Co.*, 562 F.3d at 1119; *Espinosa v. Roswell Tower, Inc.*, 32 F.3d 491, 492 (10th Cir. 1994). The state and the regulated community may reasonably take comfort in the fact that if they work toward complying with an EPA-approved SIP, EPA will not come in on a whim and reshape the regulatory landscape. Thus, the EPA's discretion is limited in the context of a SIP call. In contrast, EPA's discretion is substantial when it considers whether to approve or disapprove a SIP in the first instance because there can be no reliance upon the SIP until it is federally enforceable.

The legislative history behind section 110(k)(5) also reveals that Congress intended to limit EPA's authority to issue a SIP call. In considering the 1970 CAA Amendments, the Report of the Senate Committee on Public Works provides:

> Whenever the Secretary of his representative finds from *new information developed after the plan is approved* that the plan is not or will not be adequate to achieve promulgated ambient air quality standards he must notify the appropriate States and give them an opportunity to respond to the new information.

S. Rep. No. 91-1196, at 55-56 (1970) (emphasis added). The same committee report also states that "[w]henever *information reveals* that an approved or promulgated implementation plan is inadequate, the Secretary would be required to act to revise such plan." *Id.* at 14 (emphasis added). This language evidences that Congress recognized that circumstances may change such that a previously-approved SIP may become

deficient. *Id.* But at the same time, Congress plainly intended to restrict EPA's ability to demand revisions to a previously-approved SIP to those circumstances in which "new information" reveals the plan is substantially inadequate to attain the NAAQS.

Federal jurisprudence also requires that EPA do more than cite to the "magic words" alone to support a finding. *W.R. Grace & Co. v. U.S. Envtl. Prot. Agency*, 261 F.3d 330, 340 n.3 (3d Cir. 2001). Indeed, the federal courts have been very clear on this point; a finding must be based upon more than a statement or opinion, but must have support in the record. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856 (1983) ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." (internal quotation marks omitted)); *see also Am. Farm Bureau Fed'n v. Envtl. Prot. Agency*, 559 F.3d 512, 520 (D.C. Cir. 2009) ("An agency's failure to adequately consider a relevant and significant aspect of a problem may render its rulemaking arbitrary and capricious."); *Appalachian Power Co. v. Envtl. Prot. Agency*, 251 F.3d 1026, 1034 (D.C. Cir. 2001) (stating that a "failure to examine the relevant data and articulate a satisfactory explanation for its action either is arbitrary decision-making or at least prevents a court from finding it non-arbitrary" (internal quotation marks omitted)); *Tex Tin Corp. v. U.S. Envtl. Prot. Agency*, 992 F.2d 353, 356 (D.C. Cir. 1993) (stating that "the Agency was not entitled merely to assume" underlying facts); *Nat'l Gypsum v. U.S. Envtl. Prot. Agency*, 968 F.2d 40, 43-44 (D.C. Cir. 1992) (holding that "unsupported assumptions" may not form the basis of action by EPA). Indeed, "EPA must 'demonstrate a reasonable connection between the facts on the

record and its decision' made pursuant to its statutory authority." *Michigan v. U.S. Envtl. Prot. Agency*, 213 F.3d 663, 681 (D.C. Cir. 2000) (quoting *Ethyl Corp. v. Envtl. Prot. Agency*, 51 F.3d 1053, 1064 (D.C. Cir. 1995)); *see also Greater Cincinnati Chamber of Commerce v. U.S. Envtl. Prot. Agency*, 879 F.2d 1379, 1381 (6th Cir. 1989) (noting that modeling showed predicted violations of sulfur dioxide were likely to occur).

The case of *Commonwealth of Virginia v. Envtl. Prot. Agency*, is instructive as to the burden that EPA carries in calling for SIP revisions through section 110(k)(5). In that instance, EPA issued a SIP call to 13 states based upon a theory that ozone concentrations "snowball" as ozone, and its two primary precursor chemicals, travel northward along the Eastern seaboard. *Commonwealth of Virginia*, 108 F.3d at 1401 & 1414. Given that Virginia was the only state to challenge the SIP call, the court considered whether to only vacate EPA's final rule as it applied to Virginia. *Id.* at 1414. Without including Virginia in the plan, EPA's modeling—and basis for its SIP call—fell apart; "[i]n the absence of applicable modeling, no such agency finding could be made." *Id.* at 1415. Accordingly, the court invalidated the entire SIP call. *Id.*

The need for actual data is particularly necessary where EPA theorizes that a SIP provision is inadequate because it undermines the state's ability to attain or maintain the NAAQS. *Id.* at 1414-15 (finding that without the EPA's modeling on how ozone concentrations accumulate "there is no existing basis for these SIP calls"). In the UBR SIP Call, the EPA found that the Utah SIP was substantially inadequate because the UBR "undermines the ability to ensure compliance with SIP emission limitations relied on to achieve the NAAQS." EPA UBR SIP Call, USM Add 007, JA 03. In using this

language, EPA directly questioned whether Utah can comply with the NAAQS due to the UBR. With that question squarely before it, the actual correlation between breakdown events subject to the UBR and the NAAQS became inherently relevant data to the EPA's ultimate conclusion.

Given the foregoing caselaw, statutory text, and legislative history underlying section 110(k)(5), it is evident that EPA must demonstrate that the Utah SIP is substantially inadequate by citation to evidence and data demonstrating that the UBR is preventing Utah from attaining or maintaining the NAAQS or otherwise complying with the CAA.

**B.** **EPA Failed to Support its Finding that the UBR Renders the Utah SIP Substantially Inadequate**

In promulgating its final rule calling for revisions to the Utah SIP, EPA determined that it had no obligation to provide any factual support for its conclusion that the UBR prevents Utah from attaining or maintaining the NAAQS or complying with the CAA. EPA UBR SIP Call, USM Add 009, JA 05. This conclusion is incorrect, particularly where the EPA claims a SIP provision undermines the NAAQS. If EPA wished to require revisions to the UBR through its authority under section 110(k)(5), EPA was obligated to provide a factual connection between the UBR and a genuine threat to the NAAQS. EPA's refusal to do so leaves its conclusion arbitrary and capricious as EPA failed to consider and examine relevant factors and data.

EPA did, however, put forward a belated alternative argument based upon facts that it "note[d]" as supporting its conclusion that the UBR causes NAAQS exceedances.

*Id.* EPA notes that several counties along the populated Wasatch Front are designated as nonattainment areas for several pollutants. *Id.* EPA then goes on to cite to a specific breakdown by the Holly Refinery in June 2006 that led to a 9-hour period in which the refinery flared nearly 11,000 pounds of $SO_2$. *Id.* The evident purpose of this information was to imply that breakdowns cause such large amounts of excess emissions that they will undoubtedly lead to violations of the NAAQS. But EPA failed to examine its own record when it cited to this breakdown as the supposed smoking gun demonstrating the UBR prevents Utah from attaining the NAAQS. If EPA would have, it would have known the Holly-Refinery breakdown did not cause a NAAQS violation. According to EPA's own summary of Utah's recent exceedances of the NAAQS, there was not a single $SO_2$ violation in 2006. Utah NAAQS Exceedance Data, USM Add 059, JA 402.[9]

If EPA truly believed that the Holly-Refinery breakdown so irrefutably proved that the UBR renders the Utah SIP substantially inadequate, the least it could have done was check its own record to determine if it was possible that the breakdown caused a violation of the NAAQS. Moreover, if this was evidence that proved EPA's finding, one would expect that EPA would take the next step, as required by section 110(k)(5), of

---

[9] EPA added both the Holly Refinery data and Utah's history of NAAQS exceedances to the administrative record on April 18, 2011, the same day that it published its final rule calling for revisions to the Utah SIP. *See* Docket Folder Summary: Finding of Substantial Inadequacy of Implementation Plan; Call for Utah State Implementation Plan Revision, Docket ID: EPA-R08-OAR-2010-0909, *available at* http://www.regulations.gov/#!docketDetail;dct=FR%252BPR%252BN%252BO%252BP S%252BSR;rpp=250;po=0;D=EPA-R08-OAR-2010-0909. Recognizing that EPA had precluded the public from commenting on this information that was inherently weak and did not in fact support its conclusion, USM filed a Petition for Reconsideration with EPA. As of the time of the filing of USM's opening brief, EPA has not responded in any way to USM's Petition for Reconsideration.

inquiring into the specific ambient air monitoring data collected around the Holly Refinery to determine if the breakdown pushed ambient air quality toward a violation of the $SO_2$ NAAQS. The ambient air monitoring data is of particular importance in this context because the 11,000 pounds of $SO_2$ that the EPA cited to is meaningless when attempting to consider the ambient air concentration, which is measured by a standard of parts per million. 40 C.F.R. § 50.4 (setting the primary SO2 NAAQS in terms of parts per million through a 24-hour standard); *id.* § 50.5 (setting the secondary SO2 NAAQS in terms of parts per million through a 3-hour standard). Without examining this data—which Utah retains—EPA has no idea how the Holly Refinery breakdown actually impacted ambient air concentrations.

The CAA and the APA requires more. EPA must examine the relevant data to determine if the UBR is an actual threat to Utah attaining the NAAQS. EPA opted to take no real steps to verify the effect that breakdowns have on the NAAQS. Such conduct leads to the inevitable conclusion that the UBR SIP Call is arbitrary and capricious.

## II. EPA'S SIP CALL IS ARBITRARY AND CAPRICIOUS BECAUSE EPA RELIED EXCLUSIVELY ON POLICY STATEMENTS THAT HAVE NOT BEEN ADOPTED THROUGH RULEMAKING PROCEDURES

Rather than providing any genuine verification that the UBR threatens the NAAQS, EPA opted to rely on the 1999 Policy Memorandum. Indeed, EPA stated as much in its final rule; "[o]ur action is based on our longstanding interpretation of the CAA, which is reflected in our 1999 and earlier policy statements." EPA UBR SIP Call, USM Add 010, JA 06; *see also supra*, Standing argument (describing how EPA

compared the UBR to the 1999 Policy Memorandum). Thus, in issuing its SIP call, EPA treated the 1999 Policy Memorandum as if it were a legislative rule, binding upon the states and enforceable against the regulated industry. Such treatment is arbitrary and capricious in that the 1999 Policy Memorandum has never been elevated to the status of a rule through notice-and-comment rulemaking.

Generally, to have the force of law, a legislative rule must be subject to notice and comment rulemaking. 5 U.S.C. 553; *see also* 42 U.S.C. § 7607(d)(3)-(6) (imposing rulemaking procedures for rules promulgated under the CAA). "It is well-established that an agency may not escape the notice and comment requirements by labeling a major substantive legal addition to a rule a mere interpretation." *Appalachian Power Co. v. Envtl. Prot. Agency,* 208 F.3d 1015, 1024 (D.C. Cir. 2000); *see also S. Utah Wilderness Alliance v. Bureau of Land Mgmt.*, 425 F.3d 735, 759-60 (10th Cir. 2005) (holding that the informal policy statements of a federal agency are "not entitled to the force of law."); *Sierra Club v. Georgia Power Co.*, 443 F.3d 1346, 1354 (11th Cir. 2006) ("EPA policy guidance cannot trump the SSM rules adopted by [a state] and approved formally by EPA"). To be valid, legislative rules must first be subjected to notice and comment rulemaking. *Appalachian Power Co.*, 208 F.3d at 1024.

In considering if an agency policy is a legislative rule, federal courts analyze whether the statement "'carries the force and effect of law'" or whether the action merely "'spells out a duty fairly encompassed within the regulation that the interpretation purports to construe.'" *Id.*, at 1024 (quoting *Paralyzed Veterans v. D.C. Arena, L.P.*, 117 F.3d 579, 588 (D.C. Cir. 1997)). "Legislative rules 'affect individual rights and

obligations.'" *Ballesteros v. Ashcroft*, 452 F.3d 1153, 1158 (10th Cir. 2006) (quoting *Morton v. Ruiz*, 415 U.S. 1999, 232, 94 S.Ct. 1055 (1974)); *see also Natural Res. Def. Council v. Envtl. Prot. Agency*, 643 F.3d 311, 321 (D.C. Cir. 2011) (stating that when an agency statement "binds" the agency, the state, or the regulated community, "it cannot . . . be considered a mere statement of policy") ; *U.S. Telecom Ass'n v. Fed. Commc'n Comm'n*, 400 F.3d 29, 34-35 (D.C. Cir. 2005) (legislative rules are statements that "work substantive changes" or make "major substantive legal additions" to the law).

EPA's 1999 Policy Memoranda has never been subject to notice and comment rulemaking. Yet for years, EPA has demanded that Utah revise its SIP to mirror the policy. *See supra*, Statement of Fact, Part 4. And now, EPA has promulgated a rule that demands that Utah revise its rule for unavoidable breakdowns by mirroring the standards outlined in the 1999 Policy Memorandum or remove it entirely from the SIP. *See also* EPA UBR SIP Call, USM Add 014, JA 10 (finding that the UBR must be revised after comparing it to the 1999 Policy Memorandum).[10] In additional to treating the policy statements as binding on the states, these statements impose an obvious duty on EPA's regional administrators. That duty is straightforward: do not approve an affirmative

---

[10] It must be noted that EPA is attempting to have the 1999 Policy Memorandum treated as both binding and interpretive. While EPA painstakingly analyzes how the UBR is substantially inadequate because it does not comport with the policy, EPA also claims that the 1999 Policy Memorandum is not binding on the states. EPA UBR SIP Call, USM Add 010, JA 06. Indeed, EPA claims that it has completed the necessary rulemaking by issuing the instant SIP call. *Id.* But what EPA fails to acknowledge is that the SIP call is premised on a theory that the UBR violates the CAA because it is in conflict with EPA's policy statements. EPA's logic is circular; EPA posits that its finding is valid because the UBR does not mirror EPA's policy statements but the policy statements are not binding upon Utah.

defense rule that does not mirror the 1999 Policy Memorandum. 1999 Policy Memorandum, USM Add 032, JA 142.

In effect, EPA has elevated the 1999 Policy Memorandum to a legislative rule. But it cannot do so without first subjecting the policy to notice-and-comment rulemaking. Accordingly, the EPA circumvented its obligation to make the criteria of the 1999 Policy Memorandum a valid legislative rule, leaving the UBR SIP Call arbitrary.

## III. EPA'S SIP CALL IS ARBITRARY AND CAPRICIOUS BECAUSE IT IS INCONSISTENT WITH ITS OWN POLICY STATEMENTS AND REGULATIONS

EPA was arbitrary and capricious in ordering the removal or revision of the UBR because EPA (A) failed to account for its own policy statement that limit the scope the 1999 Policy Memorandum, (B) fails to acknowledge that the UBR is consistent with EPA's preferred rule, and (C) fails to fully account for the fact that the UBR is entirely consistent with EPA's own SSM regulations. Disparate treatment of similar situations is a hallmark of arbitrary and capricious decision-making. *See Interstate Contract Carrier Corp. v. United States*, 389 F. Supp. 1159, 1163 (D. Utah 1974) ("It is true that for an administrative agency to adopt different standards for similar situations is to act arbitrarily."); *see also County of Los Angeles v. Shalala*, 192 F.3d 1005, 1022 (D.C. Cir. 1999) ("A long line of precedent has established that an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently." (internal quotations omitted)); *Illinois Bell Tel. Co. v. Fed. Commnc'n Comm'n*, 740 F.2d 465, 470-71 (7th Cir. 1984) (recognizing the same).

## A. EPA's SIP Call is Arbitrary and Capricious Because EPA Fails to Acknowledge that It Expressly Limited the 1999 Policy Memorandum to Apply Only to Future Requests for SIP Approval

In demanding that Utah revise the UBR based upon the criteria outlined in the 1999 Policy Memorandum, EPA failed to recognize that it violated its own interpretation of the policy statement. In the 2001 Clarification, EPA stated that the 1999 Policy Memorandum "was not intended to alter the status of any existing malfunction, startup or shutdown provision in a SIP that has been approved by the EPA. . . . Rather, it is in the context of future rulemaking actions, such as the SIP approval process, that EPA will consider the Guidance." 2001 Clarification, docket no. -0051 at 1, JA 131.

This language leaves plain how EPA judged its own policy; it was just that, a policy that had no effect on any previously-approved SIP provision. Indeed, the Eleventh Circuit has held as much. The court there found the 2001 Clarification limited the preceding policy statements as having no application to any pre-existing SIP provisions. *Sierra Club v. Georgia Power Co.*, 443 F.3d 1346, 1353-54 (11th Cir. 2006). Any interpretation to the contrary was "utterly at odds" with EPA's 2001 Clarification. *Id.* But now, EPA wants to gloss the 2001 Clarification, forget that the 1999 Policy Memorandum never went through formal rulemaking, and instruct Utah to draft a new UBR that matches the standards contained in that policy. In doing so, EPA abused the purpose underlying the 1999 Policy Memorandum and, accordingly, was arbitrary and capricious in basing the SIP call on the theory that the UBR does not mirror the 1999 Policy Memorandum.

**B.** **EPA's SIP Call is Arbitrary and Capricious Because EPA Summarily Concluded that the UBR is Inconsistent with the 1999 Policy Memorandum**

In demanding revisions to the UBR, EPA determined that the Utah rule is inadequate because it failed to provide appropriate "incentives with respect to design, operation, and maintenance" of sources. EPA UBR SIP Call, USM Add 014, JA 10. But the UBR provides incentives identical to the 1999 Policy Memorandum, and, in fact, is entirely consistent with EPA's interpretation.[11] In its final rule, EPA found three bases to determine that the UBR was not consistent with the 1999 Policy Memorandum.

First, EPA claims that the "the criteria contained in the UBR are not as extensive or rigorous as the criteria in the 1999 Policy." *Id.* EPA's only example of this deficiency is that the UBR does not contain a provision that excludes excess emissions that are "part of a recurring pattern indicative of inadequate design, operation, or maintenance." *Id.* EPA goes on to state that the "lack of specificity in the UBR could lead a court to conclude that the rule was not intended to reach back to the design of the facility or its control equipment." *Id.* In using this language, EPA attempts to set its burden of proving a previously-approved SIP is substantially inadequate as follows: a SIP is substantially inadequate when EPA claims that a hypothetical court *could* read the SIP in a way that precludes EPA enforcement, a reading as to which EPA would disagree. Such a standard is contrary to section 110(k)(5), which requires EPA to find—not speculate—that the SIP is truly substantially inadequate.

---

[11] In USM's Comments to EPA's proposed rule, USM provided EPA with a table comparing how the UBR satisfies each of EPA's 10 criteria for an appropriate breakdown rule. USM Comments, USM Add 045-47, JA 179-81.

Next, EPA argues that the UBR does not satisfy the 1999 Policy Memorandum because the "UBR does not indicate who has the burden of proof regarding claims of unavoidable breakdown." *Id.* Despite EPA's conclusory statement, the UBR does put the burden on the owner/operator to prove that a breakdown is within the scope of the UBR. This is evident in the UBR two-step process of evaluating whether the UBR applies to a given breakdown. In step one, the source must report the breakdown and excess emissions to Utah by describing the cause of the breakdown, the sources response to the breakdown, and the steps the source took to prevent the breakdown from recurring. Utah Admin. Code r. 307-107-2. In step two, the UDAQ is charged with evaluating the report to "determin[e] whether a violation has occurred and/or the need for further enforcement action." *Id.* This process requires Utah to evaluate whether the facility has proved that its excess emissions are within the scope of the UBR.

What is truly problematic about EPA's conclusory statement that the UBR does not impose the burden of proof upon industry is that EPA is again using the so-called ambiguity to eliminate its own burden to issue a SIP call. Under EPA's reasoning, anytime EPA can point to any marginal ambiguity within a SIP, EPA has met its burden of showing that the SIP is substantially inadequate. The substantially-inadequate standard requires more before EPA is permitted to upset the status of a federally-enforceable SIP.

Finally, EPA argues that the UBR is not equal to the 1999 Policy Memorandum because it "appears to give the Utah executive secretary the exclusive authority to determine whether a violation has occurred." EPA UBR SIP Call, USM Add 014, JA

10.[12]   EPA's argument is premised on the prospect that a court may speculatively

conclude the UBR excludes EPA and citizens from bringing an action against a source

for excess emissions after the state has concluded the excess emissions were the result of

an unavoidable breakdown.  What is troubling about EPA's statement here is that it is in

direct conflict with EPA's previous statements and own enforcement actions.

For instance, in proposing to approve the UBR in 1979, EPA stated that "[a]ny

exemptions granted through [the UBR], however, are not applicable as a matter of

Federal law" and the "EPA reserves the right to enforce against any excess emissions."

EPA UBR Proposed Approval, 44 Fed. Reg. at 28691.  Then, in formally approving the

UBR, EPA stated:

> B.   Approved Portions—Non-Part D
>
> 1.   Malfunction        Provisions—Utah        Air
>       Conservation   Regulation   4.7   (although
>       exemptions granted under this regulation may
>       not be approved by the EPA).

EPA UBR Approval, 45 Fed. Reg. at 10763.  In both instances, EPA stated that

breakdowns that Utah found to be within the scope of the UBR had no influence on

EPA's ability to seek enforcement action of its own, and EPA reserved the right to

---

[12] In a related argument, EPA claimed that the UBR is substantially inadequate because it precludes injunctive relief. EPA UBR SIP Call, USM Add 014, JA 10. There is no language within the UBR that can reasonably be interpreted as stripping the regulated authorities of their ability to bring an enforcement action if it determines that the owner/operator failed to satisfy any of the UBR criteria. By definition, enforcement actions cover both civil penalties and injunctive relief. Moreover, for the reasons stated in the rest of this section, EPA has only taken this position in this action; the language that it used in approving the UBR and its own enforcement action demonstrate that EPA believes it retains its full quiver of weapons to use against a polluter in violation of its permit. *See infra*, Part III.B.

enforce against *any* excess emissions regardless of what Utah's regulatory arm determined.

Additionally, EPA's own enforcement actions demonstrate that EPA believes it retained authority to pursue civil penalties and injunctive relief in the face of a Utah determination that the UBR applied. In the late 1990s, the Phillips Petroleum Company ("Phillips") attempted to avoid an EPA enforcement action by arguing that the Utah Air Quality Board had shielded the refinery from such an EPA action by determining that the UBR applied to certain excess emissions.[13] In seeking summary judgment, EPA stated that "[n]othing in [the UBR] provides that making judgments about the avoidability of breakdowns is the sole province of the State." United States' Motion for Summary Judgment, in the case styled as *United States v. Phillips Petroleum Co.*, case no. 1:97-cv-0144, docket no. -0111, p. 28, JA 255. EPA went on to state:

> Here the clear intent of the Act was for EPA to maintain an oversight function, to be sure that public health is protected even if States do not take appropriate actions to achieve that goal. Approval of a SIP is not the end of EPA's oversight. The Act requires EPA to play an active role in monitoring the State's implementation of the SIP to ensure that air quality is maintained. . . .
>
> A crucial example of EPA's continuing oversight is that EPA is authorized to take a federal enforcement action when a state enforcement action is inadequate. *United States*

---

[13] Phillips predicated its defense on a state determination that the relevant excess emissions were caused by unavoidable breakdowns. Utah Air Quality Board Administrative Determination, In the Matter of Phillips Petroleum, Docket No. -0115, JA 262-63. Nonetheless, EPA filed a complaint against Phillips, alleging that Phillips exceeded its permit-based $SO_2$ limit on more than 1,000 occasions. United States' Motion for Summary Judgment, in the case styled as *United States v. Phillips Petroleum Co.*, docket no. -0111, JA 220.

> *v. SCM Corp.*, 615 F.Supp. 411, 419 (D. Md. 1985) . . . .
> Thus, it would be inimical to the scheme of the Act for EPA
> to give up its right to determine what behavior by a polluter
> constitutes a violation."

*Id.*, p. 29-31). In litigation, EPA wants to interpret the UBR as leaving it free to bring an

enforcement action regardless of what Utah determines. But for purposes of the UBR

SIP call, EPA wants to paint the UBR as entirely cutting off its right to bring an

enforcement action when the state has found that a specific breakdown is within the

scope of the UBR. Such inconsistent rationalizations leaves but one conclusion: EPA's

SIP call is arbitrary and capricious.

C. **EPA SIP Call is Arbitrary and Capricious Because it Demands that Utah Apply a Standard that EPA is Unwilling to Impose Upon its Own Regulations**

The standard set out in Utah's UBR is extremely similar to the standard that EPA

imposes through its own regulations for the New Source Performance Standards

("NSPS"). EPA UBR Proposed Approval, 44 Fed. Reg. at 28691 (stating that the UBR

sets forth malfunction provisions according to criteria "very similar to the federal

malfunction regulations"). Specifically, the General Provisions for the NSPS states:

> [o]perations during periods of startup, shutdown, and
> malfunctions shall not constitute representative conditions for
> the purpose of a performance test *nor shall emissions* in
> excess of the level of the applicable emission limit during
> periods of startup, shutdown, and malfunction *be considered
> a violation* of the applicable emission limit . . . .

*See* 40 C.F.R. § 60.8(c) (2010) (emphasis added). Under the NSPS program, excess

emissions during SSM are not considered violations.

In the face of these regulations, EPA cites to the case of *Sierra Club v. Envtl. Prot. Agency*, 551 F.3d 1019 (D.C. Cir. 2008), for the proposition that all emission limitations cannot "be anything less than continuous." EPA UBR SIP Call, USM Add 010, JA 06. In relying on *Sierra Club*, EPA fails to account for the fact that the court's holding in that case narrowly targeted three regulations that provided express exemptions from emission standards during SSM events for hazardous air pollutants. 551 F.3d at 1021, n.1, *see also* 40 C.F.R. § 63.6(e) ("The general duty to minimize emissions during a period of [SSM] does not require the owner or operator to achieve emission levels that would be required by the applicable standard."); *id.* § 63.6(f) ("The non-opacity emission standards . . . shall apply at all times except during periods of [SSM]."); *id.* § 63.6(h) ("The opacity and visible emission standards . . . must apply at all times except during periods of [SSM].").

The UBR, however, does not include a similarly worded express exemption from emission standards. Rather, the UBR requires that the owner or operator of a facility subject to an unavoidable breakdown "shall take all reasonable measures which may include . . . the immediate curtailment of production, operations, or activities . . . if necessary to limit the total aggregate emissions from the source" and that the owner or operator "shall use the most rapid, reasonable procedure to reduce emissions." Utah Admin. Code r. 307-107-4. Unlike the SSM provisions that were the subject of *Sierra Club*, the UBR does not excuse compliance with applicable emission standards during unavoidable breakdowns. In fact, the UBR emphasizes the importance—indeed the requirement—of taking all reasonably available measures necessary to ensure compliance with applicable emission standards notwithstanding the unavoidable breakdown.

And once again, EPA refuses to take heed of its own statements in regard to interpreting the court's ruling in *Sierra Club*. Following the court's issuance of *Sierra Club*, EPA interpreted the holding as a narrow decision invalidating only the three regulations at issue in that matter. Adam M. Kushner, *Vacatur of Startup, Shutdown, and Malfunction (SSM) Exemption*, (July 22, 2009), docket no. -0106. In this interpretation, EPA determined that the vacatur in *Sierra Club* "does not have a direct impact on [specific regulatory text that exempts or excuses compliance during SSM events] because those provisions were not challenged and were not before the court in *Sierra Club*." *Id.* at 2-3.

Accordingly, EPA's SIP call is arbitrary and capricious because it imposes a policy upon Utah that EPA is unwilling to impose against its own similar SSM regulations.

## CONCLUSION

For the forgoing, USM requests that the Court vacate the EPA's final rule calling on Utah to revise the UBR.

Respectfully submitted,

MICHAEL A. ZODY
Parsons Behle & Latimer

/s/ Michael A. Zody
_____
Michael A. Zody
Michael J. Tomko
Jacob A. Santini
PARSONS BEHLE & LATIMER
201 S. Main Street, Suite 1800
Salt Lake City, UT 84111
(801) 532-1234

## REQUEST FOR ORAL ARGUMENT

The issues involved in this appeal will benefit from full discussion with the Court

in oral argument, during which counsel can address any questions the court might have.

/s/ Michael A. Zody
Michael A. Zody
Michael J. Tomko
Jacob A. Santini
PARSONS BEHLE & LATIMER
201 S. Main Street, Suite 1800
Salt Lake City, UT 84111
(801) 532-1234

*Attorneys for Petitioner US Magnesium, LLC*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,541 words, excluding parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

/s/ Michael A. Zody
Michael A. Zody
Michael J. Tomko
Jacob A. Santini
PARSONS BEHLE & LATIMER
201 S. Main Street, Suite 1800
Salt Lake City, UT 84111
(801) 532-1234

*Attorneys for Petitioner US Magnesium, LLC*

## CERTIFICATION OF DIGITAL SUBMISSION

In accordance with the Tenth Circuit Court of Appeal's CM/ECF User's Manual, it is hereby certified that: (1) no privacy redactions were required for this document, (2) the hard copies required to be submitted to the Clerk's Office are exact copies of the ECF filing, and (3) the digital copy of this document has been scanned for viruses Mircrosoft Forefront Security, which was last updated on January 24, 2012, and, according to the program, is free of viruses.

/s/ Michael A. Zody
Michael A. Zody
Michael J. Tomko
Jacob A. Santini
PARSONS BEHLE & LATIMER
201 S. Main Street, Suite 1800
Salt Lake City, UT 84111
(801) 532-1234

*Attorneys for Petitioner US Magnesium, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of January, 2012, I have served the foregoing

Petitioner's Final Merits Brief on all registered counsel through the Court's CM/ECF

filing system and via First-Class Mail addressed to:

David A. Carson
United States Department of Justice
Environmental & Natural Resources
Division
999 18th Street
South Terrace, Suite 370
Denver, Co. 80202

Lisa Jackson
Environmental Protection Agency
1200 Pennsylvania Ave. NW
Washington, DC 20460-0000

Eric H. Holder, Jr.
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

/s/ Michael A. Zody
Michael A. Zody
Michael J. Tomko
Jacob A. Santini
Parsons Behle & Latimer

*Counsel for Petitioners*

ATTACHMENT A

temporary safety zone. An environmental analysis checklist and a categorical exclusion determination will be available in the docket where indicated under **ADDRESSES**.

**List of Subjects in 33 CFR Part 165**

Harbors, Marine Safety, Navigation (water), Reporting and recordkeeping requirements, Security measures, Waterways.

For the reasons discussed in the preamble, the Coast Guard amends 33 CFR Part 165 as follows:

**PART 165—REGULATED NAVIGATION AREAS AND LIMITED ACCESS AREAS**

■ 1. The authority citation for part 165 continues to read as follows:

**Authority:** 33 U.S.C. 1231; 46 U.S.C. Chapter 701, 3306, 3703; 50 U.S.C. 191, 195; 33 CFR 1.05–1, 6.04–1, 6.04–6, and 160.5; Pub. L. 107–295, 116 Stat. 2064; Department of Homeland Security Delegation No. 0170.1.

■ 2. Add section § 165.T09–0165 to read as follows:

**§ 165.T09–0165   Safety zone; Ford Estate Wedding Fireworks, Lake St. Clair, Grosse Pointe Shores, MI.**

(a) *Location.* The safety zone will encompass all U.S. navigable waters on Lake St. Clair within a 420 foot radius of the fireworks barge launch site located off the shore of Grosse Pointe Shores, MI at position 42°27′15.06″ N., 082°51′59.01″ W. All geographic coordinates are North American Datum of 1983 (NAD 83).

(b) *Effective and Enforcement Period.* This rule is effective and will be enforced from 8:30 p.m. (local) through 9:30 p.m. on June 4, 2011.

(c) *Regulations.* (1) In accordance with the general regulations in Section 165.23 of this part, entry into, transiting, or anchoring within this safety zone is prohibited unless authorized by the Captain of the Port Detroit, or his designated on-scene representative.

(2) This safety zone is closed to all vessel traffic, except as may be permitted by the Captain of the Port Detroit or his designated on-scene representative.

(3) The "on-scene representative" of the Captain of the Port is any Coast Guard commissioned, warrant, or petty officer who has been designated by the Captain of the Port to act on his behalf. The on-scene representative of the Captain of the Port will be aboard either a Coast Guard or Coast Guard Auxiliary vessel. The Captain of the Port or his designated on scene representative may be contacted via VHF Channel 16.

(4) Vessel operators desiring to enter or operate within the safety zone shall contact the Captain of the Port Detroit or his on-scene representative to obtain permission to do so.

(5) Vessel operators given permission to enter or operate in the safety zone must comply with all directions given to them by the Captain of the Port or his on-scene representative.

Dated: April 5, 2011.

**J.E. Ogden,**

*Captain, U.S. Coast Guard, Captain of the Port Detroit.*

[FR Doc. 2011–9256 Filed 4–15–11; 8:45 am]

**BILLING CODE 9110–04–P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 52**

**[EPA–R08–OAR–2010–0909; FRL–9294–9]**

**Finding of Substantial Inadequacy of Implementation Plan; Call for Utah State Implementation Plan Revision**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** Pursuant to sections 110(a)(2)(H) and 110(k)(5) of the Clean Air Act (CAA), EPA is finding that the Utah State Implementation Plan (SIP) is substantially inadequate to attain or maintain the national ambient air quality standards (NAAQS) or to otherwise comply with the requirements of the CAA and issuing a call for the State of Utah to revise its SIP. Specifically, the SIP includes Utah's unavoidable breakdown rule (rule R307–107), which exempts emissions during unavoidable breakdowns from compliance with emission limitations. This rule undermines EPA's, Utah's, and citizens' ability to enforce emission limitations that have been relied on to ensure attainment or maintenance of the NAAQS or meet other CAA requirements. EPA is requiring that the State revise the SIP to remove R307–107 or correct its deficiencies and submit the revised SIP to EPA within 18 months of the effective date of this final rule. If EPA finds that Utah has failed to submit a complete SIP revision as required by this final rule or if EPA disapproves such a revision, such a finding or disapproval will trigger clocks for mandatory sanctions and an obligation for EPA to impose a Federal Implementation Plan (FIP). If EPA makes such a finding or disapproval, mandatory sanctions will apply such that the offset sanction would apply 18 months after such finding or disapproval and highway funding restrictions would apply six months later unless EPA takes action to stay the imposition of the sanctions or to stop the sanctions clock based on the State curing the SIP deficiencies.

In its proposed rulemaking action, EPA requested comment on whether it should exercise its discretionary authority under CAA section 110(m) to impose the highway funding restrictions sanctions in areas of the State that would not be subject to mandatory sanctions. EPA is deferring a decision on whether to impose sanctions under section 110(m) and will consider any comments on the issue of imposing sanctions under section 110(m) if and when we take final action on this issue in the future.

**DATES:** *Effective Date:* This final rule is effective May 18, 2011.

**ADDRESSES:** EPA has established a docket for this action under Docket ID No. EPA–R08–OAR–2010–0909. All documents in the docket are listed on the *http://www.regulations.gov* Web site. Although listed in the index, some information is not publicly available, *e.g.,* Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the Internet and will be publicly available only in hard copy form. Publicly available docket materials are available either electronically through *http://www.regulations.gov,* or in hard copy at the Air Program, Environmental Protection Agency (EPA), Region 8, 1595 Wynkoop Street, Denver, Colorado 80202–1129. EPA requests that if at all possible, you contact the individual listed in the **FOR FURTHER INFORMATION CONTACT** section to view the hard copy of the docket. You may view the hard copy of the docket Monday through Friday, 8 a.m. to 4 p.m., excluding Federal holidays.

**FOR FURTHER INFORMATION CONTACT:** Vanessa Hinkle, Air Program, Mailcode 8P–AR, Environmental Protection Agency, Region 8, 1595 Wynkoop Street, Denver, Colorado 80202–1129, (303) 312–6561, or *hinkle.vanessa@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

**Definitions**

For the purpose of this document, the following definitions apply:

(i) The words or initials *Act* or *CAA* mean or refer to the Clean Air Act, unless the context indicates otherwise.

(ii) The words *EPA, we, us* or *our* mean or refer to the United States Environmental Protection Agency.

(iii) The initials *NAAQS* mean or refer to National Ambient Air Quality Standards.

(iv) The initials *NO<sub>X</sub>* mean or refer to nitrogen oxides.

(v) The initials $PM_{2.5}$ mean or refer to particulate matter with an aerodynamic diameter less than or equal to a nominal 2.5 micrometers.

(vi) The initials $PM_{10}$ mean or refer to particulate matter with an aerodynamic diameter less than or equal to a nominal 10 micrometers.

(vii) The initials *ppm* mean or refer to parts per million.

(viii) The initials *SIP* mean or refer to State Implementation Plan.

(ix) The initials $SO_2$ mean or refer to sulfur dioxide.

(x) The initials *SSM* mean or refer to startup, shutdown, and malfunction.

(xi) The words *State* or *Utah* mean the State of Utah, unless the context indicates otherwise.

(xii) The initials *UBR* mean or refer to the Utah unavoidable breakdown rule, R307–107.

(xiii) The initials *UDAQ* mean or refer to the Utah Division of Air Quality, Utah Department of Environmental Quality.

(xiv) The words *1982 Policy* mean or refer to the September 28, 1982 EPA Memorandum signed by Kathleen M. Bennett, Assistant Administrator for Air, Noise and Radiation, titled "Policy on Excess Emissions During Startup, Shutdown, Maintenance, and Malfunctions."

(xv) The words *1983 Policy* mean or refer to the February 15, 1983 EPA Memorandum signed by Kathleen M. Bennett, Assistant Administrator for Air, Noise and Radiation, titled "Policy on Excess Emissions During Startup, Shutdown, Maintenance, and Malfunctions."

(xvi) The words *1999 Policy* mean or refer to the September 20, 1999 EPA Memorandum signed by Steven A. Herman, Assistant Administrator for Enforcement and Compliance Assurance, and Robert Perciasepe, Assistant Administrator for Air and Radiation, titled "State Implementation Plans: Policy Regarding Excess Emissions During Malfunctions, Startup, and Shutdown."

## Table of Contents

I. Background
II. Final Action
III. Summary of Bases for Finding of Substantial Inadequacy
IV. Issues Raised by Commenters and EPA's Responses
   A. Request for Comment Period Extension/ Procedural Issues
   B. Authority and Basis for a SIP Call
   C. Sanctions
   D. Time Period for Response to SIP Call
   E. Miscellaneous Comments
V. Statutory and Executive Order Reviews

## I. Background

On November 19, 2010, we published our proposed rulemaking action in the **Federal Register** (75 FR 70888) in which we proposed to find the Utah SIP substantially inadequate to attain or maintain the NAAQS or to otherwise comply with the requirements of the CAA.[1] We also proposed to issue a SIP call to require the State of Utah to revise the SIP to correct the inadequacies. In our proposal, we stated that, "Utah rule R307–107 contains various provisions that are inconsistent with EPA's interpretations regarding the appropriate treatment of malfunction events in SIPs and which render the Utah SIP substantially inadequate." *Id.* at 70891. We went on to identify specific deficiencies in R307–107 (also known as Utah's unavoidable breakdown rule and sometimes referred to herein as the UBR). *Id.* at 70891– 70893. In particular, we explained that the UBR: (1) Does not treat all exceedances of SIP and permit limits as violations; (2) could be interpreted to grant the Utah executive secretary exclusive authority to decide whether excess emissions constitute a violation; and (3) improperly applies to Federal technology-based standards such as New Source Performance Standards (NSPS) and National Emission Standards for Hazardous Air Pollutants (NESHAPS). We explained why we were proposing to find that these deficiencies in the UBR render the Utah SIP substantially inadequate. *Id.* We proposed a 12-month deadline for the State to respond to a final SIP call.

We also proposed the order and timing of mandatory sanctions under CAA section 179(a) and requested comment on whether we should exercise our discretionary authority to impose highway funding sanctions in all areas of the State.

We requested comments on all aspects of our proposed action by December 20, 2010. We subsequently extended the public comment period through January 3, 2011. See 75 FR 79327 (December 20, 2010).

We received numerous comments. A number of commenters, particularly citizens and environmental groups, supported our proposed action. We also received a number of comments, primarily from State agencies and industrial facilities and groups, that were critical of our proposed action.

## II. Final Action

We have considered all comments submitted and prepared responses, which are contained in Section IV of this action, "Issues Raised by Commenters and EPA's Responses." None of the comments has caused us to conclude that our proposal was unreasonable, and we are finalizing our action as proposed, with the exception that we are requiring that the State respond to the SIP call within 18 months rather than 12 months. Specifically, for the reasons described in our notice of proposed rulemaking (see 75 FR 70888) and in this action, EPA finds that the Utah SIP is substantially inadequate to attain or maintain the NAAQS or to otherwise comply with requirements of the CAA due to significant deficiencies created by Utah's unavoidable breakdown rule, R307–107.[2] Utah's rule R307–107 improperly undermines EPA's, Utah's, and citizens' ability to enforce emission limitations that have been relied on in the SIP to ensure attainment and maintenance of the NAAQS or meet other CAA requirements. Pursuant to sections 110(a)(2)(H) and 110(k)(5) of the CAA, EPA is requiring that the State revise the SIP to remove R307–107 or revise it to make it consistent with CAA requirements. Utah must submit a revised SIP responding to this SIP call within 18 months of the effective date of this final rule.

If Utah fails to submit a complete SIP revision that responds to this final SIP call, section 179(a) of the CAA provides for EPA to issue a finding of State failure. Such a finding will start mandatory 18-month and 24-month sanctions clocks and a 24-month clock for promulgation of a FIP by EPA. The two sanctions that apply under CAA section 179(b) are the 2-to-1 emission offset requirement for all new and modified major sources subject to the nonattainment new source review (NSR) program and restrictions on highway funding.

EPA issued an order of sanctions rule in 1994 (see 59 FR 39832 (August 4, 1994), codified at 40 CFR 52.31) but did not specify the order of sanctions where a State fails to submit or submits a deficient SIP in response to a SIP call. However, as we proposed (75 FR 70893–

---

[1] Our proposal provided detailed background information regarding EPA's CAA interpretations with respect to Utah rule R307–107 and relevant SIP actions, and our interactions with the State and others regarding the rule over the years. See 75 FR 70889–891. We direct the reader there for such background information.

[2] We provide a summary of the bases for our finding of substantial inadequacy in Section III of this action, "Summary of Bases for Finding of Substantial Inadequacy."

70894), we have decided that the order of sanctions specified in 40 CFR 52.31 will apply here for the same reasons discussed in the preamble to that rule. Thus, if Utah fails to submit the required SIP revision, or submits a revision that EPA determines is incomplete or that EPA disapproves, the 2-to-1 emission offset requirement will apply for all new sources subject to the nonattainment NSR program 18 months following such a finding or disapproval unless the State corrects the deficiency before that date. The highway funding restrictions sanction will also apply six months after the offset sanction applies unless the State corrects the deficiency before that date. The provisions in 40 CFR 52.31 regarding staying the sanctions clock and deferring the imposition of sanctions will also apply.

Mandatory sanctions under section 179 of the CAA generally apply only in nonattainment areas. By its definition, the emission offset sanction applies only in areas required to have a part D NSR program, typically areas designated nonattainment.[3] Section 179(b)(1) expressly limits the highway funding restriction to nonattainment areas. Additionally, EPA interprets the section 179 sanctions to apply only in the area or areas of the State that are subject to or required to have in place the deficient SIP and for the pollutant or pollutants the specific SIP element addresses. In this case, mandatory sanctions would apply in all areas designated nonattainment for a NAAQS within the State because Utah rule R307–107 applies statewide and applies for all NAAQS pollutants.

In addition to sanctions, if EPA finds that the State failed to submit a complete SIP revision that responds to this SIP call or disapproves such revision, CAA section 110(c) would require EPA to promulgate a FIP no later than two years from the date of the finding or the disapproval if the deficiency has not been corrected.

In its proposed rulemaking action (75 FR 70893–70894), EPA also requested comment on whether it should exercise its discretionary authority under CAA section 110(m) to impose the highway funding restrictions sanction in areas of the State that would not be subject to mandatory sanctions—*i.e.*, areas other than nonattainment areas. EPA is not finalizing action on the use of such discretionary authority in this action. If EPA acts on the use of discretionary sanctions at a later date, it will fully

respond to relevant comments submitted in response to the November 19, 2010 notice of proposed rulemaking.

## III. Summary of Bases for Finding of Substantial Inadequacy

This section provides a brief summary of the bases for our finding of substantial inadequacy. For further detail, please refer to our notice of proposed rulemaking (75 FR 70888) and our response to comments.

1. R307–107–1 provides an exemption from emission limits in the Utah SIP and SIP-based permits for exceedances of such limits caused by an unavoidable breakdown—"emissions resulting from unavoidable breakdown will not be deemed a violation of these regulations." This generic exemption, applicable to all Utah SIP limits, precludes any enforcement when there is an unavoidable breakdown. Our interpretation of the CAA is that an exemption from injunctive relief is never appropriate, and that an exemption from penalties is only appropriate in limited circumstances.[4] Contrary to CAA section 302(k)'s definition of emission limitation, the exemption in the UBR renders emission limitations in the Utah SIP less than continuous and, contrary to the requirements of CAA sections 110(a)(2)(A) and (C), undermines the ability to ensure compliance with SIP emissions limitations relied on to achieve the NAAQS and other relevant CAA requirements at all times. Therefore, the UBR renders the Utah SIP substantially inadequate to attain or maintain the NAAQS or to comply with other CAA requirements, such as CAA sections 110(a)(2)(A) and (C) and 302(k), CAA provisions related to prevention of significant deterioration (PSD) and nonattainment NSR permits (sections 165 and 173), and provisions related to protection of visibility (section 169A).

2. R307–107–1 also applies to Federal technology-based standards like the NSPS and NESHAPS that Utah has incorporated by reference to receive delegation of Federal authority. To the extent any exemptions from these technology-based standards are warranted for malfunctions, the Federal standards contained in EPA's regulations already specify the appropriate exemptions. No additional exemptions (or criteria for deciding whether an applicable exemption applies) are warranted or appropriate. Thus, the Utah SIP is substantially

inadequate because R307–107–1 improperly provides an exemption and criteria not contained in and not sanctioned by the delegated Federal standards.

3. R307–107–2 requires the source to submit information regarding an unavoidable breakdown to the executive secretary of Utah's Air Quality Board (UAQB) and indicates that the information "shall be used by the executive secretary of the UAQB in determining whether a violation has occurred and/or the need of further enforcement action." This provision appears to give the executive secretary exclusive authority to determine whether excess emissions constitute a violation and thus to preclude independent enforcement action by EPA and citizens when the executive secretary makes a non-violation determination. This is inconsistent with the enforcement structure under the CAA, which provides enforcement authority not only to the States, but also to EPA and citizens. Because a court could interpret section R307–107–2 as undermining the ability of EPA and citizens to independently exercise enforcement discretion granted by the CAA, it is substantially inadequate to comply with CAA requirements related to enforcement. Because it undermines the envisioned enforcement structure, it also undermines the ability of the State to attain and maintain the NAAQS and to comply with other CAA requirements related to PSD, visibility, NSPS, and NESHAPS. Potential EPA and citizen enforcement provides an important safeguard in the event a State cannot or does not enforce CAA violations and also provides additional incentives for sources to design, operate, and maintain their facilities so as to meet their emission limits. Thus, R307–107–2 renders the SIP substantially inadequate to attain or maintain the NAAQS or otherwise comply with the CAA.

## IV. Issues Raised by Commenters and EPA's Response

*A. Request for Comment Period Extension/Procedural Issues*

(a) Comment: Two comment letters requested an extension of the comment period of up to 60 days. Other commenters did not specifically request an extension, but stated that they believed the comment period was too short. Some commenters complained that the proposal was issued without stakeholder input.

Response: We considered the requests for an extension of the comment period and extended the original 30-day public comment period from December 20,

---

[3] An exception to this, not relevant here, is areas located in the Ozone Transport Region, which are required to have a part D NSR program regardless of the area's designation. See CAA section 184(b)(2).

[4] As we explain in our response to comments, the UBR lacks criteria that are sufficiently detailed or robust to ensure that penalties are available at all appropriate times.

2010 to January 3, 2011 (see 75 FR 79327 (December 20, 2010)), providing a total of 45 days to submit comments. The comment period was sufficient to provide a reasonable opportunity to comment on our proposed action given its scope. We note that section 307(h) of the CAA specifies a 30-day period as a minimum comment period for rulemaking actions under the CAA, except for certain specified provisions (all of which waive notice-and-comment rulemaking requirements). We typically provide a 30-day comment period for SIP-related actions. Neither the CAA nor the Administrative Procedure Act requires a stakeholder process before or during rulemaking to issue a SIP call.

*(b) Comment:* A commenter asserts that EPA's notice is defective because it fails to provide interested parties with sufficient notice of facts, policies and case law relevant to the proposed finding. Interested parties cannot understand the bases for EPA's proposed rule and thus cannot participate and comment in a meaningful way. EPA needs to correct the deficiencies in the notice and re-propose.

*Response:* As described more fully elsewhere in our response to comments, we explained the bases for our finding of substantial inadequacy and SIP call in our proposed rulemaking action. See 75 FR 70891–70893.

*(c) Comment:* A commenter asserts that it cannot provide meaningful comments and analysis of the proposed rule because EPA has not responded to the commenter's appeal seeking documents under the Freedom of Information Act (FOIA).

*Response:* We disagree that our actions under the FOIA are relevant to the validity of our rulemaking action. In this case, we clearly explained the bases for our proposed action, and made available in our rulemaking docket all documents we considered in issuing the proposal. The commenter had the same reasonable opportunity to comment on our proposal as any other commenter and provided substantive comments.

We note that we responded to the commenter's FOIA request on June 7, 2010, providing three compact discs containing over 1,000 pages of documents. We only withheld documents we determined were privileged (and thus exempt from disclosure).

## B. Authority and Basis for a SIP Call

*(a) Comment:* The proposal is inconsistent with section 110 of the CAA. Commenters assert that EPA's authority to issue a SIP call under CAA section 110(k)(5) is limited to if the Administrator finds the applicable implementation plan for an area is substantially inadequate to attain or maintain the relevant NAAQS or to otherwise comply with any requirement of that chapter. Commenters assert that EPA has made no showing or disclosure of relevant facts that the UBR is substantially inadequate to protect the NAAQS with respect to CAA sections 110(a)(2)(H) and 110(k)(5). Commenters state that the finding of substantial inadequacy must be clearly stated and that the Administrative Record must present facts which support the SIP call. Commenters state that EPA's docket did not identify any measured or modeled impact on attainment or maintenance of a NAAQS due to excess emissions resulting from an unavoidable breakdown. Further, EPA did not provide any empirical information to support its reasoning as to why the rule is not working.

*Response:* The SIP call is consistent with CAA sections 110(a)(2)(H) and 110(k)(5). We proposed to find the UBR substantially inadequate in our NPR and are finalizing that determination here. We explained the bases for our proposed finding. See 75 FR 70891–70893. As we indicated in our proposal, SIPs, including the Utah SIP, rely on adoption and enforcement of emission limits to attain and maintain the NAAQS, protect PSD increments, protect visibility in national parks and wilderness areas, and meet other CAA requirements. See 75 FR 70891. The integrity of the SIP is maintained and protection is ensured as long as the limits are met. Consistent with this premise, the CAA and our regulations require that SIP limits be enforceable. For example, as noted in our proposal (see 75 FR 70892), CAA section 110(a)(2)(A) requires each SIP to include enforceable emission limitations necessary or appropriate to meet the CAA's applicable requirements. CAA section 110(a)(2)(C) requires that each SIP include a program to "provide for the enforcement of the measures" described in section 110(a)(2)(A). Section 302(k) defines emission limitation as a requirement established by a State or EPA that "limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis." These requirements are intended to ensure attainment and maintenance of the NAAQS, protection of increments, and protection of visibility at all times, not just occasionally or intermittently. The enforceability of the SIP is fundamental to the SIP's adequacy under the CAA.

The UBR provides an exemption from emission limits in the Utah SIP (and permits) for excess emissions caused by an unavoidable breakdown—"emissions resulting from unavoidable breakdown will not be deemed a violation of these regulations." See R307–107–1. Our longstanding view is that all exceedances are violations and must be treated as such by the SIP. See, *e.g.,* our 1982, 1983, and 1999 Policies; 42 FR 58171 (November 8, 1977). This treatment is necessary because it encourages sources to act responsibly in taking necessary measures to ensure compliance with emissions limits, preserves the potential for injunctive relief, preserves the potential for penalties, except in limited circumstances, and is consistent with the notion that protection of health under the CAA is not a sometime requirement. It is also consistent with CAA 302(k)'s definition of emission limitation as a requirement limiting emissions on a continuous basis. The UBR precludes any enforcement when there is an unavoidable breakdown. It thus renders emission limitations in the Utah SIP less than continuous and, contrary to the requirements of sections 110(a)(2)(A) and (C), undermines the ability to ensure compliance with emissions limitations and the NAAQS and other relevant CAA requirements at all times. Therefore, the UBR renders the Utah SIP substantially inadequate to attain or maintain the NAAQS or to comply with other CAA requirements.

We also explained in our proposal that R307–107–2 appears to give the executive secretary of the UAQB exclusive authority to determine whether excess emissions have been caused by an unavoidable breakdown and, thus, whether they constitute a violation. R307–107–2 provides that information submitted by a source "shall be used by the executive secretary in determining whether a violation has occurred and/or the need of further enforcement action." We explained that this provision is inconsistent with the enforcement structure of the CAA, which provides independent authority to EPA and citizens to enforce SIP and other CAA emission limits. See 75 FR 70892. We concluded that, because a court could interpret R307–107–2 as undermining the ability of EPA and citizens to independently exercise enforcement discretion granted by the CAA, it is inconsistent with CAA requirements related to enforcement and, thus, renders the SIP substantially inadequate. Preclusion of EPA and citizen enforcement could make it impossible to penalize source noncompliance (where the State may have erroneously concluded that

exceedances were caused by an unavoidable breakdown) or gain source compliance through injunctive relief. Also, potential preclusion of EPA and citizen enforcement reduces the incentive for sources to comply because it reduces the likelihood of independent evaluation of unavoidable breakdown claims by a court in an enforcement action brought by EPA or citizens.

The thrust of several comments is that we have not presented facts or empirical evidence that the UBR is not working or that shows any measured or modeled impact on attainment or maintenance of a NAAQS due to excess emissions resulting from an unavoidable breakdown. As we indicated in our proposal (see 75 FR 70892), we need not show a direct causal link between any specific unavoidable breakdown excess emissions and violations of the NAAQS to conclude that the SIP is substantially inadequate. It is our interpretation that the fundamental integrity of the CAA's SIP process and structure is undermined if emission limits relied on to meet CAA requirements can be exceeded without potential recourse by any entity granted enforcement authority by the CAA. We are not restricted to issuing SIP calls only after a violation of the NAAQS has occurred or only where a specific violation can be linked to a specific excess emissions event. It is sufficient that emissions limits to which the unavoidable breakdown exemption applies have been, are being, and will be relied on to attain and maintain the NAAQS and meet other CAA requirements. Nor are we required to wait for a judge to rule in a specific enforcement action that R307–107–2 has a preclusive effect on EPA or citizen enforcement to determine that the provision is inconsistent with the CAA and renders the SIP substantially inadequate.[5]

Nonetheless, we note the following:

1. Several counties along the Wasatch Front in Utah (which includes the largest population centers in the State) are designated nonattainment for $PM_{10}$, $PM_{2.5}$, and $SO_2$, and some have recorded violations of the 2008 0.075 ppm ozone NAAQS as well. The Wasatch Front is subject to severe wintertime inversions, and several commenters noted that Salt Lake County has at times experienced some of the worst air quality in the country. Exceedances of emission limitations due to unavoidable

breakdowns increase pollutant levels in the air in these nonattainment areas, exacerbating pollution there.[6]

2. Our experience related to refineries, power plants, and other sources indicates that potential emissions during malfunctions when normal processes or pollution controls are bypassed can be very high, far exceeding SIP limits. For example, data submitted by Holly Refining (Holly) in Woods Cross, Utah, to the State of Utah indicate that Holly flared nearly 11,000 pounds of $SO_2$ in a 9-hour period during a claimed breakdown event in June 2006 and thousands of pounds during other claimed breakdown events of varying duration (some on the order of one hour) between 2006 and 2010. By way of comparison, the January 12, 2010 permit limit for Holly's SRU tail gas incinerator is 1.6 tons (3,200 pounds) of $SO_2$ per day.[7] During malfunctions, refineries in the Billings, Montana, area sometimes flared thousands of pounds of $SO_2$ over a two- or three-hour period, whereas the State had modeled attainment of the 3-hour $SO_2$ NAAQS based on a routine flare emissions limit of 150 pounds per three hours. If Montana had modeled the higher emissions, other emission limits would have had to have been greatly curtailed for the area to demonstrate attainment of the NAAQS. Our experience indicates that the flare emissions at Holly and in Montana are not unique. See, *e.g.,* EPA Enforcement Alert, Volume 3, Number 9, October 2000, "Frequent, Routine Flaring May Cause Excessive, Uncontrolled Sulfur Dioxide Releases," which we have included in the docket for this action. Similarly, our experience indicates that power plant emissions during malfunctions can greatly exceed emissions during routine operations.

3. A report by the Environmental Integrity Project, which we included in the record for our notice of proposed rulemaking, also indicates that malfunction emissions can dwarf SIP and permit emissions limits. See "Gaming the System," August 2004, docket no. EPA–R08–OAR–2010–0909–0042, pages 2, 5–9. See also, EPA Enforcement Alert cited above, p. 2.

We also proposed other bases for our finding of substantial inadequacy. As we indicated in our notice of proposed rulemaking, the UBR not only applies to SIP limits, but also to permit limits and national technology-based standards like the NSPS and NESHAPS. See 75 FR 70892.

This means a source could use the provisions of R307–107 to claim an exemption from best available control technology (BACT) or lowest achievable emission rate (LAER) limits in a major source permit. We have consistently interpreted the Act to not allow for outright exemptions from BACT limits, and the same logic applies to LAER limits. See, *e.g.,* 1977 memorandum entitled "Contingency Plan for FGD Systems During Downtime as a Function of PSD," from Edward E. Reich to G.T. Helms and January 28, 1993 memorandum entitled "Automatic or Blanket Exemptions for Excess Emissions During Startup and Shutdowns under PSD," from John B. Rasnic to Linda M. Murphy. As noted, in order to ensure non-degradation of air quality at all times under the PSD program and protection of the NAAQS at all times, it is necessary for a source to comply with its permit limits at all times.

To the extent any exemptions from the NSPS or NESHAPS are warranted, the Federal standards contained in EPA's regulations already specify the appropriate exemptions. See, *e.g.,* 40 CFR 60.48Da(c).[8] No additional exemptions or criteria are warranted or appropriate. See, *e.g.,* 40 CFR 60.10(a); 40 CFR 63.12(a)(1); and the 1999 Policy, Attachment, at 3.[9] Furthermore, in *Sierra Club* v. *EPA,* 551 F.3d 1019 (DC Cir. 2008), the DC Circuit determined that exemptions from compliance with CAA section 112 Maximum Achievable Control Technology (MACT) standards during periods of SSM were inconsistent with CAA section 302(k), which requires continuous compliance with emission limits. Thus, R307–107–1 is substantially inadequate because it improperly provides an exemption and grants discretion to the Utah executive secretary not contained in and not sanctioned by the delegated Federal standards.

---

[5] EPA has previously issued SIP calls to correct deficiencies related to SIP enforceability. For example, EPA issued SIP calls in the 1990s to require States to revise their SIPs to allow for use of any credible evidence in enforcement actions with respect to SIP emissions limits. See 62 FR 8314, 8327 (February 24, 1997).

[6] In 2005, the State submitted a maintenance plan for $PM_{10}$ for Salt Lake County. The State's dispersion modeling, which we proposed to disapprove because of flaws, projected values very close to the 150 μg/m³ 24-hour NAAQS at the North Salt Lake monitor. If the State had used assumptions we had proposed, the projected values would have been higher. Malfunction emissions are of particular concern where modeling predicts values just under the NAAQS.

[7] In its 2005 SIP submittal for Holly, the State proposed a combined $SO_2$ emission limit for Holly, which included all external combustion process equipment and all gas-fired compressor drivers, of 4.7 tons per day.

[8] Some NSPS do not provide any relief during SSM. For example, the $SO_2$ and $NO_X$ limits under part 60, subpart Db, apply at all times. See 40 CFR 60.45(a) and 60.46(a).

[9] As EPA noted in the 1999 Policy, "to the extent a state includes NSPS or NESHAPS in its SIP, the standards should not deviate from those that were federally promulgated. Because EPA set those standards taking into account technological limitations, additional exemptions would be inappropriate."

*(b) Comment:* Commenters state that EPA is incorrect in its interpretation and reliance on a number of court decisions used in part to justify the SIP Call. Commenters indicate that *Michigan DEQ* v. *Browner* and *Arizona Public Service Co.* v. *EPA* are not relevant. Commenters state that EPA fails to mention other cases, such as *Sierra Club* v. *Georgia Power,* which commenters allege are more on point and do not support EPA's proposed SIP call. Commenters also criticize EPA's citation of *Sierra Club* v. *EPA,* and claim that EPA's "broad interpretation" is at odds with a July 2009 letter from Adam Kushner to industry.

*Response:* Our action is based on our longstanding interpretation of the CAA, which is reflected in our 1999 and earlier policy statements, among other locations. As we noted in our proposal (see 75 FR 70890), *Arizona Public Service Co.* v. *EPA,* 562 F.3d 1116, 1129 (10th Cir. 2009) held that our 1999 Policy was a "reasonable interpretation of the Clean Air Act." The court in *Michigan DEQ* v. *Browner,* 230 F.3d 181, 186 (6th Cir. 2000) similarly found that EPA's interpretation of section 110, as explained in the 1982 and 1983 Policies, was reasonable and held that "EPA reasonably concluded that Michigan's proposed SIP revision did not meet the requirements of the CAA."

Contrary to commenters' arguments, these cases are relevant to our action. The courts agreed with EPA that it is not appropriate under CAA section 110 to provide or approve an outright exemption from SIP emission limitations, and the *Michigan DEQ* court upheld EPA's determination that Michigan's defective SSM revisions did not meet the requirements of the CAA.

Commenters suggest that these cases are irrelevant because they didn't involve a SIP call. However, if, as these courts held, EPA's interpretation is reasonable—that a malfunction provision that provides an exemption from an emission limit does not meet the minimum requirements of CAA section 110—then logic leads to the conclusion that the provision is substantially inadequate to meet section 110's requirements with respect to SIP compliance and enforceability.

EPA's past approval of a provision that fails to meet the minimum requirements of the Act does not render the provision compliant, something EPA plainly acknowledged in its various policy statements over the years. The SIP call provisions of the Act provide EPA with one of the only means to revisit SIP decisions that may have been wrong or ill-considered, or that have been brought into greater focus with the passage of time and development of relevant knowledge and case law.

Contrary to commenters' assertion, we did refer to *Sierra Club* v. *Georgia Power Co.* in our proposal at 75 FR 70892, n. 7, but inadvertently omitted the case name. We disagree that the case "is more analogous" or "contradicts EPA's current interpretation." The case merely held that EPA's 1999 policy did not change the existing Georgia SIP, a proposition we agree with and have acted in accordance with here. See EPA's December 5, 2001 clarification of the 1999 Policy, which is in the docket. If we thought the policy trumped the approved SIP, there would be no need to issue a SIP call now. As *Sierra Club* v. *Georgia Power Co.* suggested, we are issuing a SIP call to ensure that the Utah SIP meets the minimum requirements of the CAA. See 443 F.3d 1346, 1355 (11th Cir. 2006).

Regarding *Sierra Club* v. *EPA,* 551 F.3d 1019 (DC Cir. 2008), while we did not cite the case as the main basis for our SIP call, we remain convinced it is relevant even though it addressed the hazardous air pollutant (HAP) regulations. In particular, the court significantly relied on section 302(k)'s definition of emission standard (as a requirement that limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis) to reach its ultimate holding disallowing EPA's exceptions from the MACT standards and attempted reliance on the general duty to minimize emissions. As with MACT standards, there is no indication that Congress intended compliance with NAAQS, or compliance with emission limits relied on to attain and maintain the NAAQS, be anything less than continuous. Also, we disagree with the comment that the UBR does not provide an express exemption from SIP and other emission limits. The UBR states that "emissions resulting from an unavoidable breakdown will not be deemed a violation of these regulations." This is an exemption. The provisions in the UBR requiring that an owner/operator take "reasonable" measures to reduce emissions resulting from an unavoidable breakdown are analogous to the general duty provisions in EPA's MACT provisions. The *Sierra Club* court found these general duty requirements were not a substitute for a 112 emission standard. Here, we find the emissions minimization requirements in the UBR are not a substitute for continuously applicable emission limitations that support attainment and maintenance of the NAAQS, and protection of PSD increments and visibility.

We also disagree that our views contradict the views Adam Kushner (EPA's Director of the Office of Civil Enforcement) expressed in his July 2009 letter to industry representatives. Mr. Kushner was delineating which MACT standards were directly affected by the court's ruling and how they would be affected. Mr. Kushner was not expressing an opinion about the import of the Court's decision for other types of emission standards and limitations. We also find noteworthy the following language from Mr. Kushner's letter: "Although these provisions [source-category specific SSM provisions] will remain in effect following the issuance of the mandate in *Sierra Club,* EPA recognizes that the legality of such source category-specific SSM provisions may now be called into question, and EPA intends to evaluate them in light of the court's decision." EPA has since revised or proposed to revise several MACT standards with source-specific malfunction provisions to eliminate the exemptions from compliance during periods of malfunction. See, *e.g.,* 76 FR 15608 (March 21, 2011); 75 FR 54970 (September 9, 2010); 75 FR 65068 (October 21, 2010).

*(c) Comment:* EPA lacks the regulatory authority to make a SIP call based on policy or guidance that has not become applicable law. The 1999 Policy EPA cites as justification for the SIP Call has never been subjected to the legal requirements of notice and public rulemaking under the Administrative Procedures Act. In addition, commenters assert that if EPA were authorized to regulate through policy, it would be inappropriate in this case because the 2001 Policy [10] clarifies that the 1999 Policy was not intended to alter the status of any existing malfunction, startup, or shutdown provisions in a SIP that had been approved by EPA.

*Response:* The 1999 Policy reflects our interpretation of the CAA. We have not treated it as binding on the States or asserted that it changed existing SIP provisions. Instead, we have done what commenters argue is necessary—we have engaged in notice and comment rulemaking to determine whether a SIP call is appropriate in this case. Through this rulemaking action, we have evaluated provisions of the Utah SIP to determine whether they are consistent with our interpretation of the CAA as reflected in our policies. We provided commenters with the opportunity to

---

[10] "Re-Issuance of Clarification—State Implementation Plans (SIPs): Policy Regarding Excess Emissions During Malfunction, Startup, and Shutdown," Eric Schaefer and John Seitz, December 5, 2001.

comment on the proposed SIP call and our basis for it, and are only finalizing the SIP call after carefully considering commenters' comments.[11] To the extent some commenters may be arguing that we must conduct national rulemaking on our policy before we can conduct SIP call rulemaking with respect to a specific State malfunction provision, we find no basis for this assertion in the CAA. We have evaluated the UBR, found it substantially inadequate as specified in the CAA, and issued a SIP call as required. The process we have followed and the substance of our action are reasonable.

Commenters emphasize our failure to specifically cite our December 5, 2001 clarification to the 1999 Policy, in which we indicated that the 1999 Policy was not intended to "alter the status of any existing malfunction, startup or shutdown provision in a SIP that has been approved by EPA."[12] The 2001 clarification merely clarifies the obvious well-understood principle—that an approved SIP remains the approved SIP unless or until EPA undertakes rulemaking action to revise the SIP. See *General Motors* v. *United States,* 496 U.S. 530, 540–541 (1990). In other words, the 1999 Policy did not modify existing SIP provisions. Here, "in the context of future rulemaking" as contemplated by the 2001 clarification, we have considered "the Guidance and the statutory principles on which the Guidance is based." See December 5, 2001 clarification.

One commenter argues that the 2001 clarification "clarifies the 1999 Policy does not apply to" the UBR. On the contrary, because the UBR addresses the treatment of excess emissions resulting from an unavoidable breakdown, EPA's interpretations reflected in the 1999 Policy are clearly relevant. Also, nothing in the 2001 clarification rejected EPA's statement in the 1999 Policy that all EPA Regions "should review the SIPs for their states in light of this clarification and take steps to insure that excess emissions provisions in these SIPs are consistent with the attached guidance." As provided above,

the sole purpose of the 2001 clarification was to expressly state that the policy—standing alone—did not serve to change the terms of an approved SIP.

*(d) Comment:* EPA's proposed SIP call is justified regardless of its reliance on guidance. Commenter explains that Utah's SIP cannot possibly assure the NAAQS and other CAA requirements will be met if the SIP allows a blanket exemption from emission limits, particularly because the effectiveness of Utah's SIP is premised upon compliance with emission limits.

*Response:* Our SIP call relies on our interpretations of the CAA as reflected in numerous policy statements and actions over the years. Otherwise, we agree with the commenter.

*(e) Comment:* Commenters assert that EPA's SIP call is inconsistent when compared with other EPA SSM polices such as those for NSPS in 40 CFR 60.8(c).

*Response:* Emission limitations in SIPs must ensure ambient levels of criteria pollutants that attain and maintain the NAAQS. For purposes of demonstrating attainment and maintenance, States assume source compliance with emission limitations at all times. Thus, provisions that exempt compliance during SSM undermine the integrity of the SIP. This principle underlies EPA's interpretations regarding SIP SSM provisions as reflected in our various policy statements over the years. For example, in our 1999 Policy we stated the following:

"EPA has a fundamental responsibility under the Clean Air Act to ensure that SIPs provide for attainment and maintenance of the national ambient air quality standards ("NAAQS") and protection of PSD increments. Thus, EPA cannot approve an affirmative defense provision that would undermine the fundamental requirement of attainment and maintenance of the NAAQS, or any other requirement of the Clean Air Act. See sections 110(a) and (l) of the Clean Air Act * * * Accordingly, an acceptable affirmative defense provision may only apply to actions for penalties, but not to actions for injunctive relief.

\*          \*          \*          \*          \*

Generally, since SIPs must provide for attainment and maintenance of the national ambient air quality standards and the achievement of PSD increments, all periods of excess emissions must be considered violations. Accordingly, any provision that allows for an automatic exemption for excess emissions is prohibited.

\*          \*          \*          \*          \*

Automatic exemptions might aggravate ambient air quality by excusing excess emissions that cause or contribute to a violation of an ambient air quality standard."

Similarly, in our 1982 Policy, we stated the following:

"The rationale for establishing these emissions as violations, as opposed to granting automatic exemptions, is that SIPs are ambient-based standards and any emissions above the allowable may cause or contribute to violations of the national ambient air quality standards."

Thus, EPA has long said that automatic exemptions from SIP emission limits are not appropriate because the SIPs are for the purpose of ensuring health-based standards are met and maintained.[13]

NSPS and other technology-based standards, on the other hand, do not have to ensure attainment of the NAAQS. Instead, CAA section 111(a)(1) provides that a new source "standard of performance" must reflect "the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction and any nonair quality health and environmental impact and energy requirements)" EPA determines has been "adequately demonstrated." Thus, historically, EPA has held different interpretations regarding the proper treatment of excess emissions during SSM under health-based standards addressed in SIPs and the NSPS technology-based standards.[14] In the SIP context, and in the context of SIP-based permits, EPA's interpretation of the CAA is reasonable, and it is reasonable for EPA to require that Utah revise the UBR or remove it from the SIP.

*(f) Comment:* The Utah UBR has been federally-approved in the SIP for over 30 years. Based on empirical UDAQ monitoring since that approval, the Utah UBR has not contributed to a NAAQS exceedance.

*Response:* As indicated above, we disagree that the commenters' suggested test—whether there is demonstrated proof that a specific excess emission event allowed under the UBR has contributed to a specific monitored

[11] We have applied the interpretation reflected in our policies in a number of other rulemaking actions. See, *e.g.,* the Billings/Laurel Federal Implementation Plan, 73 FR 21418 (April 21, 2008); approvals of Colorado SSM rules, 71 FR 8958 (February 22, 2006) and 73 FR 45879 (August 7, 2008); partial approval and partial disapproval of Texas SSM rules, 75 FR 26892 (May 13, 2010) and 75 FR 68989 (November 10, 2010); disapproval of Michigan SSM rules, 63 FR 8573 (February 20, 1998); approval of Maricopa County, Arizona SSM rules, 67 FR 54957 (August 27, 2002).

[12] We included the 2001 clarification in the docket for our proposal but did not cite it specifically.

[13] The 1999 Policy defines "automatic exemption" as "a generally applicable provision in a SIP that would provide that if certain conditions existed during a period of excess emissions, then those exceedances would not be considered violations." The UBR provides such an automatic exemption: "Except as otherwise provided in R307–107, emissions resulting from an unavoidable breakdown will not be deemed a violation of these regulations." In this notice, we also refer to this as an outright exemption or an exemption.

[14] As we noted in our proposal and elsewhere in this action, however, the 2008 *Sierra Club* case held that EPA rules exempting major sources from technology-based NESHAP standards during SSM periods violated the CAA's requirement in section 112 that some standard meeting that provision's substantive requirements apply continuously. *Sierra Club* v. *EPA,* 551 F.3D 1019, 1028 (DC Cir. 2008).

NAAQS exceedance—is the test we must use. As stated above, for purposes of demonstrating attainment and maintenance of the NAAQS (and for protecting PSD increments and visibility), States assume source compliance with SIP emission limitations at all times.[15] Thus, it is reasonable to insist that the SIP not interfere with or undermine the ability to enforce compliance with SIP limitations at all times. The UBR fails this test for the reasons already stated.

In addition, even if the commenters were correct that the sole reasonable test is whether the UBR has contributed to a monitored exceedance of the NAAQS, we cannot discern whether commenters are saying there has never been a breakdown event on a day when a monitor has exceeded a NAAQS. (The commenters submitted no data regarding claims under the UBR.) However, based on monitored violations of the NAAQS, Utah has had areas designated nonattainment for various pollutants over the course of many years and continues to have nonattainment areas for $PM_{2.5}$, $PM_{10}$, and $SO_2$. Areas in Utah will likely be designated nonattainment for ozone again in the future. As noted in a prior response, malfunction-based emissions at stationary sources can lead to large emissions in a short period of time, and it is reasonable to conclude that excess emissions during malfunctions have contributed and/or have the potential to contribute to NAAQS exceedances and violations in the urbanized areas of Utah.[16] If EPA promulgates new, more stringent NAAQS, the potential for NAAQS exceedances and violations only increases.

Several commenters emphasize that the UBR has been in the SIP for more than 30 years and that EPA has approved it more than once. We first approved the UBR in 1980 only after stating in our 1979 proposed rulemaking action that we could not fully approve the UBR "because it exempts certain excess emissions from being violations of the Air Conservation Regulations" and only after opining that exemptions granted under the UBR would not apply

as a matter of Federal law. See 44 FR 28688, 28691 (May 16, 1979).

Second, our approval of the UBR preceded the 1982 and 1983 Policies. These memoranda to EPA's Regional Administrators were issued in response to requests for clarification of EPA's policy regarding excess emissions during SSM. Presumably, these memoranda were issued because previously there had been some confusion about EPA's interpretation of the CAA on this issue. A comparison of the UBR to these policies reveals that the UBR did not and does not comport with the interpretation reflected in the policies. For example, the 1982 Policy states that EPA can approve SIP revisions that incorporate an "enforcement discretion approach" that requires the State agency to treat all excess emissions due to malfunctions as violations and commence a proceeding to notify the source of its violation. Then the State agency would determine whether to initiate an enforcement action based on specific, detailed criteria contained in the 1982 Policy. The UBR does not treat all excess emissions as violations, does not require the State to initiate a proceeding to notify the source of its violation, and does not contain the criteria consistent with those contained in the 1982 Policy. The 1982 Policy stated, "Where the SIP is deficient, the SIP should be made to conform to the present policy." Contrary to the 1982 Policy's directive, the SIP was not made to conform to the 1982 Policy.

We approved a revised version of the UBR in 1994 with no preamble discussion except to note that the Utah air rules had been renumbered and new requirements had been added to the SIP. See 57 FR 60149 (December 18, 1992) and 59 FR 35036 (July 8, 1994). There is no indication that EPA evaluated the substance of the UBR or any of the other re-numbered provisions that were already included as part of the approved SIP. *Id.* We also note that the 1994 approval preceded our 1999 Policy, which re-alerted EPA regional offices to the issues regarding SIP SSM rules, acknowledged that some existing SIPs included deficient SSM provisions, and directed the Regions to review the SIPs and seek to correct such provisions.

Subsequent to EPA's issuance of the 1999 Policy, we approved another renumbering of the Utah SIP, including a renumbering of the UBR. Again, EPA did not consider the substance of the UBR, but did expressly reference EPA's ongoing concerns with SIP rules and specifically noted that Utah had committed to address those concerns, which included concerns with the UBR.

We indicated that we would "continue to require the State to correct any rule deficiencies despite EPA's approval" of the recodification. See 70 FR 59681, 59683 (October 13, 2005).

In other words, we indicated in the 1979 proposal that preceded our 1980 approval that we could not fully approve the UBR because it provided exemptions from violations, and in our subsequent actions, we did not reanalyze the adequacy of the rule. However, we did indicate in our most recent re-numbering approval our intent to require the State to correct the deficiencies in the UBR.

Furthermore, since EPA issued the 1999 Policy, we have been working with Utah in an attempt to change the UBR on a cooperative basis. As noted in our proposal, Utah acknowledged that the provision could benefit from clarification and initiated rulemaking toward that end. In an April 18, 2002 letter, Utah also specifically committed to address our concerns with the rule. See 75 FR 70891. However, Utah never completed a change to the UBR despite our substantial efforts to help Utah develop a revised rule that would meet CAA requirements. *Id.* The delay that has resulted from our attempt to reach a consensus-based solution does not diminish our authority to issue a SIP call.

*(g) Comment:* Commenter asserts that "there must be evidence of new information that would explain how Utah's SIP has somehow been transformed from adequate to substantially inadequate." Commenter cites *Clean Air Implementation Project v. EPA,* 150 F.3d 1200, 1207 (DC Cir. 1998) for this proposition. Commenter asserts that no such information has been provided.

*Response:* Commenter's interpretation would preclude EPA from changing its interpretations and conclusions over time or from determining that prior approvals were a mistake, and issuing a SIP call on such bases. CAA sections 110(a)(2)(H) and 110(k)(5) do not constrain us in that way, and *Clean Air Implementation Project v. EPA* did not hold that a SIP previously found by EPA to be adequate could not be subsequently found to be inadequate absent evidence of new information. On the contrary, the case did not involve a challenge to a SIP call at all, and the statements the commenter refers to were dicta involving a completely different set of facts.[17]

---

[15] We note that dispersion modeling, based on SIP emission limitations, is often required to demonstrate attainment and maintenance of the NAAQS because modeling can predict pollutant levels at receptor locations throughout an area, whereas monitors are limited in number and location. See, *e.g.,* 40 CFR 51.112; 40 CFR part 51, appendix W.

[16] Based on data in EPA's Air Quality System database for the years 2005 through 2010, there were 171 days during which the $PM_{2.5}$ NAAQS was exceeded at a monitor in Utah and 154 days during which the 2006 ozone NAAQS was exceeded at a monitor in Utah.

[17] *Clean Air Implementation Project v. EPA* addressed a challenge to EPA's credible evidence rule and held that the challenge was not ripe for decision.

As a practical matter, our past decisions are not infallible. They reflect a decision made at a particular point in time by a particular set of individuals based on a particular understanding (or misunderstanding) of facts, policy, and law. Our 1999 Policy expressly recognizes this: "A recent review of SIPs suggests that several contain provisions that appear to be inconsistent with this policy, either because they were inadvertently approved after EPA issued the 1982–1983 guidance or because they were part of the SIP at that time, and have never been removed." 1999 Policy at 1. Further, the 1999 Policy advised all Regions to review the SIPs for their States in light of the clarification and take steps to insure that excess emissions provisions in these SIPs are consistent with the policy. *Id.* at 4. Similarly, EPA's 1982 Policy explained that the Agency, because it had been inundated with proposed SIPs in the early 1970's and had limited experience processing them, had not given sufficient attention to the "adequacy, enforceability, and consistency" of SSM provisions. Thus, "many SIPs were approved with broad and loosely-defined provisions to control excess emissions." 1982 Policy at 1.

The 1999 Policy can be viewed as refreshing EPA's institutional memory. It reiterated and clarified EPA's longstanding interpretation and provided direction to EPA's regional offices to review SIPs from their respective States. This caused EPA Region 8 to review SIPs for Utah and the other States within the region. As noted in our proposal, several Region 8 States have submitted revisions to their SSM rules in response to our review, and EPA has approved revised rules for Colorado and Wyoming. See 75 FR 70890. Our review of the Utah rule revealed that it was inconsistent with CAA requirements, and we initiated sustained efforts to get the State to revise the rule. The State did not revise the rule. See 75 FR 70890–70891.

A review of facts here indicates that EPA's 1980 approval of the UBR was ill-considered because even then our basic interpretation that all excess emissions must be treated as violations applied. As discussed in our proposal for this action, EPA said in its 1979 proposal on the UBR that EPA "may not fully approve Regulation 4.7 because it exempts certain excess emissions from being violations of the Air Conservation Regulations" but then proposed to approve the UBR anyway. Clearly, the regulation did not comport with EPA's interpretations regarding SSM provisions in SIPs. However, with almost no explanation, EPA justified its

approval based on a conclusion that any exemptions granted by Utah "are not applicable as a matter of federal law." See 44 FR 28691. This did not obviate the deficiency in the UBR. Also, EPA's interpretation of that time—that exemptions granted by Utah would not affect Federal enforcement—could be questioned and rejected in court. While some commenters state that EPA's enforcement discretion would not be affected by the Utah executive secretary's decision, others offer no such concession. See, *e.g.,* Utah Manufacturers Association, *et al.,* comment letter at 5 versus Utah Industry Environmental Coalition, *et al.,* comment letter at 14, which are in the docket for this action. Furthermore, Phillips Petroleum asserted in a 1997 EPA enforcement action that Utah's non-violation determinations under the UBR were binding on EPA.[18]

While we disagree with the commenter that a SIP call is only allowed where there is new external information that the SIP is invalid,[19] facts since our 1980 approval, such as arguments made in enforcement cases contrary to EPA's interpretation, would certainly qualify as new information justifying a SIP call. Among other things, the UBR is substantially inadequate because it is burdened by the uncertainty of whether EPA or citizens may pursue independent enforcement where the Utah executive secretary decides an excess emission is not a violation.

*(h) Comment:* Commenters state that EPA mischaracterizes the Utah UBR in that Utah's rule does not allow for outright exemptions from BACT or LAER limits, and does not undermine protection of the NAAQS, PSD increments, or visibility.

*Response:* We do not agree. Under the UBR, excess emissions resulting from

---

[18] In 1997, EPA initiated an enforcement action against the Phillips Petroleum refinery in Davis County, Utah when the State declined to pursue enforcement. Among other things, EPA alleged that Phillips had violated its one-hour emission limit contained in the Utah SIP for the Salt Lake County PM₁₀ nonattainment area. The State, with little or no apparent analysis, decided that all or nearly all of the more than 1,000 exceedances EPA cited in its complaint against Phillips were caused by unavoidable breakdowns and were not violations under the UBR. Phillips alleged in pleadings that the State's decision precluded EPA enforcement as a matter of law. We disagreed with the State's decision and with Phillips' arguments, but the court never decided the issue because a settlement was reached. We have included in the docket for this action various pleadings and documents from the Phillips enforcement case that reflect the facts cited herein.

[19] We also may have been justified using our authority under 110(k)(6) to revise the rule, but have decided the better course here is to provide the State the opportunity to revise the SIP through the SIP call process.

unavoidable breakdowns are not violations. We consider that an outright exemption, which prevents enforcement action where, for example, it may be needed to protect the NAAQS. The commenter's premise—that unavoidable breakdowns will occur regardless of the rule—assumes a continued right to pollute regardless of whether such emissions might undermine the very purpose of the SIP—attainment and maintenance of the NAAQS. It also assumes that the UBR provides adequate incentives to avoid malfunctions and protect the NAAQS. We do not agree. See our other responses.

*(i) Comment:* A commenter argues that the UBR does not preclude injunctive relief. The commenter cites UDAQ's ability to pursue injunctive relief if it decides the excess emissions were not caused by an unavoidable breakdown.

*Response:* The commenter says nothing about EPA or citizen authority where UDAQ decides, erroneously or not, that the excess emissions were caused by an unavoidable breakdown, or where the excess emissions were in fact caused by an unavoidable breakdown as defined in the UBR. It is our interpretation that injunctive relief must be preserved regardless of the State determination and regardless of the cause of the exceedance. Protection of the NAAQS should not be subservient to a source's desire to continue operating as it has, or its "need" to continue polluting. As we have explained in our various policy statements over the years, all exceedances must be treated as violations to allow protection of the NAAQS, and no defense to injunctive relief is appropriate. See the 1982, 1983, and 1999 Policies.

Also, as to UDAQ's enforcement discretion, we find it likely that the UBR would prevent the State from obtaining injunctive relief where the breakdown meets the criteria in the UBR to be classified as unavoidable.

*(j) Comment:* Commenters state that contrary to EPA's assertion, the discretion afforded the UDAQ executive secretary under the unavoidable breakdown rule does not limit EPA's ability to overfile or a third party's ability to file a citizen's suit. Another commenter states that EPA lacks a reasonable basis to presume "uncertainty" about reserved enforcement authority.

*Response:* The UBR language in question reads: "The submittal of such information shall be used by the executive secretary in determining whether a violation has occurred and/or the need of further enforcement action."

The plain language appears to grant the executive secretary the authority to determine whether excess emissions constitute a violation or not. Our approval of that language could be construed by a court as ceding that authority to the State. A court could conclude that it should not resort to the interpretation we offered with our 1980 approval—that an exemption granted by the Utah executive secretary would not apply as a matter of Federal law—because the language of the regulation is clear on its face.[20] Also, we did not repeat our 1980 interpretation in subsequent approvals. In addition, representations made by the commenters here would not bind them or other entities in subsequent enforcement actions.

The State suggests that it would not "forget EPA's interpretation of the law." But, in its comments, the State does not say it agrees with EPA's interpretation or that it or another entity would not argue against EPA's interpretation in an enforcement action. As noted, at least one defendant—Phillips Petroleum—has already argued against our 1980 interpretation. To our knowledge, the State has never provided an interpretation that the UBR was not intended to and does not have a preclusive effect on EPA or citizen enforcement.

At best, the UBR language is ambiguous, and in the face of this ambiguity, a court could defer to the State's interpretation, whose interpretation of the rule is currently unknown. Ambiguous language can undermine the purpose of the SIP and compliance with CAA requirements.[21]

The commenters would have us remain silent in face of the uncertainty caused by the UBR language. The reasonable course is to require the State through our SIP call authority to change the UBR to remove its potential impediment to our and citizens' exercise of our independent enforcement authority under CAA sections 113 and 304.[22] The UBR's threat to our and citizens' independent enforcement authority under the CAA renders the SIP substantially inadequate.

The State suggests that our action is unreasonable because it has taken us so long to recognize and address the problem. As we noted above, issuance of the 1999 Policy spurred our re-examination of the Utah SIP. In particular, the 1999 Policy clarified that SIPs should not include provisions whereby a State's enforcement decision would "bar EPA's or citizens' ability to enforce applicable requirements." 1999 Policy at 3. The Phillips Petroleum case also influenced us. The State does not mention that we attempted to address our concerns cooperatively with the State since shortly after the 1999 Policy was issued, and for many years thereafter.

*(k) Comment:* One commenter suggests that the potential preclusive effect of the executive secretary's violation/non-violation determinations under the UBR may be "in keeping with the role given to states in SIP matters."

*Response:* We disagree. Sections 113 and 304 of the Act clearly provide independent enforcement authority to EPA and citizens. While section 304 limits citizens' authority where a State or EPA "has commenced and is diligently prosecuting a civil action," nothing in the CAA suggests that Congress intended or required States to have exclusive authority to determine whether an exceedance constitutes a violation. Nor is there any rational reason EPA should be relegated, as the commenter suggests, to an action under section 113(a)(2) of the Act—to essentially wait for "widespread" dereliction of duty on Utah's part—to correct this problem in the UBR. Our use of SIP call authority to correct the problem is reasonable. We have responsibility to implement and interpret the CAA, and we reject the commenter's interpretation that the "balance of authority in Utah's SIP and the UBR is in keeping with the role given to states in SIP matters." Contrary to the commenter's suggestion, we are not required to wait for a court to determine in the context of an enforcement action whether the potential preclusive effect of the UBR language is consistent with the CAA. Congress did not hamstring us in that way; instead it provided us with authority to issue a SIP call to address substantial inadequacies in the SIP.

*(l) Comment:* Commenters argue that EPA's preferred approach would have no impact on emissions because unavoidable breakdowns are by their nature unavoidable regardless of the rule governing such events.

*Response:* First, as we explain above, the UBR precludes injunctive relief when the excess emissions fall within the UBR's coverage. As we have explained, this is inconsistent with the CAA. Commenters do not address this, but instead appear to assume the need to pollute trumps protection of the NAAQS.

Second, how "unavoidable" is defined makes a difference. Depending on the definition, different incentives with respect to design, operation, and maintenance are created. We find that the criteria contained in the UBR are not as extensive or rigorous as the criteria in the 1999 Policy for asserting an affirmative defense to penalty actions. For example, the UBR indicates that breakdowns caused by "poor maintenance" or "careless operation" or "any other preventable upset condition or preventable equipment breakdown" shall not be considered unavoidable breakdowns. Unlike the UBR, the 1999 Policy specifically addresses potential design flaws in addition to issues with maintenance and operation: "The excess emissions were not part of a recurring pattern indicative of inadequate design, operation, or maintenance." The lack of specificity in the UBR could lead a court to conclude that the rule was not intended to reach back to the design of the facility or its control equipment. In addition, the UBR does not indicate who has the burden of proof regarding claims of unavoidable breakdown. The 1999 Policy clearly provides that the source has the burden to prove the elements of the affirmative defense to penalties.

Third, who decides whether a breakdown qualifies as unavoidable makes a difference. As we have indicated, the UBR appears to give the Utah executive secretary exclusive authority to determine whether a violation has occurred—*i.e.,* whether a breakdown was an unavoidable breakdown. As noted, potential preclusion of EPA and citizen enforcement reduces the incentive for sources to improve their design, maintenance, and operation practices.

*(m) Comment:* Commenters assert that Utah's Unavoidable Breakdown Rule is generally consistent with EPA's criteria in the 1999 Policy and provide their own side-by-side comparison of the

---

[20] See, e.g., *U.S.* v. *Ford Motor Co.*, 736 F.Supp. 1539 (W.D. Mo. 1990) and *U.S.* v *General Motors Corp.*, 702 F.Supp. 133 (N.D. Texas 1988) (EPA could not pursue enforcement of SIP emission limits where States had approved alternative limits under procedures EPA had approved into the SIP); *Florida Power & Light Co.* v. *Costle*, 650 F.2d 579, 588 (5th Cir. 1981) (EPA to be accorded no discretion in interpreting State law). While we do not agree with the holdings of these cases, we think the reasonable course is to eliminate any uncertainty about reserved enforcement authority by requiring the State to revise or remove the unavoidable breakdown rule from the SIP.

[21] In approving Colorado's affirmative defense rule for startup and shutdown, we specifically disapproved one section of the rule that we felt could have been construed to cede authority to Colorado to determine whether a source had established the elements of the affirmative defense. 71 FR at 8959 (February 22, 2006).

[22] The UBR could be easily revised to address the problem. The sentence in question could be changed to read, "The submittal of such information shall be used by the executive secretary in determining whether to pursue enforcement action."

1999 Policy's affirmative defense provisions to the relevant provisions in Utah's Unavoidable Breakdown Rule. Commenters state that this comparison shows the criteria contained in the 1999 Policy are addressed "in all material respects" by the Utah UBR, and that it is therefore difficult to understand EPA's conclusion of substantial inadequacy.

*Response:* The commenters have not alleviated our concerns. In our proposal and elsewhere in this notice, we identify fundamental flaws in the UBR that render the UBR substantially inadequate regardless of the criteria for determining whether a breakdown is unavoidable.

We also disagree with the commenters that the criteria are equivalent. We find that the UBR lacks the specificity contained in the 1999 Policy. For example, the 1999 Policy indicates that the source needed to use off-shift labor and overtime, to the extent practicable, to make repairs and needed to make repairs expeditiously when it knew or should have known that emissions limits were being exceeded. This specificity helps define the more general admonition in the policy that the source needs to employ good practices for minimizing emissions. We have already noted that the UBR criteria do not appear to address proper design of the facility, and they do not require reporting of all breakdowns. Also, the UBR does not require that the owner or operator document its actions in response to the breakdown with signed, contemporaneous operating logs.

Finally, we note that one significant difference between the affirmative defense described in the 1999 Policy and the UBR is that a violation of the emissions standard has occurred and provides relief only for actions for penalties. The UBR provides that the excess emissions are excused and would prohibit any action for penalties and any action for injunctive relief.

*(n) Comment:* The terms of the UBR are analogous to the criteria that EPA's 1982 and 1983 policies provided for analyzing whether a malfunction ought to spur enforcement action under the enforcement discretion approach. The UBR does not provide an automatic exemption as described in those policies.

*Response:* See our previous response. Also, assuming the comment regarding the criteria is relevant, we disagree with the commenter. The UBR is inconsistent with the 1982 and 1983 Policies in several respects. Specifically, the 1983 Policy states that "EPA can approve SIP revisions which incorporate the

'enforcement discretion approach.' Such an approach can require the source to demonstrate to the appropriate State agency that the excess emissions, **though constituting a violation,** were due to an unavoidable malfunction. **Any malfunction provision must provide for the commencement of a proceeding to notify the source of its violation and to determine whether enforcement action should be undertaken for any period of excess emissions."** (Emphasis added). The UBR does not require the State to initiate a proceeding to notify the source of its violation. Moreover, contrary to the foregoing, the UBR specifically provides that the executive secretary may decide that the excess emissions are not a violation, which could preclude enforcement action by EPA or citizens as well as injunctive relief. Finally, the 1999 Policy clarified the meaning of the term "automatic exemption." As we explain elsewhere, the UBR clearly provides an automatic exemption.

*(o) Comment:* EPA fails to acknowledge Utah Rule R307–107–1, 'Application', which states "Breakdowns that are caused entirely or in part by poor maintenance, careless operation, or any other preventable upset condition or preventable equipment breakdown shall not be considered unavoidable breakdown." Therefore, commenters state EPA's complaint claiming that "the rule's exemption reduces a source's incentive to design, operate, and maintain its facility to meet emission limits at all times" is without merit.

*Response:* We disagree. First, the quoted language is part of the criteria contained in the UBR. See our responses to comments comparing the criteria of the UBR to the criteria contained in our SSM policies. Second, considered as a whole, we conclude that the UBR reduces a source's incentive to meet its emission limits at all times. We have explained the basis for our view in our responses to previous comments. In particular, the rule appears to give the executive secretary exclusive authority to decide whether a breakdown meets the criteria under the UBR and thus, whether an exceedance is a violation.

*(p) Comment:* Commenters assert that EPA's SIP call is inconsistent with the Federal-State partnership as contemplated in the CAA. Commenters state that the CAA does not contemplate mandates to require a State to modify its SIP, without regard to environmental or air quality benefits, simply because EPA has a particular policy it wants to advance.

*Response:* We are not acting at odds with the CAA's contemplated Federal-State partnership. The CAA establishes

minimum requirements for SIPs and does not, as the commenters indicate, limit EPA's action to simply reviewing a SIP to determine whether it will provide for attainment and maintenance of the Act. Section 110(a)(2) provides a specific list of obligations that a State must meet and we are acting to ensure the Utah SIP meets those minimum requirements. In particular, we are acting to ensure that SIP emission limits, and related permit limits, which are for the purpose of attaining and maintaining the health-based air quality standards, protecting increments, and improving visibility in national parks and wilderness areas, can be enforced at all times as contemplated by sections 110 and 302 of the Act. We are also acting to ensure that Utah's SIP does not undermine delegated national standards like NSPS and NESHAPS.

*(q) Comment:* It is left to the states, and not EPA, to choose how they will achieve assigned emission reduction levels. Section 110 allows for a SIP call only if the state is not achieving NAAQS. As long as a state achieves the applicable air quality standards, Congress did not intend EPA to require a plan revision merely because it disagrees with the measure that a state implements.

*Response:* We are not interfering with Utah's selection of SIP emissions limits. We are acting to ensure that one element of the SIP—the UBR—is modified or removed so that it does not interfere with one of the minimum requirements of the CAA—that the SIP limits relied on to attain and maintain the NAAQS, protect increments, and protect visibility apply and be enforceable at all times. Furthermore, in the context of NSPS and NESHAPS, to which the UBR also applies, it is up to EPA to select emission limits (and any exemptions), not the State.

We disagree that section 110 only allows a SIP call if the State is not achieving the NAAQS. One commenter cites *Virginia* v. *EPA,* 108 F.3d 1397, 1410 (DC Cir. 1997) to support its view, but that court was addressing whether EPA could impose specific control requirements through its NOₓ SIP call and did not reach the holding the commenter alleges. Such a holding would be inconsistent with the plain language of section 110 and the legislative history. Congress specifically amended CAA section 110(a)(2)(H) in 1977 to add the phrase, "or to otherwise comply with any additional requirements established under this chapter" to the language, "is substantially inadequate to attain the national ambient air quality standard." CAA section 110(k)(5), added in 1990, is

in accord. In other words, there are other instances in which a SIP call may be issued. Fundamentally, SIP limits must be enforceable and apply continuously to meet CAA requirements (CAA sections 110(a)(2)(A) and (C) and 302(k)), and where these requirements are not met, a SIP call is warranted.

Furthermore, as noted already, a number of areas in Utah are designated nonattainment and have violated, or are violating various NAAQS.

*(r) Comment:* Some commenters assert that allowing EPA to proceed with a SIP call here in the absence of data showing the UBR has caused specific NAAQS violations could set the stage for unfettered, arbitrary EPA SIP calls with respect to any number of state rules. A commenter asserts that EPA's SIP call runs counter to past EPA SIP calls. Another asserts that EPA erroneously finds that the SIP call does not have Federalism implications. A commenter references an EPA action under CAA section 110(k)(6) with respect to a Nevada malfunction rule to argue that the SIP call is arbitrary.

*Response:* We explain above why we think we have a valid basis for the SIP call. We note that we have rarely issued SIP calls, but in any event, the commenters' fears about potential future EPA SIP calls are irrelevant to this action. The question is whether we have reasonably concluded that the UBR renders the Utah SIP substantially inadequate as provided under 110(k)(5). We conclude we have. Whether other SIPs or SIP rules are substantially inadequate will depend on the language of those rules and facts relevant to them. The comment that this SIP call is inconsistent with past EPA SIP calls is also inaccurate. While in some cases EPA has issued SIP calls to address specific violations of the NAAQS, EPA has also issued a SIP Call notifying certain States that their SIPs were inadequate to comply with sections 110(a)(2)(A) and (C) of the CAA because the SIPs could be interpreted to limit the types of evidence or information that could be used for determining compliance with and establishing violations of emissions limits. See 62 FR 8314, 8327 (February 24, 1997); October 20, 1999 letter from William Yellowtail to Governor Marc Racicot. We stand by our conclusion that the SIP call does not have Federalism implications within the meaning of Executive Order 13132; we are issuing a SIP call as required by sections 110(a)((2)(H) and 110(k)(5) of the CAA, following a finding of substantial inadequacy. Finally, regarding the vague reference (without citation) to EPA Region 9's proposal to address issues with the Nevada SIP

using the authority of CAA section 110(k)(6) (not section 110(a)(2)(H) or 110(k)(5)), we are unable to ascertain the relevance. Section 110(k)(6) provides an additional tool to ensure that SIPs are consistent with the requirements of the Act, and whether it could have been used in this instance does not implicate whether sections 110(a)(2)(H) and 110(k)(5) are appropriate tools to use. To the extent the commenter is suggesting that our SIP call is arbitrary because EPA Region 9 has not finalized its proposed 110(k)(6) action, we respectfully disagree.

*(s) Comment:* Utah's UBR is "clearly less stringent than the CAA and EPA rules and guidance."

*Response:* We agree that the UBR does not meet minimum CAA requirements and thus is substantially inadequate.

## C. Sanctions

*(a) Comment:* Commenter asserts that EPA fails to meet the requirements to impose mandatory sanctions under the CAA because sanctions can only be triggered by a "finding of substantial inadequacy." The commenter also asserts that sanctions are unwarranted because Utah has always acted in good faith to involve all stakeholders, including EPA, in an attempt to craft a clarified rule. The commenter expresses concern that sanctions would harm Utah's economy in these difficult economic times and indicates that EPA" should be circumspect in brandishing its sanctions club."

*Response:* This rulemaking action finalizes our finding of substantial inadequacy under CAA section 110(k)(5), and the State is required to submit a SIP revision in response to the finding of substantial inadequacy. If the State fails to submit the required SIP, the 18-month period before mandatory sanctions apply under section 179 will be triggered.

Under CAA section 179, whether or not Utah has acted in good faith to change the UBR is irrelevant; we lack authority to forestall the mandatory sanctions if EPA determines Utah has failed to respond to the SIP call or submits an incomplete or disapprovable SIP. Utah, however, has the power to avoid sanctions and any economic impacts to the State by submitting an approvable SIP addressing our SIP call. We have provided additional time, at the State's request, for the State to make its submission. Finally, as we noted in our proposal, other States in the Region have changed their SSM rules and gained EPA's approval.

*(b) Comment:* If EPA were to impose statewide sanctions, it would violate 40 CFR 52.30(b) if the criteria of 40 CFR

52.30(c) are met by one or more political subdivisions within the State.

*Response:* No commenter has suggested that a political subdivision within Utah meets the criteria of 40 CFR 52.30(c). However, as described in the "Final Action" section of this action, we are deferring a decision on whether to impose sanctions under section 110(m) and will consider any comments on the issue of imposing sanctions under section 110(m) if and when we take final action on this issue in the future.

*(c) Comment:* EPA's discretion under the CAA "must not be unreasonable or arbitrary. Since the EPA has not identified any reasons upon which consideration of statewide sanctions was based, the EPA has not provided adequate notice to the public of whether the exercise of discretionary authority under CAA Section 110(m) is appropriate in this case."

*Response:* While we provided a reason in our proposal—namely, that the UBR applies statewide—we are deferring a decision on whether to impose discretionary sanctions.

*(d) Comment:* Transportation and mobile sources should not be punished for a rule governing industry operations. The commenter therefore recommends that EPA "include a 'Protective finding' in the SIP call for mobile sources," which "would prevent the automatic 'freeze' of conformity and allow for operations to continue for at least two years after an EPA disapproval takes effect." Another commenter expresses concern that sanctions would negatively impact transit services.

*Response:* EPA does not intend to "punish" anyone. The purpose of sanctions is to encourage corrective action by the State. The applicable sanctions are specified by Congress, not EPA. As noted above, sanctions can be avoided altogether by Utah's timely submission of an approvable revision to the SIP. Regarding the suggestion that we provide a protective finding, our interpretation is that disapproval of any rule submitted in response to this SIP call would not result in a conformity freeze because the revision at issue is not a control strategy SIP revision governed by 40 CFR 93.120. The metropolitan planning organization could continue to make conformity determinations even after such a disapproval. Also, for the same reason, even if highway sanctions are triggered by future disapproval of a revised breakdown rule, a conformity lapse would not occur because we would not be disapproving a control strategy SIP revision. If highway sanctions are triggered, certain projects, such as transit projects and highway safety and

maintenance projects, could still go forward. See 61 FR 14363 (April 1, 1996), which contains the Federal Highway Administration's sanction exemption criteria policy.

*(e) Comment:* EPA sanctions on transportation funding might slow improvements to transportation projects across Utah, potentially resulting in diminished air quality in both attainment and nonattainment areas across the state. Sanctions on transportation funding might also stifle growth.

*Response:* See our previous responses. As noted, the sanctions would be mandatory in certain areas. The sanctions can be avoided through appropriate State action, and certain projects can proceed even if highway sanctions are triggered. As noted, we are deferring a decision on whether to impose discretionary sanctions under CAA section 110(m).

*(f) Comment:* EPA should not impose statewide sanctions, because this would punish portions of the state that are in compliance with the CAA.

*Response:* As noted, we are deferring a decision on whether to impose the sanctions under CAA section 110(m).

*(g) Comment:* Applying sanctions only in nonattainment areas rather than statewide would be inconsistent with the CAA, as the intent of the CAA "is not simply to attain the NAAQS and other CAA requirements, but to maintain compliance."

*Response:* As noted, we are deferring a decision regarding the application of sanctions statewide. However, we note that the CAA provides us with discretion to expand the scope of the sanctions; it does not require we do so.

*(h) Comment:* EPA should apply sanctions if Utah fails to correct the UBR.

*Response:* As noted, mandatory sanctions will apply if the relevant triggering events occur. We are deferring a decision regarding the application of discretionary sanctions. See the "Final Action" section of this action, above.

### D. Time Period for Response to SIP Call

*(a) Comment:* Utah requests that EPA grant the entire 18 months allowed by section CAA 179(a). Twelve months is an extremely short time to gather stakeholders, build consensus, draft a proposed rule, and allow for public participation, especially considering the considerable workload UDAQ faces aside from this SIP call. Utah states that a response time of less than 18 months may cause a change in the prioritization and possibly compromise other air quality efforts by the State including the development of its Regional Haze Rule,

the development of its PM$_{2.5}$ SIP revision, and efforts to meet the lower ozone standard. Another commenter believes that 12 months is an appropriate response period, while another argues for six months.

*Response:* In our proposed rulemaking action (see 75 FR 70893), we proposed that 12 months would be an appropriate length of time for Utah to respond to this SIP call. We viewed this as an acceptable time frame given the history with the State of Utah regarding the UBR and the time it has taken other States to submit SIPs addressing SSM rules. We have considered the State's comments and appreciate the resource burden a 12-month time frame would pose for UDAQ in view of the State's current work with its Regional Haze SIP revision, the development of its PM$_{2.5}$ attainment SIP revision (for three PM$_{2.5}$ nonattainment areas), and the potential for additional resource requirements to meet EPA's forthcoming reconsidered 8-hour ozone NAAQS. We also conclude that six months may not provide the State with sufficient time to revise the rule and still provide a reasonable opportunity for public input. Therefore, as CAA section 110(k)(5) grants EPA the authority to establish "reasonable deadlines" up to 18 months for a State to respond to a SIP call, and in view of the resource requirements that this SIP call will impose on the State in addition to those noted above, we have decided to grant the full 18 months for response as allowed by the CAA. We consider this a reasonable time period for the State to revise the rule, provide for public input, process the SIP revision through the State's procedures, and submit the SIP revision to us. We encourage the State to work with us on appropriate rule language and to submit the SIP revision as soon as possible.

### E. Miscellaneous Comments

*(a) Comment:* The commenters support EPA's action, and believe the action benefits the health and well-being of Utah citizens.

*Response:* We acknowledge receipt of the comment and the support for our proposal.

*(b) Comment:* Utah's UBR does not give industry incentive to design, operate and maintain equipment to meet emission limits at all times.

*Response:* We agree.

*(c) Comment:* The Utah UBR prevents the opportunity for citizen enforcement or injunctive relief.

*Response:* We agree that the UBR may preclude citizen enforcement or injunctive relief.

*(d) Comment:* EPA has notified Utah of the need to change their UBR on many occasions.

*Response:* We agree.

*(e) Comment:* SSM plans should be part of Title V permits so that information such as emission limits will be available to the public.

*Response:* This comment is not directly relevant to our action today, which does not address the treatment of SSM plans in Title V permits.

*(f) Comment:* EPA should include Utah R307–415–(7)(g) "Startup Shut down and Malfunction" in its analysis.

*Response:* Our review indicates that Utah rule R307–415–(7)(g) is part of Utah's Title V operating permit regulations and is titled "Permit Revision: Reopening for Cause." Utah's Title V regulations are separate from and not approved as part of the SIP. Thus, our SIP call authority is not applicable to those regulations. We were unable to find any discussion of startup, shutdown, or malfunction in R307–415–(7)(g) and, thus, are unable to respond more extensively to the comment.

## V. Statutory and Executive Order Reviews

Under Executive Order 12866 (58 FR 51735, October 4, 1993), this action is not a "significant regulatory action" and therefore is not subject to review by the Office of Management and Budget. For this reason, this action is also not subject to Executive Order 13211, "Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use" (66 FR 28355, May 22, 2001).

This action only requires the State of Utah to revise Utah rule R307–107 to address requirements of the CAA. Accordingly, I certify that this action will not have a significant economic impact on a substantial number of small entities under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*) because this action does not impose any requirements on small entities.

Since the only costs of this action will be those associated with preparation and submission of the SIP revision, EPA has determined that this action does not include a Federal mandate that may result in expenditures of $100 million or more to either State, local, or Tribal governments in the aggregate, or to the private sector in any one year. Accordingly, this action is not subject to the requirements of sections 202 or 205 of the unfunded mandates reform act (UMRA).

In addition, since the only regulatory requirements of this action apply solely to the State of Utah, this action is not subject to the requirements of section

203 of UMRA because it contains no regulatory requirements that might significantly or uniquely affect small governments.

Since this action imposes requirements only on the State of Utah, it also does not have Tribal implications. It will not have a substantial direct effect on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes, as specified by Executive Order 13175 (65 FR 67249, November 9, 2000).

This action also does not have Federalism implications because it will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government, as specified in Executive Order 13132 (64 FR 43255, August 10, 1999), because it will simply maintain the relationship and the distribution of power and responsibilities between EPA and the States as established by the CAA. This SIP call is required by the CAA because EPA has found the current SIP is substantially inadequate to attain or maintain the NAAQS or comply with other CAA requirements. Utah's direct compliance costs will not be substantial because the SIP call requires Utah to submit only those revisions necessary to address the SIP deficiencies and applicable CAA requirements.

EPA interprets Executive Order 13045 "Protection of Children from Environmental Health Risks and Safety Risks" (62 FR 19885, April 23, 1997) as applying only to those regulatory actions that concern health or safety risks, such that the analysis required under section 5–501 of the EO has the potential to influence the regulation. This action is not subject to EO 13045 because it does not establish an environmental standard, but instead requires Utah to revise a State rule to address requirements of the CAA.

Section 12 of the National Technology Transfer and Advancement Act of 1995 requires Federal agencies to evaluate existing technical standards when developing a new regulation. To comply with the National Technology Transfer and Advancement Act, EPA must consider and use "voluntary consensus standards" (VCS) if available and applicable when developing programs and policies unless doing so would be inconsistent with applicable law or otherwise impractical. In making a finding of a SIP deficiency, EPA's role is to review existing information against

previously established standards. In this context, there is no opportunity to use VCS. Thus, the requirements of section 12(d) of the National Technology Transfer and Advancement Act of 1995 (15 U.S.C. 272 note) do not apply.

This action does not impose an information collection burden under the provisions of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 et seq.), since it only requires the State of Utah to revise Utah rule R307–107 to address requirements of the CAA.

The Congressional Review Act, 5 U.S.C. 801 et seq., as added by the Small Business Regulatory Enforcement Fairness Act of 1996, generally provides that before a rule may take effect, the agency promulgating the rule must submit a rule report, which includes a copy of the rule, to each House of the Congress and to the Comptroller General of the United States. EPA will submit a report containing this action and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the United States prior to publication of the rule in the **Federal Register**. A major rule cannot take effect until 60 days after it is published in the **Federal Register**. This action is not a "major rule" as defined by 5 U.S.C. 804(2).

Under section 307(b)(1) of the Clean Air Act, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by June 17, 2011. Filing a petition for reconsideration by the Administrator of this final rule does not affect the finality of this action for the purposes of judicial review nor does it extend the time within which a petition for judicial review may be filed, and shall not postpone the effectiveness of such rule or action. This action may not be challenged later in proceedings to enforce its requirements. (See section 307(b)(2).)

## List of Subjects in 40 CFR Part 52

Environmental protection, Air pollution control, Carbon monoxide, Incorporation by reference, Intergovernmental relations, Lead, Nitrogen dioxide, Ozone, Particulate matter, Reporting and recordkeeping requirements, Sulfur oxides, Volatile organic compounds.

Authority: 42 U.S.C. 7401 et seq.

Dated: March 31, 2011.

**James B. Martin,**

*Regional Administrator, Region 8.*

[FR Doc. 2011–9215 Filed 4–15–11; 8:45 am]

**BILLING CODE 6560–50–P**

## ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Part 112**

**[EPA–HQ–OPA–2008–0821; FRL–9297–3]**

**RIN 2050–AG50**

## Oil Pollution Prevention; Spill Prevention, Control, and Countermeasure (SPCC) Rule— Amendments for Milk and Milk Product Containers

**AGENCY:** Environmental Protection Agency.

**ACTION:** Final rule.

**SUMMARY:** The U.S. Environmental Protection Agency (EPA or the Agency) is amending the Spill Prevention, Control, and Countermeasure (SPCC) rule to exempt all milk and milk product containers and associated piping and appurtenances from the SPCC requirements. The Agency is also removing the compliance date requirements for the exempted containers.

**DATES:** This final rule is effective on June 17, 2011.

**ADDRESSES:** The public docket for this rulemaking, Docket ID No. EPA–HQ–OPA–2008–0821, contains the information related to this rulemaking, including the response to comments document. All documents in the docket are listed in the index at *http://www.regulations.gov.* Although listed in the index, some information may not be publicly available, such as Confidential Business Information (CBI) or other information the disclosure of which is restricted by statute. Certain other material, such as copyrighted material, will be publicly available only in hard copy. Publicly available docket materials are available either electronically at *http://www.regulations.gov* or in hard copy at the EPA docket, EPA/DC, EPA West, Room 3334, 1301 Constitution Ave., NW., Washington, DC. The Public Reading Room is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding legal holidays. The telephone number of the Public Reading Room is 202–566–1744, and the telephone number to make an appointment to view the docket is 202–566–0276.

**FOR FURTHER INFORMATION CONTACT:** For general information, contact the Superfund, TRI, EPCRA, RMP, and Oil Information Center at 800–424–9346 or TDD at 800–553–7672 (hearing impaired). In the Washington, DC metropolitan area, contact the Superfund, TRI, EPCRA, RMP, and Oil