**ORAL ARGUMENT NOT YET SCHEDULED**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**

Case Nos. 11-9533

US MAGNESIUM LLC,

*Petitioner,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondent.*

On Petition for Review of Final Action of the
U.S. Environmental Protection Agency

**PETITIONER'S FINAL REPLY BRIEF
(DEFERRED APPENDIX APPEAL)**

Michael A. Zody
Michael J. Tomko
Jacob A. Santini
Parsons Behle & Latimer
201 South Main Street, Suite 1800
Salt Lake City, UT  84111
Telephone: (801) 532-1234
Facsimile: (801) 536-6111

*Attorneys for Petitioner*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.................................................................................ii

GLOSSARY OF ACRONYMS ...........................................................................v

ARGUMENT ......................................................................................................1

I.    USM HAS STANDING TO CHALLENGE EPA'S SIP CALL AS A
      DECISION BY THIS COURT WILL LIKELY REDRESS USM'S
      INJURY..................................................................................................2

II.   EPA'S SIP CALL IS ARBITRARY BECAUSE EPA FAILED TO
      DEMONSTRATE THAT THE UBR IS SUBSTANTIALLY
      INADEQUATE.......................................................................................6

      A.    EPA Must Demonstrate a SIP Is Substantially Inadequate
            Before it May Call for Revisions.........................................................7

      B.    EPA Did Not Support its Finding that the Utah SIP was
            Substantially Inadequate to Attain or Maintain the NAAQS ..............9

            1.    EPA's conclusion fails to account for the fact that excess
                  emissions falling within the scope of the UBR are
                  unavoidable.................................................................................10

            2.    EPA failed to examine how the UBR had been applied in
                  the past 32 years and how that application impacted
                  Utah's ambient air .....................................................................11

      C.    EPA Did Not Support its Finding that the Utah SIP is
            Substantially Inadequate to Otherwise Comply with the CAA.........15

            1.    EPA failed to justify its conclusion that the UBR is
                  substantially inadequate to comply with the NSPS and
                  NESHAP programs ...................................................................16

            2.    EPA's conclusion that the UBR "appears" to vest Utah
                  with exclusive authority to enforce against violations is
                  inconsistent with EPA's prior positions and fails to
                  justify the SIP Call...................................................................20

CONCLUSION .................................................................................................22

CERTIFICATE OF COMPLIANCE WITH RULE 32(A)(7)...............................23

CERTIFICATION OF DIGITAL SUBMISSION.................................................24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Baca v. King,*
    92 F.3d 1031 (10th Cir. 1996)............................................................. 3

*Citizens' Comm. to Save Our Canyons v. Kruegar,*
    513 F.3d 1169 (10th Cir. 2008)........................................................ 12

*Clean Air Implementation Project v. EPA,*
    150 F.3d 1200 (D.C. Cir. 1998) ........................................................ 9

*Commonwealth of Virginia v. EPA,*
    108 F.3d 1397 (D.C. Cir. 1997) ...................................................... 13

*Envtl. Def. v. Duke Energy Corp.,*
    549 U.S. 561, 127 S.Ct. 1423 (2007) ............................................. 13

*Hydro Res., Inc. v. EPA,*
    608 F.3d 1131 (10th Cir. 2010)......................................................... 2

*Int'l Fabricare Inst. v. EPA,*
    972 F.2d 384 (D.C. Cir. 1992) ....................................................... 19

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555, 112 S.Ct. 2130 (1992) ............................................... 2

*Marshall Durbin Co. of Jasper, Inc. v. EPA,*
    788 F.2d 1490 (11th Cir. 1986)......................................................... 3

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,*
    463 U.S. 29, 103 S.Ct. 2856 (1983) ......................................... 12, 19

*National Parks Conservation Association v. Manson,*
    414 F.3d 1 (D.C. Cir. 2005) ......................................................... 4, 5

*Norvell v. Sangre de Cristo Dev. Co.,*
    519 F.2d 370 (10th Cir. 1975)........................................................ 22

*Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.,*
    656 F.3d 580 (7th Cir. 2011).......................................................... 19

*S. Utah Wilderness Alliance v. Office of Surface Mining Reclamation and Enforcement,*
620 F.3d 1227 (10th Cir. 2010)...................................................................3, 4

*United States v. LTV Steel Co.,*
118 F. Supp.2d 827 (N.D. Ohio 2000)...................................................21

*W.R. Grace & Co. v. EPA,*
261 F.3d 330 (3d Cir. 2001)...................................................................9

## STATUTES

42 U.S.C. 7410(k)(5)...................................................................6, 8, 9

42 U.S.C. 7470...................................................................13

42 U.S.C. §§ 7413...................................................................21

42 U.S.C. §§ 7470-7479...................................................................13

42 U.S.C. § 7475...................................................................4

42 U.S.c. § 7604...................................................................21

## FEDERAL REGULATIONS

40 CFR 60.10(a)...................................................................17, 18, 19

40 CFR 60.48Da(c)...................................................................17

40 CFR 63.12(a)...................................................................17, 18, 19

## FEDERAL REGULATION NOTICES

44 Fed Reg. 28688 (May 16, 1979)...................................................................22

45 Fed. Reg. 10761 (Feb. 19, 1980)...................................................................21

67 Fed. Reg. 58998 (Sept. 19, 2002)...................................................................17

72 Fed. Reg. 4641 (Feb. 1, 2007)...................................................................17

75 Fed. Reg. 70888 (Nov. 19, 2010)...................................................................13, 18

76 Fed. Reg. 21639 (April 18, 2011)...................................................................5, 9, 12-18, 20

76 Fed. Reg. 63878, 63991/1 (Oct. 14, 2011).............................................. 18

UTAH ADMINISTRATIVE CODE

Rule 307-107-1................................................................................. 1, 10, 11

Rule 307-107-2..................................................................................... 21

Rule 307-107-4..................................................................................... 10

Rule 307-107-6..................................................................................... 18

# GLOSSORY OF ACRONYMS

CAA............................ Clean Air Act

EPA............................ Environmental Protection Agency

NAAQS ...................... National Ambient Air Quality Standards

NESHAP..................... National Emissions Standards for Hazardous Air Pollutants

NSPS........................... New Source Performance Standards

PSD............................ Prevention of Significant Deterioration

SIP ............................. State Implementation Plan

UDAQ......................... Utah Division of Air Quality

UDEQ ........................ Utah Department of Environmental Quality

USM............................ US Magnesium LLC

# ARGUMENT

For the past three decades, Utah's Unavoidable Breakdown Rule ("UBR")—codified as Rule 307-107-1, et seq., of the Utah Administrative Code—has addressed how the Utah Division of Air Quality ("UDAQ") will proceed in the event that a facility regulated under the Clean Air Act ("CAA") suffers an unavoidable and unpreventable breakdown. Now, EPA believes that the UBR must be removed or revised because, according to EPA, the provision leaves the Utah State Implementation Plan ("SIP") substantially inadequate to attain or maintain the National Ambient Air Quality Standards ("NAAQS") or otherwise comply with the CAA. But EPA's rulemaking demanding UDAQ revise the SIP—commonly known as a SIP call—is arbitrary. Rather than confronting the burden that EPA must overcome to order UDAQ to make such revisions, EPA minimized its obligation to demonstrate that the SIP *is substantially inadequate*, EPA refused to conduct any investigation into how the UBR has been applied in the course of three decades and how the UBR impacted Utah's ambient air, and EPA failed to engage in the legal analysis that would justify its conclusion. Ultimately, the UBR SIP Call is a rulemaking predicated on assumptions that lack factual and legal foundation and inconsequential ambiguities in the law.

**I.  USM HAS STANDING TO CHALLENGE EPA'S SIP CALL AS A DECISION BY THIS COURT WILL LIKELY REDRESS USM'S INJURY**

In addition to contesting the merit of USM's appeal, EPA argues that USM lacks standing to challenge the SIP Call because a decision vacating the SIP Call will not likely redress USM's injury.    Resp. Br. pp. 21-23.   In making its argument, EPA highlighted the fact that UDAQ—who is the target of EPA's SIP Call—is not a party to this appeal, and has opted to revise the UBR in accord with EPA's SIP Call.  Resp. Br. pp. 22-23.  To establish Article III standing, a party invoking federal jurisdiction must, among other elements, establish that the injury suffered "is likely to be 'redressed by a favorable decision.'" *Hydro Res., Inc. v. EPA*, 608 F.3d 1131, 1144 (10th Cir. 2010) (en banc) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct. 2130 (1992)).  The "unfettered choices made by independent actors" may undermine a party's ability to show redressability. *Lujan*, 505 U.S. at 562 (internal quotation marks omitted).

But UDAQ's actions are not independent, unfettered choices that preclude a finding of standing.  None of the cases that EPA cites are analogous to the scenario created by EPA's SIP Call, wherein EPA promulgated a rulemaking that explicitly required UDAQ to proceed in a particular fashion.  Rather, each of the cases involves an agency decision that had no binding impact on the exercise of discretion by the final decisionmaker.  *See Lujan*, 504 U.S. at 558, 568-71 (finding

no redressability in a challenge to the Secretary of the Interior's interpretation of the Endangered Species Act because the petitioners' injury was caused by the funding decisions of other agencies that were not bound by the Secretary's interpretation); *Marshall Durbin Co. of Jasper, Inc. v. EPA*, 788 F.2d 1490, 1492 (11th Cir. 1986) (finding no redressability because an agency's decision to upgrade a water treatment facility was not dependent upon EPA's decision to fund the upgrade, which was the subject of the challenge); *Baca v. King*, 92 F.3d 1031, 1037 (10th Cir. 1996) (finding no redressability in a challenge to the Department of Interior's independent decision to exchange land with a third party because the agency retained discretion as to whether to reinstate petitioner's grazing permit). In contrast, UDAQ's action is the direct result of EPA's SIP Call rulemaking, the vacatur of which would obviate the "need for UDAQ to revise the UBR and the existing UBR could be left in place." *See* Declaration of Bryce Bird, Director of UDAQ, ¶ 20, attached hereto ("Bird Declaration).

This Court has found that an agency's recommendation that "is critical to the decision making process" of a third-party is sufficient to establish standing. *See S. Utah Wilderness Alliance v. Office of Surface Mining Reclamation and Enforcement*, 620 F.3d 1227, 1235 (10th Cir. 2010). In *SUWA*, the Court was confronted with a challenge to a mining plan recommendation by the Office of Surface Mining's ("OSM"), which was merely to be considered by—but not

binding upon—the Secretary of the Interior. *Id.* at 1234. While the Court could not order the Secretary as to how to decide the issue, the environmental petitioners still established standing because "[a] recommendation from OSM, while not binding on the Secretary, is critical to the decision making process." *Id.* at 1235. Similarly, a ruling by this Court finding EPA's SIP Call to be unlawful would be critical to Utah's decision as to whether to revise the UBR.

The D.C. Circuit's decision in *National Parks Conservation Association v. Manson*, 414 F.3d 1 (D.C. Cir. 2005), is instructive as to this point. In *NPCA*, the court considered a challenge, brought under the CAA, against the Interior Department's determination that a proposed power plant would not adversely impact Yellowstone National Park and a nearby wilderness area. *Id.* at 3-4. Under CAA section 165, 42 U.S.C. § 7475, federal land managers are required to advise states as to whether a permit will cause adverse impacts on the air quality in protected areas. *Id.* at 3. Ultimately, the agency challenged the environmental appellants' standing, in part, on the basis that appellants could not establish redressability because the final decision of whether to issue the permit lied with the state, not the Interior Department. *Id.* at 6-7. The court, nonetheless, found that petitioners had shown redressability.

> A district court order setting aside Interior's letter withdrawing its adverse impact determination doubtless would *significantly affect these ongoing proceedings*.

*Id.* at 7.  As the decisions in *SUWA* and *NPCA* demonstrate, USM's standing is not eliminated by the mere fact that—up to this point—Utah has opted to revise the UBR.  Rather, the Court must consider the influence EPA's rulemaking had on UDAQ.  Indeed, EPA's SIP Call contains a stronger connection between the action challenged and the conduct of a third-party than that presented in either *NPCA* or *SUWA*, as EPA's SIP Call orders UDAQ to take specific action, as opposed to merely providing a recommendation.

EPA's SIP Call directs Utah to either revise the UBR to follow one of EPA's preferred malfunction rules or remove the UBR from the SIP entirely.  76 Fed. Reg. 21639, 21640/3 (April 18, 2011).  Moreover, EPA threatened to impose significant sanctions upon Utah if it did not follow EPA's directive.  *Id.*  Utah opposed the SIP Call; in its comments to EPA's proposed SIP Call, UDAQ called EPA's reasoning "hasty, unwarranted and without adequate legal foundation." Letter from UDAQ to Callie A. Videtich, Director of EPA's Region 8 Air Program, dated Dec. 28, 2010, docket number -0084, JA 168 ("UDAQ Comments).  Today, UDAQ still maintains that EPA's SIP Call was promulgated "without legal foundation and pursuant to misinterpretation of the UBR."  Bird Declaration, ¶ 16; *see also* Resp. Br., addendum, E-mail message from Dave McNeill, UDAQ, to Monica S. Morales, Unit Chief, Air Quality Planning Unit,

EPA Region 8 (June 15, 2011) (stating the UDAQ decided against appealing the rulemaking for various policy reasons).

Moreover, UDAQ is aware of this appeal and has explained "if this Court were to invalidate EPA's SIP Call, there would be no need for UDAQ to revise the UBR and the existing UBR could be left in place." Bird Declaration, ¶¶ 19-20. This statement confirms that EPA's SIP Call is the reason that UDAQ has decided to revise the UBR, a process that is not yet complete. And it is reasonable to conclude that if the mechanism forcing UDAQ action is removed, it is very likely that UDAQ will leave the UBR in place. As such USM has satisfied the redressability requirement.

## II.   EPA'S SIP CALL IS ARBITRARY BECAUSE EPA FAILED TO DEMONSTRATE THAT THE UBR IS SUBSTANTIALLY INADEQUATE

When EPA believes that a previously-approved SIP must be revised or amended, EPA must proceed through section 110(k)(5). 42 U. S. C. § 7410(k)(5). Section 110(k)(5) imposes a unique burden upon EPA before the agency issues a SIP call. Specifically, EPA must demonstrate that the SIP "*is substantially inadequate*" to attain or maintain the NAAQS or otherwise comply with the CAA before it may issue a SIP call. USM argued what this standard requires in its opening brief and will not intend to re-argue this issue here. *See* Pet. Br., Part I.A. (discussing the plain language of section 110(k)(5), its relation to other CAA

provisions, the legislative history underlying the CAA, and federal jurisprudence illuminating the burden imposed on EPA). But USM is compelled to provide a reply to EPA's attempt to minimize its burden, thereby avoiding its obligation to provide any factual data on the use of the UBR, its impact on ambient air, and any genuine analysis of the UBR's interplay with the CAA.[1]

A.     **EPA Must Demonstrate a SIP *Is Substantially Inadequate* Before it May Call for Revisions**

Throughout the rulemaking underlying this appeal, EPA has attempted to minimize the burden that Congress set when it authorized EPA to issue a SIP Call. And in its Response brief, EPA continues to attempt to reduce that burden to the point that the phrase "is substantially inadequate" is all but excised from section 110(k)(5).

EPA states that Congress provided "EPA with the discretion to determine when and under what circumstances a previously-approved SIP is substantially

---

[1] USM does not, as EPA suggests, concur with "EPA's long-standing interpretation of the CAA with respect to unavoidable breakdowns." Resp. Br. 23. EPA asserts that *Arizona Pub. Serv. Co. v. EPA* all but settles the "reasonableness" of EPA's interpretation. *Id.* But *Arizona* was a case that involved the reasonableness of EPA's decisionmaking in fashioning a Federal Implementation Plan ("FIP") in the first instance. *See* Pet. Br. 20, n.5. This is an important and materially different procedural context from that presented in the instant case. If anything, the reasoning in *Arizona* is supportive of the ongoing validity of the UBR. In *Arizona*, EPA, in establishing a FIP, occupied the role typically held by a state. In that role, EPA was accorded discretion by this court in fashioning an implementation plan. In contrast, the present case involves one which Utah has a valid, EPA-approved SIP that presently includes the UBR. EPA has taken the extraordinary action of seeking to reverse this longstanding SIP provision.

inadequate." Resp. Br. 25. USM does not contest this statement. But EPA goes on to equate the standard as authorizing EPA "to make a judgment call" as to the adequacy of a SIP without any regard to what consequences the offending inadequacy has on air quality. Resp. Br. 38. In other words, EPA reads section 110(k)(5) as vesting it with the authority to arbitrarily demand a state to revise a SIP without it having to offer any—never mind substantial—evidence to support its conclusion.

But EPA's authority to call for revisions to a previously-approved SIP is drawn narrowly. Section 110(k)(5) states that:

> Whenever the Administrator finds that the applicable [SIP] for any area *is substantially inadequate* to attain or maintain the relevant [NAAQS], to mitigate adequately the interstate pollutant transport described in [the CAA], or to otherwise comply with any requirement of this chapter, the Administrator shall require the State to revise the plan as necessary to correct such inadequacies.

42 U.S.C. 7410(k)(5) (emphasis added). Section 110(k)(5) authorizes EPA to call for SIP revision in three specific circumstances. Moreover, section 110(k)(5) permits EPA to call for revisions only after finding that the SIP "is substantially inadequate." This phrase must have some meaning. Yet, EPA's conduct in issuing the UBR SIP Call, and contesting USM's challenge in this appeal, demonstrates that EPA prefers to leave the phrase as an ambiguous term that EPA can arbitrarily manipulate to demand revisions from states. EPA cannot "assume that the

inclusion of these 'magic words' . . . will be sufficient to sustain" its conclusion. *W.R. Grace & Co. v. EPA*, 261 F.3d 330, 340 n.3 (3d Cir. 2001).[2]

**B.    EPA Did Not Support its Finding that the Utah SIP was Substantially Inadequate to Attain or Maintain the NAAQS**

Section 110(k)(5) permits EPA to issue a SIP call when the SIP is substantially inadequate to attain or maintain the NAAQS. 42 U.S.C. § 7410(k)(5). In the UBR SIP Call, EPA determined that it had no obligation to examine how the UBR had been applied over the past 32 years and that application's effect on ambient air before concluding Utah's SIP cannot attain or maintain the NAAQS. 76 Fed. Reg. at 21643/1. This conclusion is arbitrary because it fails to (1) account for the reality that unavoidable breakdowns will occur regardless of whether Utah revises the UBR to conform to EPA's preferred rule and (2) consider how the UBR has been applied by Utah.

---

[2] A D.C. Circuit decision examining EPA's credible evidence rule suggests EPA has a heightened burden to explain what has changed to make a SIP substantially inadequate. While the action challenged in *Clean Air Implementation Project v. EPA* was not a SIP call *per se*, the court still questioned EPA's reasoning.

> If state plans approved by EPA met the enforceability requirement prior to EPA's adoption of the credible evidence rule, one may wonder why the state plans have now become "unenforceable" to the extent they do not permit the use of credible evidence.

150 F.3d 1200, 1207 (D.C. Cir. 1998). Similarly, one must wonder how the previously-approved UBR has now, approximately 30 years later, become substantially inadequate.

1.    **EPA's conclusion fails to account for the fact that excess emissions falling within the scope of the UBR are unavoidable**

EPA believes that the UBR must be revised because Utah cannot attain or maintain the NAAQS so long as the current version of the UBR remains in Utah's SIP. This is so, according to EPA, because the UBR "undercuts" Utah's ability to attain and maintain the NAAQS since it "exempts" sources from complying with emission limitations during unavoidable breakdowns.[3] Resp. Br. 26. In other words, EPA believes that the excess emissions caused by unavoidable breakdowns will somehow cease to occur, thereby ensuring compliance with the NAAQS, if the UBR is removed from the SIP and replaced with one of EPA's preferred malfunction rules.

In fact, the UBR, while not identical, is consistent with EPA's preferred breakdown rules. By definition, excess emissions originating from a breakdown that meets the criteria of the UBR and EPA's affirmative defense provision are "unavoidable." An unavoidable breakdown under the UBR is one that is not caused by "poor maintenance, careless operation, or *any other preventable* upset

---

[3] The UBR does not provide an exemption from emission limitations. The rule merely addresses how UDAQ will treat emissions occurring during an unpreventable breakdown event. The rule does not apply to incidents "that are caused entirely or in part by poor maintenance, careless operation, or any other preventable upset condition or preventable breakdown." Utah Admin. Code R. 307-107-1. Furthermore, the UBR requires that a source do everything possible to comply with emission limitations during a breakdown incident, including curtailment of operations. *Id.* R. 307-107-4.

condition or *preventable* equipment breakdown." Utah Admin. Code R. 307-107-1 (emphasis added). Similarly, a breakdown qualifying as an affirmative defense under EPA's policy is one that (1) was not "caused by a sudden, unavoidable breakdown of technology, beyond the control of the owner or operator," and (2) the excess emissions "did not stem from any activity or event that could have been foreseen and avoided, or planned for" and "could not have been avoided by better operation and maintenance practices." 1999 Policy Memorandum, attachment, 3.[4] Both measures only apply to unpreventable or unavoidable malfunctions. Both measures recognize that excess emissions will occur despite the proper maintenance and operation of the facility. But EPA never reconciles the reality that excess emissions due to *unavoidable* breakdowns will occur regardless of which measure is in place. Accordingly, EPA lacks basis to conclude that eliminating the UBR will have any impact on the attainment or nonattainment status of air quality in Utah.

   **2.    EPA failed to examine how the UBR had been applied in the past 32 years and how that application impacted Utah's ambient air**

   Without considering how the UBR had been applied over the past three decades and what actual affect the UBR had on ambient air, EPA did not examine

---

[4] A complete side-by-side comparison of the two rules is contained in USM's comments to EPA's proposed SIP Call. Letter Re: Proposed Rule Finding of Substantial Inadequacy of Implementation Plan, dated Dec. 30, 2010, docket number -0091, 5-7, JA 179-81.

the data relevant to its conclusion that the SIP was substantially inadequate to attain the NAAQS. In reaching its conclusion regarding the interplay between the UBR and the NAAQS, EPA argued the issue in the alternative in the final SIP Call: (1) it claims that it had no obligation to examine any factual connection between the UBR and Utah's ambient air; and (2) but then it asserts, that if it must satisfy a factual burden, it included sufficient factual data supporting its SIP Call. 76 Fed. Reg. at 21643/1-2.[5]

In every rulemaking, EPA is obligated to "examine[] the relevant data and articulate[] a rational connection between the facts found and the decision made." *Citizens' Comm. to Save Our Canyons v. Kruegar*, 513 F.3d 1169, 1176 (10th Cir. 2008) (internal quotation marks omitted); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856 (1983) (stating the same). The effect that a so-called substantially-inadequate-SIP has on the ambient air is not merely relevant information on EPA's conclusion that the Utah SIP is substantially inadequate to attain or maintain the NAAQS, but it is critical data that

---

[5] EPA interpreted USM's argument that it must support *this* SIP Call with evidence connecting breakdown events covered by the UBR with violations of the NAAQS, as a contention that EPA must in *all* SIP calls link the violative provisions of a SIP with actual violations of the NAAQS. Resp. Br. 45. This has never been USM's argument. To do so would ignore the plain language of section 110(k)(5). But in certain circumstances—particularly where EPA is calling a SIP because it is substantially inadequate to attain or maintain the NAAQS—EPA cannot issue a SIP call without examining how the presumably offensive provisions impact air quality.

goes to the core of the SIP Call. So too is an evaluation of how the UBR has actually been used and applied in the past 32 years.[6]

Without evaluating the in-the-air impact that the UBR has on the NAAQS or how and when the UBR has actually been used in the past, EPA has not examined the relevant data that ties the UBR to attainment or maintenance of the NAAQS.[7] Moreover, an examination of the facts that EPA considered carries EPA's

---

[6] USM previously pointed to the decision in *Commonwealth of Virginia v. EPA*, 108 F.3d 1397 (D.C. Cir. 1997), as supporting this argument. This decision is instructive because the court invalidated a multi-state SIP call after determining the modeling supporting the call could not stand without the data from one of the jurisdictions subject to the call. Rather than facing the holding in this decision, EPA merely argues that decision has no influence on the analysis of EPA's SIP Call to UDAQ because USM argued that EPA must support *all* SIP calls with actual violations of the NAAQS. Resp. Br. 45.

[7] The same logic holds true for EPA's contention that the UBR is violative of the Prevention of Significant Deterioration ("PSD") program. The PSD program, 42 U.S.C. §§ 7470-7479, is intended to maintain good air quality in areas that already meet the NAAQS and to protect air quality in national parks and wilderness areas. 42 U.S.C. 7470(2); *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 567-68, 127 S.Ct. 1423 (2007). Like the NAAQS, the PSD program is based upon ambient air quality. Indeed, the very policy interpretations that EPA relied upon in its final rule as establishing an EPA policy against allowing exemptions like the UBR to apply to the PSD program, treats the PSD program as an "ambient-based" program similar to a SIP. Memorandum from John B. Rasnic to Linda M. Murphy regarding Automatic or Blanket Exemptions for Excess Emissions During Startup and Shutdowns under PSD (Jan. 28, 1993), 1 (hereinafter the "Rasnic Memorandum"). Moreover, the Rasnic Memorandum relies on the same policy memoranda at issue in this appeal.

EPA refused to look at the in-the-air impacts that the UBR has on the national parks, national wilderness areas, and other pristine areas found within Utah. Instead, EPA merely cites to policy interpretations followed by conclusory statements that the UBR must violate the PSD program. 75 Fed Reg. at 70892/2-3; 76 Fed. Reg. at 21643/3; Resp. Br. 29.

13

conclusion no further. EPA added data to its final rule in an effort to show that breakdowns can cause excess emissions. Resp. Br. 31-32, 46. However, USM has never contended that unavoidable breakdown events do not lead to excess emissions. To the contrary, USM has recognized that, notwithstanding that a facility is well-designed, -operated, and -maintained, there remains some potential for unavoidable breakdowns that may result in excess emissions regardless of whether the Utah SIP contains the UBR or EPA's preferred rule. What USM, and others, have argued is that before EPA may conclude that the UBR renders the Utah SIP substantially inadequate, EPA must explain how the UBR has been applied such that that application has adversely affected Utah's ambient air quality.[8] EPA has made no attempt to do so.

EPA's failure is on full display when it calls the Court's attention to ambient air quality monitoring data that indicates several NAAQS exceedances over a five

---

[8] The UDAQ's comments are particularly insightful in this regard.

> EPA has failed to substantiate, provide data, or to give the State adequate notice, why the State's long-established rule is now inadequate to meet the [NAAQS] . . . . Nowhere in the Notice is there any discussion that, during its 32-year existence, Utah's unavoidable breakdown rule was responsible for a violation of the NAAQS. EPA cannot make that finding because such is not the case.

UDEQ Comment, 2, JA 169. EPA's final rule states that this comment is "ambiguous" and that the commenter provided not data supporting its claim. 76 Fed. Reg. at 21646/1. In other words, rather than examining the data itself to determine if excess emissions under the UBR have led to NAAQS violations, EPA attempts to shift the burden to commenters to disprove EPA's unsupported conclusion.

year period. Resp. Br. 46, n.18. According to EPA, because there were exceedances, "it is therefore reasonable to conclude that excess emissions during malfunction events have contributed, or have the potential to contribute in the future, to nonattainment of the NAAQS." *Id.* EPA does not, however, point to a single breakdown incident as being associated with the NAAQS exceedances. Nor does EPA identify a single instance where it disagreed with UDAQ's application of the federally-approved UBR or explain how the application of its policy would result in a different outcome.

Rather than doing so, EPA slapped together a few citations in its final SIP Call—in a weak attempt to play both sides of the evidentiary issue—that does not support its ultimate conclusion.[9] EPA did not examine the relevant facts, which in this SIP Call includes the actual use of the UBR and its effect on the NAAQS. Accordingly, EPA's action was arbitrary.

## C. EPA Did Not Support its Finding that the Utah SIP is Substantially Inadequate to Otherwise Comply with the CAA

EPA also called for revisions to the UBR based upon a conclusion that the Utah SIP is substantially inadequate to otherwise comply with the CAA. 76 Fed. Reg. at 21641/2-3. EPA's argument here can be divided into two contentions: (1) the UBR inappropriately applies to the technology-based standards adopted by

---

[9] As US Magnesium pointed out in its opening brief, the only data EPA included about a breakdown event—the Holly Refinery data—did not lead to a NAAQS exceedance. Pet. Br. 29-31.

EPA under the New Source Performance Standards ("NSPS") and National Emissions Standard for Hazardous Air Pollutants ("NESHAPS") programs; and (2) the UBR might improperly bar enforcement action by citizens and EPA by vesting the state with exclusive authority to judge if a breakdown event falls within the scope of the UBR (or at least a court might find as such, which causes EPA concern). 76 Fed. Reg. at 21641/2-3; Resp. Br. 33-35.

>    **1.    EPA failed to justify its conclusion that the UBR is substantially inadequate to comply with the NSPS and NESHAP programs**

In its final rule, EPA concluded that the UBR is substantially inadequate because it supersedes the emission limitations found in EPA's NSPS and NESHAP programs. But this conclusion is unsupported, and contradicted by EPA's own statements and the UBR. In determining that the UBR is written to trump the NSPS and NESHAP programs, EPA does not point to any assertions by UDAQ that the UBR applies to otherwise more specific provisions of the NSPS and NESHAP programs. Nor does EPA identify a single instance where UDAQ has applied the UBR to either NSPS or NESHAP limitations or where UDAQ has made such application in a manner that was inconsistent with NSPS or NESHAP requirements. Rather, EPA's entire argument as to the UBR's interplay with the regulations established under the NSPS and NESHAP is:

>    To the extent any exemption from the NSPS or NESHAPS are warranted, the Federal standards

contained in EPA's regulations already specify the appropriate exemption. See, *e.g.*, 40 CFR 60.48Da(c). No additional exemptions or criteria are warranted or appropriate. See, *e.g.*, 40 CFR 60.10(a); 40 CFR 63.12(a)(10; and the 1999 Policy, Attachment, at 3.

76 Fed. Reg. at 21643/3 (internal footnotes omitted). EPA's justification is insufficient to sustain EPA's conclusion that the Utah SIP is substantially inadequate.

EPA's conclusion is in conflict with EPA's previous statements relating to the interplay between the NSPS and NESHAP regulations in the Utah SIP. For instance, when EPA delegated administration of the NSPS program to Utah, EPA stated:

> [I]f at any time there is a conflict between a State and Federal NSPS regulation, the Federal regulation must be applied if it is more stringent than that of the State.

67 Fed. Reg. 58998, 58999/1 (Sept. 19, 2002); *see also* 72 Fed. Reg. 4641, 4643/1 (Feb. 1, 2007) (stating the same). In making this statement, EPA left no ambiguity as to how it believed Utah ought to proceed should the SIP conflict with federal regulations. Neither Utah nor USM have argued otherwise. Therefore, even if EPA's premise were true—i.e., that the UBR provides a broader malfunction provision than those found in the NSPS and NESHAP programs—Utah's SIP still is not substantially inadequate because EPA believes federal malfunction regulations take precedence over the UBR.

Moreover, EPA has argued that the UBR's allowance that "emissions resulting from an unavoidable breakdown will not be deemed a violation of *these regulations*" "include[es] the federal technology-based NSPS and NESHAPS, for which the State has delegated authority." Resp. Br. 33-35; 75 Fed. Reg. at 70892/1-2. In fact, however, the UBR explicitly states that "[o]ther provisions of [these regulations] may require more stringent controls than listed herein, in which case those requirements must be met." Utah Admin. Code R. 307-107-6. This provision is exactly consistent with the statements made by EPA—recognizing the supremacy of the federal standards over otherwise inconsistent state regulation—when delegating administration of federal NSPS standards to Utah.

Furthermore, an examination of the authority that EPA relies upon for its conclusion reveals that EPA's argument is meritless. In particular, EPA cited to the general provisions governing the NSPS and NESHAP programs (40 CFR §§ 60.10 & 63.12) as prohibiting exemptions in addition to federal regulations for the two programs. 76 Fed. Reg. at 21643/3; Resp. Br. 33 & 57. But these regulations merely preclude states from "[a]dopting and enforcing any emission standard or limitation" that is "less stringent than" than the regulations EPA adopted for the

NSPS and NESHAP programs. 40 CFR §§ 60.10(a) & 63.12(a). Utah has not

adopted emission standards less stringent than the NSPS or NESHAP programs.[10]

In every rulemaking, EPA must "examine the relevant data and articulate a

satisfactory explanation for its action." *State Farm*, 463 U.S. at 43. Furthermore,

a "conclusory statement, of course, does not in itself provide the 'satisfactory

explanation' required in rulemaking." *Int'l Fabricare Inst. v. EPA*, 972 F.2d 384,

392 (D.C. Cir. 1992) (quoting *State Farm*, 463 U.S. at 43); *see also Owner-*

*Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 656 F.3d 580,

588 (7th Cir. 2011) (stating that an agency's "explanation may not be superficial or

perfunctory" but must provide a cogent explanation as to why it exercised

discretion to ensure "that the decision was the product of 'reasoned

decisionmaking'" (quoting *State Farm*, 463 U.S. at 52)). Ultimately, when EPA

concluded that the UBR conflicts with the NSPS and NESHAP programs to such a

degree that it must be removed from the Utah SIP, EPA did exactly what this

standard prohibits; EPA reached its conclusion without examining whether the

---

[10] EPA attempts to rebut USM's argument that the UBR and EPA's own
malfunction rules are substantially similar, Pet. Br. Part IV.C, by stating that EPA
no longer believes malfunction provisions are appropriate for NSPS. Resp. Br. 57,
n.20. EPA supports this claim by citing to recent revisions of two NSPS, neither of
which state that EPA has determined that *all* malfunction provision for NSPS must
be revised. Indeed, in one of these revisions, EPA preserves its authority to
provide a malfunction exemption. 76 Fed. Reg. 63878, 63991/1 (Oct. 14, 2011)
(citing to the NSPS's general malfunction provision and stating that it "may be
amended for individual subparts").

UBR and the federal regulations truly conflict and what the outcome of that conflict might be in some future dispute. Without doing so, EPA's conclusion is arbitrary.

> **2.  EPA's conclusion that the UBR "appears" to vest Utah with exclusive authority to enforce against violations is inconsistent with EPA's prior positions and fails to justify the SIP Call**

EPA's final justification for issuing its SIP Call is that EPA now interprets the UBR as *appearing* to exclude enforcement by EPA and citizens. 76 Fed. Reg. at 21641/3. But EPA did not provide an analysis that shows its conclusion to be the product of reasoned decisionmaking. Indeed, as it did throughout the SIP Call, EPA reached its determination on this issue through a conclusory statement that is not supported by any genuine analysis of the issue.

In concluding that the Utah SIP is substantially inadequate due to its effect on federal and citizen enforcement, EPA stated that the UBR "appears to give" UDAQ "exclusive authority to determine whether excess emissions constitute a violation" because a "court could" interpret the UBR as undermining its ability to bring an enforcement action for excess emissions related to a malfunction. 76 Fed. Reg. 21641/3. In other words, EPA believes the substantially-inadequate standard is met whenever EPA points to any ambiguity in a SIP that a court *might* interpret contrary to EPA's view. But section 110(k)(5) requires EPA to determine a SIP "*is* substantially inadequate," not that its view of the SIP may be judicial invalidated.

Moreover, EPA's "appears-to-give" basis has permitted EPA to avoid stating whether it believes that the UBR in reality bars it from bringing an enforcement action. EPA wants to use the ambiguity here—if any exists—as a basis for this SIP Call without conceding that it cannot bring an enforcement action in the face of the UBR. EPA's unwillingness to stake out its true position left the SIP Call bare of any genuine analysis of this issue. For instance, EPA did not engage in the necessary statutory interpretation comparing the purported offensive language of Utah Administrative Code Rule 307-107-2 with CAA sections 113 or 304. 42 U.S.C. §§ 7413 (providing for federal enforcement), 7604 (providing for citizen suits). Indeed, nothing in the UBR purports to curtail such enforcement authority. Additionally, EPA did not analyze whether the CAA allows EPA to "overfile" regardless of what action the state has taken or what the UBR states. *United States v. LTV Steel Co.*, 118 F. Supp.2d 827, 832-835 (N.D. Ohio 2000).[11] EPA did not provide any interpretation of what it meant when EPA stated that "exemptions granted under [the UBR] may not be approved by the EPA" when it approved the Utah SIP in 1980. 45 Fed. Reg. 10761, 10763/3 (Feb. 19, 1980); *see*

---

[11] EPA does acknowledge that it brought an enforcement action against the Phillips Petroleum Company ("Phillips") in the late 1990s. Pet. Br. 55-56. EPA does not state whether it believes that action was valid in light of the UBR; EPA only states that because Phillips took a particular position in that litigation, Utah's SIP is substantially inadequate. Stated differently, EPA believes that a SIP call is warranted any time a litigant takes a position that is adverse to EPA's interpretation of the law.

*also* 44 Fed Reg. 28688, 28691/3 (proposed May 16, 1979) (stating that "EPA reserves the right to enforce against any excess emissions"). Instead, EPA's rejoinder to this statement is that it is now unclear *how* EPA reached this conclusion. Resp. Br. 55. This does not make the Utah SIP substantially inadequate, nor does it answer whether the UBR bars EPA enforcement.

By refusing to stake out its position as to the UBR's impact on federal and citizen enforcement, EPA asks this Court to validate the SIP Call in the abstract. *See Norvell v. Sangre de Cristo Dev. Co.*, 519 F.2d 370, 375 (10th Cir. 1975) ("It is fundamental that federal courts do not render advisory opinions and that they are limited to deciding issues in actual cases and controversies."). Federal jurisprudence and the CAA's rulemaking procedures require more of EPA. EPA is not permitted to promulgate rules through conclusory, superficial analysis that does not provide a cogent explanation that ensures EPA engaged in reasoned decisionmaking.

## CONCLUSION

For the forgoing reasons, USM requests that the Court vacate EPA's final rule calling on Utah to revise or remove the UBR from the Utah SIP.

Respectfully submitted,

MICHAEL A. ZODY
Parsons Behle & Latimer

/s/ Michael A. Zody
_____

Michael A. Zody
Michael J. Tomko
Jacob A. Santini
PARSONS BEHLE & LATIMER
201 S. Main Street, Suite 1800
Salt Lake City, UT 84111
(801) 532-1234

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)

USM's Reply complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B)(ii) because this reply contains 6,964 words, excluding parts of the brief

exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

/s/ Michael A. Zody

Michael A. Zody
Michael J. Tomko
Jacob A. Santini
PARSONS BEHLE & LATIMER
201 S. Main Street, Suite 1800
Salt Lake City, UT 84111
(801) 532-1234

*Attorneys for Petitioner US Magnesium, LLC*

## CERTIFICATION OF DIGITAL SUBMISSION

In accordance with the Tenth Circuit Court of Appeal's CM/ECF User's Manual, it is hereby certified that: (1) no privacy redactions were required for this document, (2) the hard copies required to be submitted to the Clerk's Office are exact copies of the ECF filing, and (3) the digital copy of this document has been scanned for viruses Mircrosoft Forefront Security, which was last updated on January 24, 2012, and, according to the program, is free of viruses.

/s/ Michael A. Zody
Michael A. Zody
Michael J. Tomko
Jacob A. Santini
PARSONS BEHLE & LATIMER
201 S. Main Street, Suite 1800
Salt Lake City, UT 84111
(801) 532-1234

*Attorneys for Petitioner US Magnesium, LLC*

## CERTIFICATE OF SERVICE

It is hereby certified that on this 30th day of January, 2012, I have served the foregoing Petitioner's Final Reply Brief on all registered counsel through the Court's CM/ECF filing system and via First-Class Mail addressed to:

David A. Carson
United States Department of Justice
Environmental & Natural Resources
Division
999 18th Street
South Terrace, Suite 370
Denver, Co. 80202

Lisa Jackson
Environmental Protection Agency
1200 Pennsylvania Ave. NW
Washington, DC 20460-0000

Eric H. Holder, Jr.
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530


/s/ Michael A. Zody
Michael A. Zody
Michael J. Tomko
Jacob A. Santini
PARSONS BEHLE & LATIMER
201 S. Main Street, Suite 1800
Salt Lake City, UT 84111
(801) 532-1234

*Attorneys for Petitioner US Magnesium, LLC*

ATTACHMENT

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

Case No. 11-9533

US MAGNESIUM LLC,

*Petitioner,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondent.*

On Petition for Review of Final Action of the
U.S. Environmental Protection Agency

## DECLARATION OF BRYCE C. BIRD

I, Bryce C. Bird, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct:

1.     I am over the age of 18, have personal knowledge regarding the facts stated herein, and if asked I would testify according to the facts below.

2.     I have been employed by the Utah Division of Air Quality ("UDAQ") for the past 20 years. I am currently the Director of the UDAQ.

3.     The Utah Unavoidable Breakdown Rule ("UBR"), which is codified as Rule 307-107-1 to -6 of the Utah Administrative Code, is a rule adopted by the Utah Air Quality Board and approved by EPA as part of the federally-approved SIP.

4.     The Environmental Protection Agency ("EPA") published a proposed rule on November 19, 2010, that proposed to require that Utah revise the UBR because EPA alleged the UBR rendered Utah's State Implementation Plan ("SIP") substantially inadequate to attain or maintain the National Ambient Air Quality Standards ("NAAQS") or to otherwise comply with the Clean Air Act. EPA's action is commonly known as a "SIP Call" and was done pursuant to sections 110(a)(2)(H) and 110(k)(5) of the Clean Air Act.

5.     UDAQ provided comments to EPA's proposed SIP Call in which UDAQ opposed EPA's proposed SIP Call.

6.     UDAQ commented that EPA's proposed SIP Call was done (1) without an adequate legal basis, (2) was pursuant to an inadequate analysis of the UBR, and (3) the sanctions that EPA proposed in its proposed SIP Call were unwarranted.

7.     Specifically, UDAQ identified EPA's proposed SIP Call as "hasty, unwarranted and without adequate legal foundation."

8.    As to UDAQ's comments regarding the legal basis for EPA's proposed SIP Call,

UDAQ stated:

> EPA has failed to substantiate, provide data, or to give the State adequate
> notice, why the State's long-established rule is now inadequate to meet the
> national ambient air quality standards (NAAQS) or otherwise comply with
> the Clean Air Act. Nowhere in the Notice is there any discussion that,
> during its 32-year existence, Utah's unavoidable breakdown rule was
> responsible for a violation of the NAAQS. EPA cannot make that finding
> because such is not the case.

9.    Furthermore, in commenting on EPA's interpretation of the UBR, UDAQ

highlighted EPA's apparent reversal in its interpretation of the effect of the UBR, that an

exemption granted by the state would not apply as a matter of federal law:

> EPA has changed its position with respect to whether the Executive
> Secretary of the Utah Air Quality Board has discretion to determine
> whether emissions from a breakdown are subject to enforcement action.
> In 1980, EPA approved Utah's breakdown rule, finding that EPA might
> not approve exemptions granted by the State and that the State's
> exemption would not apply as a matter of federal law. Now, in 2010, EPA
> is re-thinking its 1980 position . . .

10.    As to the sanctions that EPA proposed in its proposed SIP Call, UDAQ stated:

> Imposition of sanctions is also unwarranted because Utah has always
> acted in good faith to involve all stakeholders (including EPA) in an
> attempt to craft a clarified rule, and because Utah has successfully
> implemented the EPA-approved unavoidable breakdown rule for 32 years.
> In the 32 years of its existence, use of the unavoidable breakdown rule has
> never contributed to a NAAQS exceedance. Further, UDAQ empirical
> monitoring conducted for the last 32 years shows evidence that the Utah
> SIP strategy has been successful in bringing areas into attainment. In the
> absence of any evidence that the unavoidable breakdown rule does
> anything but support SIP implementation, these facts only reinforce
> UDAQ's position that mandatory sanctions would not only be excessive,
> but also be beyond EPA's current application of its Clean Air Act
> authority.

11.    Despite UDAQ's opposition to the SIP Call, EPA proceeded with the SIP Call by

issuing a final rule calling for revisions to the UBR on April 18, 2011.

12.     In issuing the SIP Call, EPA determined that the UBR rendered the Utah SIP substantially inadequate to attain or maintain the NAAQS or to otherwise comply with the CAA.

13.     EPA's final rule requires UDAQ to remove the UBR from the Utah SIP or revise it to comply with EPA's previously issued policy memoranda regarding startup, shutdown, and malfunction provisions contained in SIPs.

14.     In its SIP Call, EPA stated that it will replace the Utah SIP with a Federal Implementation Plan promulgated by EPA if Utah fails to remove or revise the UBR within eighteen months.

15.     EPA also stated that it will impose sanctions upon the State of Utah if the UDAQ fails to remove or revise the UBR within eighteen and twenty-four months of the issuance of EPA's SIP Call.   Specifically, EPA stated that it will impose a 2-to-1 emission offset requirement for all new and modified major sources subject to the New Source Review program and impose restrictions on highway funding if Utah fails to remove or revise the UBR within the time periods set out in EPA's SIP Call.

16.     UDAQ has maintained its position that EPA promulgated the SIP Call without legal foundation and pursuant to misinterpretation of the UBR.

17.     UDAQ decided against filing a judicial challenge to EPA's SIP Call because such a challenge would be disruptive, would drain UDAQ's limited resources, and the potential for sanctions would have a negative effect on communities within Utah.

18.     Accordingly, UDAQ began the process of revising the UBR in accord with EPA's SIP Call through Utah's rulemaking procedures.

19.     UDAQ is aware that U.S. Magnesium LLC challenged EPA's SIP Call with the Tenth Circuit Court of Appeals.

20.    As stated previously, UDAQ maintains its belief that EPA mandated that Utah revise or remove the UBR from the Utah SIP without adequate legal foundation and pursuant to a misinterpretation of the UBR.  Accordingly, if this Court were to invalidate EPA's SIP Call, there would be no need for UDAQ to revise the UBR and the existing UBR could be left in place.


EXECUTED this _9th_ day of January, 2012.


_____
Bryce C. Bird